Dean T. Kirby, Jr.    (SBN 090114)
Roberta S. Robinson (SBN 99035)
**KIRBY & McGUINN, A P.C.**
707 Broadway, Suite 1750
San Diego, California 92101
Telephone:  (619) 398-3358
Facsimile:  (619) 398-3359

Attorneys for Trustee, Leonard J. Ackerman

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>HYPERIKON, INC.<br><br>               Debtor | Bankruptcy Case No. 21-01776-LT-7<br><br>DECLARATION OF LEONARD J. ACKERMAN, TRUSTEE'S IN SUPPORT OF HIS MOTION FOR AN ORDER AUTHORIZING REJECTION OF CERTAIN UNEXPIRED NON-RESIDENTIAL LEASES AND PURPORTED EXECUTORY CONTRACTS AND ABANDONING PROPERTY OF NEGLIBLE VALUE AND/OR BURDENSOME TO THE BANKRUPTCY ESTATE<br>Date: August 4, 2021<br>Time: 2:00 p.m.<br>Dept: 3/Room 129<br>Judge: Laura Taylor |

I, Leonard J. Ackerman, declare:

---

Trustee's Dec Re Rejection of Leases, etc.        Bankruptcy Case No. 21-01776-LT-7

1.I am the duly appointed Chapter 7 Trustee in the above-entitled matter. The following is true of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2. Attached hereto as Exibits A through E, respectively, are copies of the following leases, subleases or contracts, provided to me by either the Debtor or third parties, in connection with this case.

i) With respect to the property commonly known as **4850 S. Indianapolis Road**, Whitestone, Indiana:

> a) Lease between Indiana Becknell Investors 2011, LLC, as lessor, on the one hand, and the Debtor, as lessee, on the other hand, dated August 1, 2017, (Exhibit A), and which apparently assigned, via an Assignment and Assumption of Leases to SREIT 4820 Indianapolis Drive, LLC, (Exhibit B),
>
> b) Sublease between the Debtor, as sublessor, on the one hand, and HomeGoods, Inc., as sublessee on the other hand, dated November 2, 2020, (Exhibit C).

ii) With respect to the property commonly known as **8515 Miramar Place**, San Diego, California:

> a) AIR COMMERCIAL REAL ESTATE ASSOCIATON STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE-NET, dated

August 12, 2016 between MGM Partnership, as Lessor, on the one hand, and

the Debtor, Lessee, on the other hand, (Exhbit D), and

b) AIRCR Standard Sublease between the Debtor, as Sublessor, on the one

hand, and Crest Beverage, LLC, on the other hand. (Exhibit E).

3. With respect to the property commonly known as 4850 Indianapolis Road,

Whitestone, Indiana, the monthly base rent under the lease is currently $46,360

(Exhbit B to Exhibit A), and is scheduled to rise to $47,246.67 per month on

March 1, 2022. (Id.). Additional rent,  (Exhibit A, ¶ 7), consisting of common area

rent and other charges, is believed to be approximately $11,009.98 per month. Per

the lease, the Debtor paid a $47,073.59 security deposit in connection with the

lease. [Exhibit A, ¶ 4 (c )]. The lease term expires on  January 31, 2023. (Exhibit

A, ¶ 3). As of the date of the filing of the petition, the rent apparently was in

arrears in the amount of $66,297.87. (Exhibit 1 to Doc. 31).

Minimum Rent under the sublease is $775,200 annually, (Exhibit C, ¶ 5A),

which equates to $64,600 per month. There is  apparently no provision for any

additional rent under the sublease. Accordingly, looking at the rent figures, in

isolation, there is $7,230.02 net return to the Debtor on the sublease, on a go

forward basis- at least until the contractural rent increase on the master lease takes

effect, and terminating at the end of the sublease, which, as noted above, is one

month shy of the master lease term.

---

The subtenant paid the Debtor a security deposit of $129,200.00 in connection with sublease. (Exhibit C, ¶ 33 ) The Debtor indicates that security deposit was received and that the security deposit funds were commingled with the Debtor's other funds at the time of receipt. The sublease term apparently expires at the end of December 2022, (Exhibit C, ¶ 3 ), while the master lease does not expire until January 31, 2023. [Exhibit A, ¶ 3(a)].

4. The subtenant apparently prepaid the May 1, 2021 rent that would have been due the date following the petition, and the Debtor commingled that payment with its other funds.

5. After the filing of the petition, the landlord filed an emergency motion to compel the payment of post- petition administrative rent. (Docs. 18 and 23).

On June 7, 2021, the Bankruptcy Court entered an order requiring the subtenant to pay the rent that would be due on June 1, 2021, to the Landlord's counsel, who was authorized to disburse the monies owing to his client for the June rent, including both base rent and additional rent, and hold any additional sums in his Client Trust Account, pending further order of the Court. (Doc. 39).

6. On June 1, 2021, counsel for the Landlord  informed the Trustee's counsel that once he received the June 1, 2021 sublease rent from the subtenant, he would disburse $57,369.98 to his client, and retain the balance in his Client Trust Account.

---

Trustee's Dec Re Rejection of Leases, etc.                    Bankruptcy Case No. 21-01776-LT-7

7. By order entered on June 16, 2021, (Doc. 56), the Bankruptcy Court extended the provisions of the June 7, 2021 order as to the May rent, to the rent due under the sublease for July and August 2021.

8. Per the Sublease, the Sublessee also is allowed the benefit of the use of certain equipment and furniture, (Exhibit C, ¶ 4B, as set out in Schedule B to the Sublease), including all racking, which was to be returned to the Debtor at the end of the Sublease.

9. Based on the above, if I were to assume the master lease, I calculate that the cost to the estate to assume the lease, would be as follows:

A. Cure of pre-petition arrearages:                $66,297.87

B. May 2021 post-petition rent                     $57,369.98

C. June- Aug.2021 post petition rent

(passed through by Subtenant per Court Order)             $0

D. Sept. 2021- Feb. 2022 rent                    $344,219.88

E. March 2022- Jan. 2023 rent                    $640,823.15

Subtotal                                        $1,108,710.88

Less  (Monies in Landlord's Client Trust Account-    $21,639.45

anticipated holdbacks on June, July, and Aug Sublease rent)

Less – Security Deposit                          $47,073.59

      Total Ancticpated cost to the Estate:        $1,039,997.84

These calculations assume that there is no change in the Additional Rent Charges for the balance of the lease term, although I presume that, over time, it is likely that there would be some increase. These calculations also assume that the subtenant will promptly pay the sublease rent to the Landlord's attorney for the months of July and August 2021, per the Court order.

10. If I were to assume the sublease, the rent for the remainder of sublease term, from and after September 2021, (assuming, as above, that the sublease rent before September would be paid directly to the Landlord, per the Court order), through December 2022, would be $1,033,333.28, at which time the estate likely would owe the sublessee its security deposit of of $129,200.00.

Accordingly, in my business judgment, there is no economic benefit to the bankruptcy estate to assume the lease or the sublease, and I seek an order granting my motion to reject both of them.

11. With respect to the trade fixtures and equipment, including all racks on the premises, and equipement, listed on Schedule B of the Sublease, it is my understanding, based on information received from the Debtor, that the liquidation value of those items is either of nominal value or not likely to exceed the administrative expenses associated with a sale of those items. Additionally, I would anticipate possible litigation with the landlord or subtenant as to whether some of those items are equipment or fixtures, or any economic damages resulting

from removal, as I assume the subtenant will likely remain in place. Finally, the personal property may be subject to security interest in favor of the United States Small Business Administration. However, I do believe that the SBA may be oversecured, and I have set aside funds to satisfy that claim. Accordingly, I seek to abandon all of those items listed on Schedule B of the sublease as being either of nominal value or burdensome to the bankruptcy estate.

In the event that, prior to the hearing on this motion, I determine that the valuation of the racks is something other than I currently believe it to be, I may withdraw this portion of the motion.

12. With respect to the Miramar Place property, the base rent under the master lease, payable by the Debtor curently appears to be $53,424.75 per month, and increases to $55,027.49 on November 1, 2021. (Exhibit D, Addendum, ¶ 50)  The Debtor is also liable for 53. 62% of the common area charges. (Exhibit D, ¶ 1.6), The lease term runs through January 31, 2022,  (Exhibit D, ¶ 1.3), and the Debtor apparently paid a security deposit of $59,392.29,  [Exhibit D, ¶ 1.7(c )].

13.   According to the Debtor's schedules, pre-petition arreages on the lease, for the period from February 2021 through April 2021, total $110,565.78. (Doc.1, p.33). However, I have received information from the landlord, MGM Partnership, indicating that the pre-petition arrearages actually total $121,250.74. A copy of

that documentation is attached hereto as Exhibit F. Without admitting the validity of those calculations, those numbers are used in my calculations, below.

14. The sublease term ends on January 31, 2022, the same date that the master lease expires. (Exhibit E,§ 1.3) Is not clear, from the documentation, when the sublease began, as the date is keyed to the execution date, and while the month and year, (August 2018) appear to be set out, the date of the month the sublease was executed, is not readily apparent. The sublease, however, is believed to have been executed some time in August 2018, so that the lease would have commenced in October 2018, per the terms of the lease. By my calculations The base rent due under the Sublease, post-petition, per the Addendum, would be $62,513.32 per month, through September 2021, rising thereafter to $64,388.72 (Exhibit E, ¶ 1.6). Common Area Maintainence or other charges due under the sublease are calculated per paragraph 15 of the Addendum. (Exhibit E, page 7, ¶ 15). It is not clear to me, the extent to which these charges will correspond to the charges under the master lease but, for the sake of this analysis, I have assumed that they are roughly equivalent.

15. Per the sublease, the subtenant provided a security deposit of $64,388.72. (Exhibit E,§ 1.6) The Debtor has informed me that this security deposit was received and commingled with the Debtor's other funds.

16. Since the filing of the petition, I have not received any checks from the subtenant, Crest Beverage. To the best of my knowedge, Crest Beverage has not wired any funds to the Debtor, either.

17. Based on the above, if I were to assume the master lease, I calculate that the cost to the estate, for the balance of the lease term, would be as follows:

A. Cure of pre-petition arrearages:          $121,250.75

B. Post-petition base rent to end of lease term     $570,121.48[1]

Subtotal                                      $691,372.23

Less – Security Deposit                        - $59,392.29

          Total Ancticated cost to the Estate:    $631,979.94

18. Based on my calculations, assuming, again, for the purposes of this analysis, that all common area and other additional charges simply pass through, the anticipated rent to be received from the sublessee, from May 1, 2021 through January 31· 2022, would be $631,979.94, at which time the bankruptcy estate likely would have to return the security deposit of $64,388.72, leaving a net of $567,591.22 - considerably less that the estate would owe the landlord under the master lease.

---

[1] On its schedules, the Debtor calculates the damages owing to MGM for the balance of the lease term to be $1,044278.40 (Doc.1, p. 20). I have not been able to determine how the Debtor arrived at this number but, if the Debtor's calculation is accurate and mine is not, then the economic injury to the estate if the lease were to be assumed, would be even larger.

---

19. For all the foregoing reasons, in my business judgment, it is in the best interests of the bankruptcy estate to reject both the master lease and the sublease for the Miramar Place property.

20. The sublease provides that all warehouse racking was to be removed before the commencement or early possession date. (Exhibit D, ¶ 2.2). To the best of my knowledge, the Debtor does not have any trade fixtures, equipment or other property located at the Miramar Place location.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this declaration was executed on June  25 , 2021, in San Diego, California.

_____
Leonard J. Ackerman

---

## LEASE

THIS AGREEMENT OF LEASE ("Lease") is made and entered into this 1st day of ~~July,~~ August 2017 by and between INDIANA BECKNELL INVESTORS 2011 LLC, a Delaware limited liability company, hereinafter called "Lessor," and HYPERIKON, INC., a California corporation, hereinafter called "Lessee."

W I T N E S S E T H:

1.      **PREMISES; PARKING**:  (a) Lessor, in consideration of the covenants and agreements hereinafter mentioned to be kept and performed by Lessee and upon the conditions hereinafter set forth, does hereby lease to Lessee certain premises consisting of approximately 152,000 square feet (the "Premises") located within a building consisting of approximately 322,000 total square foot (the "Building"), situated on certain real property commonly known as Eagle Creek Industrial Park 4850 S. Indianapolis Rd., Whitestown, IN (the "Land"), all as more particularly shown on the Exhibit "A" site plan attached hereto and incorporated herewith.

(b)      During the Term (as defined below), Lessee and its agents, employees, invitees, and customers shall have the right to 121 non-exclusive parking spaces as shown on the Exhibit "A" site plan, and otherwise the non-exclusive right to use the other adjacent parking areas and spaces in common with other tenants of the Building.

2.      **LESSEE'S WORK**:  Commencing on the date of this Lease, Lessee and its employees, agents, representatives, contractors and vendors shall have access to the Premises upon the terms of this Lease to commence the construction of office space, LED lighting, dock locks, racking, electrical improvements, or other improvements that benefit the Building and are approved by Lessor as set forth hereunder (collectively, the "Lessee's Work."

Lessee's Work includes the construction of areas to be used for warehousing and areas to be used for office space.  Subject to Lessor's obligation to disburse the Allowances, as defined and set forth below, Lessee shall complete the Lessee's Work at Lessee's expense.  Lessee shall diligently pursue the completion of the Lessee's Work such that it is completed on or before the Commencement Date.  Upon the completion

1

Exhibit A  Page 1 of 39

thereof, Lessee shall promptly deliver to Lessor an AIA G704 certificate of substantial completion of Lessee's Work, signed by Lessee's architect, along with a certificate of occupancy from all appropriate governmental authorities.

Prior to commencing the Lessee's Work, Lessee shall cause to be prepared at its sole expense, by Lessee's architect and other consultants as required each with full professional accreditation in the jurisdiction in which the Premises is situated, and submit to the Lessor final plans, construction drawings, specifications and other requirements of the Lessee pertaining to the Lessee's Work and such other elements as are customarily included and as may be reasonably requested by the Lessor (collectively, the "Final Plans and Specifications") which shall be consistent with terms of this Lease. The Final Plans and Specifications may be developed for review in stages, at no cost to the Lessor, and the provisions of this Section shall apply to each such stage. At the time of such submission of the Final Plans and Specifications for review by the Lessor, the Lessee shall notify Lessor in writing of any potential deviations in the Final Plans and Specifications from the requirements set forth in this Lease and from the previous set of Final Plans and Specifications if applicable, and in each case the reasons for such deviations. If there is a conflict within the Lease, and/or the Final Plans and Specifications, then unless otherwise agreed in writing the order of priority of documents, from highest to lowest, shall be (i) this Lease, and (ii) the Final Plans and Specifications.   Lessee represents and warrants that Lessee is familiar with all governmental laws, rules, regulations and requirements in respect of the Lessee's Work and that the Lessee shall at all times comply with and conform to such governmental laws, rules, regulations and requirements in respect of the Lessee's Work which are or become in force during the performance of the Lessee's Work.  Lessor shall have ten (10) business days from the date it receives the initial Final Plans and Specifications, and five (5) business days following the date it receives any revised Final Plans and Specifications, to review and comment in writing on the Final Plans and Specifications. Lessor may, in its written comment, approve or specify an objection to or make a proposal for a modification of the Final Plans and Specifications. If Lessor does not

2

Exhibit A  Page 2 of 39

comment in writing on the Final Plans and Specifications within such period, then it shall be deemed to have rejected the Final Plans and Specifications. Lessee shall, within three (3) days from the date it receives Lessor's initial comments to the Final Plans and Specifications, and two (2) days following the date it receives any Lessor comments to revised Final Plans and Specifications make such changes to the Final Plans and Specifications in accordance with the Lessor's request and re-submit revised Final Plans and Specifications to Lessor for its review and comment in accordance with this Section. The parties agree to work diligently and to deal in good faith to finalize the Final Plans and Specifications and the Lessee represents and warrants that the Commencement Date includes reasonable and adequate periods of time for such finalization. The Final Plans and Specifications, once approved in writing by the Lessor, shall be known as the "Approved Plans." Notwithstanding the foregoing, any review, comment, proposal, or approval by Lessor will relate only to conceptual matters shown in the materials approved, and not to any design, technical, or compliance matters therein, and Lessor will not be responsible for the completeness, accuracy, adequacy, quality, fitness, or suitability thereof. Lessee shall, at no cost to Lessor, also furnish samples of all materials and component parts of the Lessee's Work as reasonably requested by Lessor. In addition, Lessee shall furnish (as part of Lessee's Work) periodic submittals to Lessor, as Lessee's Work progresses, and conduct and coordinate testing and inspection of the Lessee's Work as deemed reasonably necessary by Lessor, or the testing and inspection agencies or governmental authorities. Lessor and its consultants shall have the right to access the Premises periodically to perform their own inspections in Lessor's discretion. Lessee shall have a continuing obligation to ensure that the Approved Plans are and remain compliant with all governmental laws, rules, regulations and requirements, and are and remain approved and in good standing with all governmental laws, rules, regulations and requirements.

The Lessee's Work shall be completed in substantial compliance with the Approved Plans, and in a lien free, good and workmanlike manner, free of defects in workmanship and material with all building systems in good, serviceable operating condition. Lessee

Exhibit A  Page 3 of 39

shall obtain and maintain, or cause to be obtained and maintained, for the duration of the Lessee's Work, builder's risk insurance for the Lessee's Work in an amount not less than the Allowances. Lessor shall be named as an insured on such builder's risk policy and Lessee shall provide a certificate of the coverage required herein to Lessor prior to commencing Lessee's Work, and at such times as requested by Lessor.

During the performance of the Lessee's Work, Lessee may submit a written request to the Lessor for one or more change orders to the Approved Plans. No change order shall be accepted and incorporated into the Lessee's Work unless the same is approved in writing by the Lessor within three (3) business days of the request therefor. If Lessor fails to approve any such change order within such three (3) business day period, then such change order shall be deemed to have been disapproved. Any proposed change in the cost for the work must be set forth in the change order request.

Notwithstanding any other provisions in the Lease, any written notice or written request under this Section, or other provisions pertaining to Lessee's Work, shall be deemed sufficiently given if sent by email transmission to Lessor's representative Pete Anderson at panderson@becknellindustrial.com, with a copy to Larry Richardson at lrichardson@becknellindustrial.com, and to Lessee's representative Jan Brandrup at jbr@hyperikon.com .

Lessee shall indemnify, defend and hold Lessor harmless from and against any loss, claim or damage resulting from Lessee's Work, or any other work being completed or directed by Lessee at the Premises, including, without limitation, the installation of Lessee's, furniture, fixtures, equipment, and other personal property ("Lessee's FF&E"). Lessee's access to the Premises prior to the Commencement Date, whether to complete Lessee's Work, or otherwise, shall be deemed to be upon all the terms, covenants, conditions and provisions of this Lease, except the obligation to pay Rent. Notwithstanding anything contained within this Lease to the contrary, in the event of an uncured default on the part of Lessee under this Section 2, in addition to all remedies available to Lessor under this Lease, at law, or in equity, Lessee shall reimburse Lessor for all amounts paid by Lessor to Lessee under this Section 2 and Section 4 below.

4

3.    **TERM; SURRENDER**:

(a)    This Lease shall be effective as of the date hereof, however the term of this Lease shall commence on September 1, 2017 (the "Commencement Date"), and shall extend for a period of five (5) years and five months (5) until January 31, 2023 ("Initial Term"). For purposes of this Lease, the word "Term" shall mean the Initial Term and any Renewal Term, as defined and set forth below.

(b)    Upon either the expiration of the Term or the termination of this Lease, Lessee shall immediately surrender the Premises to Lessor in broom clean condition, expressly except for ordinary wear and tear, casualty and condemnation damage and repairs that are the obligation of Lessor hereunder. Lessee shall remove all of Lessee's property therefrom, except as otherwise expressly provided in this Lease. Lessee shall surrender to Lessor any and all keys, access cards, computer codes or any other items used to access the Premises.

4.    **RENT; ALLOWANCES; SECURITY DEPOSIT AND FIRST MONTH'S BASE RENT**: (a) During the Initial Term, Lessee shall pay to Lessor at the address stated herein, or to such other person or at such other place as Lessor may designate in writing, base rent as shown in the schedule attached hereto and incorporated herewith as Exhibit "B" ("Base Rent"). Base Rent and Additional Rent (as defined below) are sometimes hereinafter referred to collectively as the "Rent." Rent shall be paid in monthly installments on or before the first day of every month during the Term without demand; provided, however, that Base Rent shall be abated for the first five (5) months of the Initial Term as set forth in the Base Rent schedule attached hereto. If the Commencement Date happens to fall on a day other than the first day of a calendar month, then for the first partial month in which a full Rent payment is due hereunder, Lessee shall pay a Rent payment prorated on a per diem basis.

If Lessee does not pay a Rent payment, or any other sum due and owing hereunder, in full within ten (10) days of becoming due, a five percent (5%) late fee shall be paid by Lessee to Lessor in addition to the Rent, or other installment due under this Lease. Any installment of Rent and any other sum due from Lessee under this Lease

5

which is not received by Lessor within ten (10) (days from when the same is due, shall bear interest from the date such payment was originally due under this Lease until paid at an annual rate equal to ten percent (10%) per annum.

In addition to the Base Rent, Lessee shall pay to Lessor each month and with each payment contemplated hereby as "Additional Rent" a sum equal to any sales or use tax, franchise tax, tax on rentals, and any other charges, taxes and/ or impositions, now in existence or hereafter imposed by any governing body based upon the privilege of renting the Premises or any portion thereof or upon the amount of rent collected therefor. Nothing herein shall, however, require Lessee to pay any part of any federal and State income or inheritance taxes imposed upon Lessor.

(b)      Lessor has made available to Lessee the following allowance for the completion of a portion of the Lessee's Work (the "Tenant Improvement Allowance"): $354,900.00 ($2.34/SF), provided that in no event shall any portion of the Allowance be used for Lessee's FF&E (as defined above), tenant fixtures, or other personal property. Lessor shall disburse portions of the Tenant Improvement Allowance, as applicable, in draw requests to be submitted not more than once per month, and within fifteen (15) business days following Lessor's receipt of a draw request including proof of payment, contractor's affidavits, releases and lien waivers, and any other documentation reasonably requested by Lessor and any of Lessor's consultants, in such form and substance as reasonably required by Lessor and any of Lessor's consultants, executed by the contractors, subcontractors or suppliers with respect to such labor, materials and suppliers in connection with portion of Lessee's Work to be paid.   The parties acknowledge that the Tenant Improvement Allowance is expressly limited to the amount set forth above, and agree that Lessee shall be solely responsible for any costs in excess thereof.   Furthermore, the parties hereby acknowledge and agree that the Tenant Improvement Allowance, and Lessor's obligation to disburse thereof, shall be in effect only until December 31 2017, after which time any portion of the Tenant Improvement Allowance not disbursed, and the obligation to disburse any additional portion thereof, will become null and void.

Exhibit A  Page 6 of 39

Lessor has also made available to Lessee an allowance of $38,000.00 to pay for some or all of Lessee's moving expenses (the "Moving Allowance"). Lessor shall utilize the Moving Allowance for Lessee's actual, out-of-pocket expenses incurred as part of moving into the Premises at the time of Substantial Completion. Lessor shall disburse all or a portion of the Moving Allowance to Lessee within thirty (30) days of its receipt of a request for reimbursement from Lessee accompanied by invoices, proof of payment, receipts and lien waivers for third parties providing the moving services. In no event shall Lessor have any obligation to disburse more than the Moving Allowance, and any expenses reimbursed by Lessor for the moving expenses that are in excess of the Moving Allowance shall be Lessee's sole responsibility and reimbursed to Lessor within ten (10) days of written demand. At the written direction of Lessee, any unused portion of any Moving Allowance may be applied to other Tenant Improvement Allowance Work, or applied to such other improvements that benefit the Building but in no event shall any portion of the Allowance be used for Lessee's FF&E (as defined above), tenant fixtures, or other personal property. Any unused portion of the Moving Allowance at the time Lessor has Substantially Completed Lessor's Work shall be deemed to have not been utilized and no longer available under this Lease, it being acknowledged and agreed by the parties that the Moving Allowance shall likewise automatically terminate at the time Lessor's Work is Substantially Completed

(c)    Upon the execution of this Lease, Lessee shall deposit with Lessor the amount of Forty-Seven Thousand Seventy-Three and 59/100 Dollars ($47,073.59), as security for the full and faithful performance of each term, provision, covenant and condition of this Lease ("Security Deposit"). In the event Lessee defaults in respect of any of the terms, provisions, covenants or conditions hereof, including but not limited to payment of Annual Rent, Lessor may use, apply or retain the whole or any part of the Security Deposit for the payment of any Annual Rent in default or for any other sum which Lessor is entitled to under this Lease as a result of Lessee's default; and Lessee agrees to promptly, upon demand, deposit such additional sum with Lessor as may be required to maintain the full amount of the Security Deposit. Should Lessee faithfully

7

Exhibit A  Page 7 of 39

and fully comply with all of the terms, provisions, covenants and conditions of this Lease, then within twenty (20) days after the expiration or earlier termination of the Term, the Security Deposit, or any balance thereof, shall be returned to Lessee.  Lessee shall not be entitled to interest on such Security Deposit.

Upon the execution of this Lease, Lessee shall also pre-pay to Lessor the first month's Base Rent payment, to be held by Lessor and applied to Lessee's first Base Rent payment due under this Lease.  The parties agree that Lessee shall not be entitled to interest on such first month's pre-paid Base Rent.

5.      **UTILITIES**:  Lessee shall pay directly to the applicable utility provider all charges for heat, electricity, and other public utilities incurred by the Lessee in the use of the Premises, including sewer user fees and sanitary charges, that are separately metered exclusively for the Premises.  To the extent any such utilities are not separately metered then Lessee shall pay to Lessor its proportionate share, or such amount as determined by Lessor in its reasonable discretion.

6.      **SUBORDINATION**:  Lessee shall, upon written demand by Lessor, execute such instruments as may be required to subordinate the rights and interests of the Lessee hereunder to the lien of any mortgage at any time placed on the Land, provided, however, that such subordination shall expressly not affect Lessee's right to the possession of the Premises upon all of the terms hereof so long as Lessee is not in default hereunder. Lessor shall use commercially reasonable efforts to obtain from any mortgage holders a non-disturbance agreement in the customary form. Lessor represents to Lessee that as of the date of this Lease, there is no mortgage on the Land.

7.      **TAXES, INSURANCE, EXPENSES:**

(a)      Beginning on the Commencement Date, in addition to all other amounts set forth in this Lease, Lessee shall pay to Lessor as "Additional Rent," Lessee's pro rata share of the total real estate taxes assessed, imposed or levied on the Building and Land during the Term.  Such Additional Rent shall be prorated to reflect the actual Term of the Lease during the first and last lease years.  Should the State where the Land is located or any political subdivision thereof, or other governmental authority having

8

jurisdiction over the Building and Land, specifically impose a tax, assessment, charge or fee or specifically increase a then existing tax, assessment, charge or fee which Lessor shall be required to pay, either by way of substitution for such real estate taxes or impose an income or franchise tax or tax on rents in addition to or as a substitution for a general tax levied against the same, such taxes, assessments, charges or fees shall be deemed to constitute a real estate tax hereunder to the extent such taxes are in substitution therefor or in addition thereto. In the case of special taxes or assessments which may be payable in installments, only the amount of each installment paid during a calendar year shall be included in taxes for that year.  Interest due on any real estate tax resulting from late payment shall not be included in real estate taxes for the purpose of this Section 7 unless such late payment was caused by Lessee's late payment of its pro rata share.  In addition, Lessee shall pay to Lessor, as Additional Rent, Lessee's pro rata share of Lessor's reasonable costs and expenses (including reasonable attorneys' fees) in contesting or attempting to reduce any taxes related to the time period of Lessee's lease Term, but only to the extent of the actual reduction or refund achieved. Lessee's obligation to pay real estate taxes hereunder shall be reduced by any recovery or refund received of real estate taxes previously paid by Lessor, provided such refund relates to taxes paid during the Term.  If no further amounts are due from Lessee, Lessee shall be refunded such amount within thirty (30) days after Lessor's receipt of such amounts.  Lessee acknowledges that Lessee is responsible for its share of the above described real estate taxes as they are assessed during the Term, not as they become due and payable.  In States where real estate taxes are paid in arrears, this means that such real estate taxes that are assessed during the Term may not become due and payable until the following calendar year.  Accordingly, in the event that such real estate taxes are paid in arrears, then Lessor's determination of Lessee's share of the real estate taxes as set forth herein shall be based on the likely actual amount that will be assessed during the Term, regardless of when they are paid.   Lessee acknowledges that Lessor's estimates may be based upon assessed values not yet known.   Furthermore, Lessee agrees that the reconciliation of such real estate taxes may be delayed beyond the

Exhibit A  Page 9 of 39

deadlines and dates set forth herein if the actual bill for the prior Subject Year (as defined below) has not yet been issued.  Once the bill is issued, the parties agree to reconcile and true-up such real estate taxes within a reasonable time thereafter, not to exceed thirty (30) days.  Lessor shall pay the bill for such real estate taxes directly to the taxing authority, and Lessee shall reimburse Lessor its proportionate share as part of its payment of Additional Rent.  Lessee acknowledges and agrees that its obligation to pay for its share of such real estate taxes that were assessed during the last year of the Term, but will not become due and payable until after the expiration or earlier termination of the Term, shall nevertheless survive such expiration or earlier termination of the Lease and be paid to Lessor.

(b)    Beginning on the Commencement Date, Lessee shall also pay to Lessor as Additional Rent in every year of the Term, Lessee's pro rata share of the expenses incurred by Lessor for fire, flood, extended coverage, umbrella, public liability and property damage insurance on the Building and Land in any year of the Term.

(c)    Beginning on the Commencement Date, Lessee will pay to Lessor as further Additional Rent in every year of the Term, Lessee's pro rata share of the costs of operating, maintaining, managing, protecting and repairing the Building and Land ("Operating Expenses"). Operating Expenses to be reimbursed by Lessee include, without limitation, gardening and landscaping maintenance, owners association assessments, property management fees, parking lot sealing and restriping, repairs to curbs, sidewalks, drainage and lighting facilities, as may from time to time be necessary, painting, caulking, lighting, sanitary control, and removal of snow and ice.  Operating Expenses to be reimbursed shall also include repairs, replacements and maintenance of the roof, walls, support beams, concealed underground plumbing, parking lot and pavement (including, without limitation, access drives, aisles, curbs, truck courts, and sidewalks), foundation, and other structural components and members, and items that are capital in nature as determined under generally accepted accounting principles (sometimes hereinafter referred to as "Capital Expenses").  Notwithstanding the foregoing, Lessee shall not be responsible for reimbursing Lessor nor shall any of the

10

Exhibit A  Page 10 of 39

following items be included in Operating Expenses: (i) depreciation; (ii) interest, late charges or penalties assessed to Lessor for failure to timely pay bills; (iii) attorney's fees and costs; (iv) any and all expenses incurred in procuring, retaining, negotiating, amending, extending, administering, or terminating leases with any other existing or prospective tenants including without limitation, advertising, brokerage commissions, architectural engineering fees or legal fees; (v) any amounts payable under mortgages, deeds of trust or ground leases encumbering any or all of any part of the Building or Land; (vi) salaries of Lessor's employees or agents; (vii) marketing and advertising costs; and (viii) costs for alterations or work performed by Lessor to other lessee's premises in the Building.

(d)     It is intended that the Additional Rent described above and in this Lease shall be paid as nearly as possible in equal monthly installments during the Term of the Lease.  Accordingly, Lessor may notify Lessee of Lessor's reasonable estimate of the amount for which Lessee will be obligated hereunder and on the first day of the month after Lessor so notifies Lessee that Additional Rent is due hereunder.  Lessee shall pay to Lessor a sum equal to 1/12th of such Additional Rent multiplied by the number of months which has passed during the year.  Thereafter, Lessee shall pay 1/12th of such Additional Rent on the first day of each ensuing month including months in the succeeding year until a new determination has been made.  Upon request from Lessee, Lessor will submit invoices and such backup dates to Lessee as reasonably necessary from time to time to enable Lessee to substantiate the computation and allocation of Additional Rent.

(e)     As of the date hereof, Lessee's proportionate, or pro rata share is 47.05%.

(f)     Within ninety (90) days after each calendar year, Lessor shall, if requested by Lessee in writing, such request to be given no later fifteen (15) days after the end of each applicable calendar year, provide to Lessee a statement ("Statement") setting forth the taxes, charges, fees, and other costs described above and in this Lease which were incurred during such calendar year ("Subject Year") and Lessee's pro rata share thereof.  Within sixty (60) days after receipt of the Statement, Lessee, or its authorized

11

Exhibit A  Page 11 of 39

representative, shall have the right to examine Lessor's books and records relating to the contents of the Statement. Such examination shall occur upon reasonable prior notice at the place or places where such records are normally kept. Lessee may take exception to matters included in the Statement by sending notice specifying such exception and the reasons therefor to Lessor no later than thirty (30) days after Lessee's examination of all such books and records. If Lessee takes exception to any matter contained in the Statement and the parties are unable to agree with respect to such matter within thirty (30) days after Lessee's notice, the parties shall refer the matter to a mutually acceptable independent certified public accountant, whose certification as to the proper amount shall be final and conclusive as between Lessor and Lessee. Lessee shall promptly pay the cost of such certification, unless such certification determines that Lessee's pro rata share of such Additional Rent was overstated by more than ten percent (10%) in which case Lessor and Lessee shall equally share the cost of such certification. Pending resolution of any such exceptions in the foregoing manner, Lessee shall continue paying its monthly payments of Additional Rent, subject to adjustment after any such exceptions are so resolved. If such certification determines that Additional Rent was overstated, Lessee shall receive a credit for the amount of such overstatement against the next installment(s) of Base Rent and Additional Rent (or, if no further installments are due from Lessee or the further installments of Rent are less than the overstatement, the excess shall be paid by Lessor to Lessee within thirty (30) days after the certification).

8. **MAINTENANCE**: During the occupancy of the Premises under the terms of this Lease, Lessee shall maintain the interior of the Premises, including, without limitation, entrance doors and door jambs (both inside and outside), ceiling tile, windows and window casings and sills (both inside and outside) and plate glass, and shall be responsible for all maintenance, repairs and replacements on the mechanical equipment, including the plumbing, heating, ventilating, air conditioning, and electrical systems. Lessee shall also be responsible for semi-annual maintenance of the mechanical equipment, and will provide evidence of such maintenance on

Exhibit A  Page 12 of 39

request of the Lessor.  Lessee shall keep the Premises in good, clean condition, and at
the termination of this Lease, Lessee shall deliver the Premises in good order and
condition, normal wear and tear excepted. Lessor shall maintain, repair and replace all
portions of the Premises, Building and Land that are not otherwise the Lessee's
responsibility under this Section 8, subject to reimbursement from Lessee for such
portions that are included in Operating Expenses.  If Lessee or Lessor refuses or
neglects to make repairs and/ or refuses to maintain or replace as required hereunder
in a manner reasonably satisfactory to the other, then Lessor or Lessee, as the case may
be, shall have the right upon giving the other fifteen (15) days written notice of election
to do so, to make such repairs or perform such maintenance or replacement on behalf
of and for the account of the other.   In such event, such work shall be paid for by the
other within ten (10) days upon receipt of the bill therefor.

9.    **WASTE; ABANDONMENT; OWNERS ASSOCIATION:**  Lessee shall not
permit the accumulation of waste or refuse matter on the Premises, Building or Land.
Lessee shall not abandon the Premises.  Lessee shall be subject to all rules and regulations
of any owners association, provided, however, that Lessor represents to Lessee that no
such association exists as of the date of this Lease.

10.    **CONDITION OF PREMISES AND BUILDING**:  On the Commencement
Date, the Premises will be in broom-clean condition, Lessor's Work will be Substantially
Complete, and the mechanical systems, structural elements, roof and building systems
of the Building will be in normal working condition.

11.    **IMPROVEMENTS; ALTERATIONS; AND PERSONAL PROPERTY**

Lessee shall make all improvements necessary for the operation of its Permitted
Use (as defined below), subject to written approval of Lessor of the plans and
specifications, which approval shall not be unreasonably withheld or delayed.  Any
work to be completed by Lessee shall be done in a good and workmanlike manner, lien-
free, and in compliance with all applicable federal, state, and local codes and laws.

Lessee shall not make any alterations or installations of fixtures in or additions or
improvements to the Premises ("Alterations"), or make any contract therefor without first

Exhibit A  Page 13 of 39

procuring Lessor's written consent, which consent will not be unreasonably withheld or delayed. At the time of giving such consent, Lessor may advise Lessee whether Lessor will require Lessee to remove such Alterations. All Alterations shall be performed in a good and workmanlike manner, in compliance with all legal requirements. All Alterations (except those required by Lessor to be removed, Lessee's trade fixtures, partitions, furniture, office equipment, warehouse machinery and equipment and other movable items paid for by Lessee, all of which shall remain the property of and be removed by Lessee) shall become the property of Lessor, and shall remain upon and be surrendered with the Premises on the expiration or earlier termination of the Lease Term without compensation or credit to Lessee. Lessee shall promptly remove all Alterations which are required to be removed as provided in this Lease, and repair any damage occasioned by such removal, and in default thereof, Lessor may effect said removals and repairs at Lessee's expense.

Notwithstanding any of the foregoing to the contrary, Lessee may install, operate, and maintain "satellite dishes," or other similar equipment or devices, such as antennae (collectively "Communication Equipment"), for the purpose of receiving and sending radio, television, computer, telephone, or other communication signals, and supplemental HVAC equipment (the "Supplemental HVAC Equipment;" the Communication Equipment and Supplement HVAC Equipment are sometimes hereinafter referred to as "Lessee's Roof Equipment") on the roof of the Premises at a location mutually agreeable to Lessor and Lessee at no additional rental cost to Lessee (other than the cost of actual installation and maintenance), provided that Lessee has obtained Lessor's prior written consent, which consent will not be unreasonably withheld or delayed. Lessee's right to install, operate and maintain the Roof Equipment shall be subject to all governmental laws, rules, and regulations, and in accordance with any and all roof warranty requirements. All costs of installation, operation, and maintenance of Lessee's Roof Equipment and any necessary related equipment (including, without limitation, costs of obtaining any necessary permits) will be borne by Lessee. In addition, Lessee shall reimburse Lessor for its reasonable costs (including

14

the reasonable cost of any roof contractor engaged by Lessor or the roof warranty company) in the event any roof penetrations occur or the roof is otherwise damaged by Lessee's Roof Equipment.  Lessee will use the Lessee's Roof Equipment so as not to cause any interference to other tenants in the Building or with any mechanical systems or communication equipment owned by Lessor or a third party and installed on the roof of the Building, and not to damage or interfere with the normal operation of the Building.  Lessee will:  (1) be solely responsible for any damage caused as a result of Lessee's Roof Equipment; (2) promptly pay any tax, license, or permit fees charged pursuant to any laws or regulations in connection with the installation, maintenance, or use of Lessee's Roof Equipment, and comply with all precautions and safeguards required by all governmental authorities; and (3) pay for all necessary repairs to, replacements to, or maintenance of Lessee's Roof Equipment.  At Lessee's sole expense, Lessee will remove Lessee's Roof Equipment and related equipment upon the expiration or sooner termination of this Lease or upon the imposition of any governmental law or regulation which may require removal, and will promptly repair any damage caused to the Building by such removal.  Notwithstanding any of the foregoing to the contrary, Lessee shall permit the roof warranty company and any of its licensed contractors to inspect and supervise any of the work associated with Lessee's Roof Equipment so that the roof warranty is not voided.

12.    **WAIVER OF SUBROGATION**:  Lessor and Lessee each hereby waive any and all right of recovery, claim, action or cause of action against the other, its agents, directors, officers and employees for any loss or damage (including loss of use thereof) that may occur to the Premises or any improvements, or to the Building, Land, or any improvements thereto or any personal property of such party in the Premises or the Building by reason of fire, the elements or any other cause which is insured against under the terms of any insurance policies regardless of cause of origin including negligence of the other party hereto, its agents, directors, officers or employees. Such waiver also applies to any such loss that would, but for the deductible, be covered by such insurance policies.

Exhibit A  Page 15 of 39

13.    **CONDEMNATION**:   If the whole of the Premises hereby demised shall be taken or condemned by any competent authority for any public use or purpose, then the term hereby granted shall cease on the day prior to the vesting of title in such authority, or taking of possession, (whichever occurs first) and Base Rent and any other sums due and owing hereunder shall be paid and adjusted as of that day.

If a portion of said Premises, including the parking lot, shall be taken and, as a result thereof, there shall be such a major change in the character of the Premises as to prevent Lessee from using the same in substantially the same manner as theretofore used, then, and in that event, Lessee may either cancel or terminate this Lease as of the date when the part of the Premises so taken shall be required for such public purpose, or Lessee may continue to occupy the remaining portion, provided, however, Lessee shall give written notice to Lessor, within thirty (30) days after the date of such vesting of title, of its election. In the event Lessee shall remain in possession and occupation of the remaining portion, all the terms and conditions of this Lease shall remain in full force and effect with respect to such remaining portion, except that the Base Rent and any additional sums due hereunder reserved to be paid hereunder shall be equitably reduced according to the amount and value of such remaining space; and provided further that Lessor shall, at Lessor's own expense, promptly and with reasonable diligence (subject to Force Majeure (as defined below)) do such work as to make a complete architectural unit of the remainder of the Premises, and this Lease shall continue for the balance of its Term, subject to the terms and conditions herein stated.

The entire award or purchase price for the Premises taken, or the amount paid pursuant to private purchase in lieu thereof, whether such condemnation or sale be total or partial, shall belong to and be the property of Lessor, and Lessee hereby assigns to Lessor any and all such award or purchase price.  Nothing herein contained shall be deemed or construed to prevent Lessee from interposing and prosecuting in any condemnation proceeding a claim for the value of any trade fixtures or personal property installed in the Premises by Lessee, moving expenses, and in the case of a

16

partial condemnation of the Premises, the cost or damage sustained by Lessee as a result of the interruption of or damage to Lessee's business.

14.    **LIABILITY INSURANCE**:    Lessee and Lessor shall not do anything which will in any way impair the reasonable obligation of any policy of insurance upon the Premises. Lessee shall procure and maintain at Lessee's own cost and expense policies of insurance insuring Lessee against public liability, covering the Premises and the use and operation thereof with limits of not less than $3,000,000.00 combined single limit for bodily injury and property damage and shall be issued by an insurance company authorized to do business in the state where the Premises is located with an A.M. Best rating of A or better.  Any insurance required to be procured and maintained by Lessee shall not be subject to cancellation except after ten (10) days prior written notice to Lessor through an endorsement to the insurance policy, or if such endorsement is not available, by Lessee's direct written notice to Lessor.  Certificates of insurance for such policies shall be deposited with Lessor on or before the date of this Lease, and again annually upon renewal thereof. Lessor, Lessor's designee, and Lessor's mortgagee, if any, shall be included as an Additional Insured under this policy.  The deductible amount under all insurance policies required to be maintained under this Lease by Lessee shall not exceed a reasonable amount for the particular policy at issue.

15.    **INDEMNIFICATION**:    Lessee agrees to indemnify and save harmless Lessor from and against all claims of whatever nature arising from any wrongful act or omission or negligence of Lessee or Lessee's agents, servants or employees, for personal injury or damage to the property of any person in or about the Premises, Building or Land, unless such claims arise from any act, omission, or negligence of Lessor, Lessor's agents, servants or employees or any other tenants and/or their employees, agents or customers. This indemnity and hold harmless agreement shall include indemnity against all reasonable costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon, the reasonable expense of investigating the same and the defense thereof.

Exhibit A  Page 17 of 39

Lessor agrees to indemnify and save harmless Lessee from and against all claims of whatever nature arising from any wrongful act or omission or negligence of Lessor or Lessor's agents, servants, or employees or any other tenants, and their employees, agents or customers, or personal injury or damage to the property of any person occurring in or about the Premises, Building or Land, unless such claims arise from any act, omission, or negligence of Lessee, Lessee's agents, servants or employees. This indemnity and hold harmless agreement shall include indemnity against all reasonable costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon, the reasonable expense of investigating the same and the defense thereof.

16.    **ASSIGNMENT**:   Lessee agrees not to assign, sublet, or in any manner transfer this Lease, in whole or in part, without the previous written consent of Lessor in each instance, which consent shall not be unreasonably withheld or delayed. Any such assignment or subletting without Lessor's consent shall be void and of no force or effect. Notwithstanding the foregoing, Lessee shall have the right to sublease the Premises or assign this Lease to an affiliate, commonly controlled, parent or wholly-owned direct or indirect subsidiary company or to the surviving company in the event of a merger without Lessor's consent, provided Lessor is given written notice within fifteen (15) days following said sublease or assignment.   Any transfer or assignment by Lessee shall in no event release Lessee from any liability or obligation hereunder unless agreed to otherwise by Lessor in writing.   Lessor may freely assign its interest hereunder at any time during the Term of the Lease.

17.    **ACCESS BY LESSOR**:   Lessor reserves the right to enter upon the Premises at all reasonable business hours upon not less than twenty-four (24) hours prior notice to Lessee for the purpose of inspecting the same, or of making repairs, or to exhibit the Premises to prospective purchasers; provided, however, that in the event of an emergency, including, without limitation, a property, life or public safety emergency, no such notice shall be required before Lessor may exercise its access rights hereunder. Unless this Lease is renewed as provided for herein, during the last two

18

Exhibit A  Page 18 of 39

hundred seventy (270) days of the Initial Term or any Renewal Term, Lessor shall have the right to exhibit the Premises to prospective tenants. All such access shall be accorded to Lessor without unreasonable hindrance by Lessee.

18.    **DAMAGE OR DESTRUCTION**: In the event the Premises shall be destroyed or so damaged by fire, explosion, windstorm, or other casualty as to be untenantable, Lessor shall promptly restore the Premises.  Base Rent and any other sums due and owing hereunder shall abate on a per diem basis during any period of restoration.

In the event the Premises shall be damaged as aforesaid but are not thereby rendered untenantable, Lessor shall promptly restore the Premises, and while such damage is being repaired, Lessee shall be entitled to an equitable abatement of the Base Rent and any other sums due and owing hereunder.  Lessor shall not be liable for any delays in rebuilding or repairing due to Force Majeure.  As used herein, the term "Force Majeure" shall mean any labor dispute, strike, lockout, fire, unavailability of material, acts of God, riots, insurrection, war or other casualty or events of a similar nature beyond a party's reasonable control.  For purposes of clarity, weather conditions that are not customary and or reasonably anticipated for the particular time of year shall constitute Force Majeure.  Notwithstanding anything contained herein to the contrary and subject only to delays caused by Lessee, or its agents, in the event that the Premises are not restored within two hundred ten (210) days when rendered untenantable or within one hundred fifty (150) days when not rendered untenantable, Lessee shall have the right to terminate this Lease and all obligations hereunder by providing Lessor with written notice within thirty (30) days after the expiration of such two hundred ten (210) or one hundred fifty (150) day period.

19.    **DEFAULT**:  Lessee shall be in default under the terms of this Lease upon the occurrence of any of the following:

(a)    Lessee's failure to pay an installment of Base Rent ten (10) days after becoming due;

19

(b)　　Lessee's failure to pay any other sum due and owing hereunder within ten (10) days after becoming due;

(c)　　The making by Lessee [or Guarantor] of an assignment for the benefit of creditors;

(d)　　The levying of a Writ of Execution or Attachment on or against the property of Lessee, and failure to have the same discharged within sixty (60) days;

(e)　　The taking of any action for voluntary dissolution of Lessee [or Guarantor];

(f)　　The doing or permitting to be done by Lessee of any act which creates a mechanic's lien or claim therefor against the land or Building of which the Premises are a part, and failure to have the same discharged within fifteen (15) days;

(g)　　If proceedings are instituted in a court of competent jurisdiction for the adjudication as a bankrupt or insolvent or for the appointment of a receiver of the property of Lessee [or Guarantor], and said proceedings are not dismissed within sixty (60) days after the institution of said proceedings;

(h)　　An assignment or sublease, or attempted assignment or sublease, of this Lease or the Premises by Lessee contrary to the provisions of Section 16;

(i)　　Any insurance required to be maintained by Lessee pursuant to this Lease shall be canceled or terminated or shall expire or be reduced or materially changed, except as permitted in this Lease; or

(j)　　The failure of Lessee to perform any other of its covenants, agreements or obligations hereunder (except those failures specified as defaults in any other subsection of this Section 19, which shall be governed by such other subsection) within ten (10) days of written notice to Lessee or, if by reason of the nature thereof, said event cannot with due diligence be wholly cured within said period, if Lessee shall fail to commence the curing thereof within such ten (10) day period and thereafter proceed diligently to cure the same within ten (10) days after such written notice.

Lessor may terminate this Lease upon the happening of any one or more of the foregoing events.  Upon the termination of the Lease, as aforesaid, Lessor may re-enter

Exhibit A  Page 20 of 39

upon the Premises with process of law, and remove all persons and chattels therefrom, and Lessor shall not be liable for damages or otherwise by reason of such re-entry or termination of the term of this Lease.  Notwithstanding such termination, the liability for the Base Rent and any other sums due and owing hereunder of Lessee provided shall not be extinguished for the balance of the Term remaining.  Lessor shall be entitled to recover monthly as it becomes due, the difference between the Base Rent and that obtained by reletting the Premises. The parties agree that Lessor shall use commercially reasonable efforts in accordance with applicable law to mitigate its damages and relet the Premises.

20.    **EXPENSES UPON DEFAULT**:  In the event either Lessor or Lessee shall at any time be compelled to pay any sum of money or do any act which will require the payment of any sum of money or incurs any expense, including reasonable attorney's fees, for instituting or prosecuting any action or proceedings to enforce said party's rights hereunder, if such party prevails in any said action or proceeding, the sum or sums so paid by said party shall be deemed damages in favor of said party against the party in default, and shall be due and payable forthwith.

21.    **HOLDOVER**:  Upon expiration of the Term, Lessee will yield up possession to Lessor, and failing so to do, at Lessor's option, will pay as liquidated damages for each day that possession is withheld an amount equal to one hundred twenty-five percent (125%) for the first three (3) months, fifty percent (150%) thereafter, of the amount of the daily Base Rent computed on a thirty-day month basis,  plus any consequential damages equal to the rental income from a third party that is lost as a result of such holdover by Lessee.

22.    **ADDRESS FOR RENT PAYMENT:**  The Rent payable hereunder shall be made payable to "Becknell Industrial Operating Partnership L.P." and shall be forwarded to the following address:  2750 E. 146th Street, Suite 200, Carmel, IN 46033.

23.    **NOTICES**:  Any notice under this Lease shall be deemed sufficiently given if sent by overnight courier or certified mail to Lessee at 8515 Miramar Place, San Diego, CA 92121, Attn: Jan Brandrup and to Lessor at the address then fixed for the

Exhibit A  Page 21 of 39

payment of Base Rent. Either party may designate a different address to which notices shall be sent by providing written notice to the other. Notices shall be deemed given the day of receipt or rejection thereof.

24.    **ENVIRONMENTAL**:  Lessor hereby warrants and represents to the best of its knowledge that, except as set forth below, neither the Premises nor the Building and/ or the Land contain asbestos, PCB transformers, or other hazardous, toxic or contaminated materials or substances, or underground fuel storage tanks or any other material or substance which is defined or classified as hazardous or toxic under federal, state or local law (the aforementioned all of which collectively shall hereinafter be referred to as "Hazardous Materials").

Lessor hereby  covenants and agrees to indemnify and hold harmless Lessee and its directors, officers, employees, successors, legal representatives and assigns from and against all claims, damages, liabilities, losses, judgments, settlements and costs (including, without limitation, reasonable attorney's fees and disbursements) in connection with Hazardous Materials arising out of, resulting from or in any way connected with or alleged or claimed to arise out of, result from or be in any way connected with (a) the use or occupancy of the Premises by the Lessor or any previous owner/occupant/user of the Premises, or any portion thereof, prior to Lessee's occupancy of the Premises; (b) the use or occupancy of the Premises by any subsequent owner/occupant/user of the Premises, or any portion thereof, after Lessee's occupancy of the Premises terminates; (c) violations by any prior or subsequent owner/ occupant/user of the Premises of local, state and/ or federal laws and regulations, including all applicable environmental laws and regulations as well as any liabilities resulting from the practices of the prior or subsequent owner/ occupant/ user whether or not such practices were or could be deemed a violation of such laws and regulations; and (d) contamination of the premises by Lessor or by its agents or employees during the Term.

Lessee hereby covenants and agrees to indemnify and hold harmless Lessor and its directors, officers, employees, successors, legal representatives and assigns from and

Exhibit A  Page 22 of 39

against all claims, damages, liabilities, losses, judgments, settlements and costs (including, without limitation, reasonable attorney's fees and disbursements) in connection with Hazardous Materials arising out of, resulting from or in any way connected with or alleged or claimed to arise out of, result from or be in any way connected with (a) the use or occupancy of the Premises by the Lessee or any occupant/ user of the Premises, or any portion thereof; and (b) violations by Lessee or any occupant/ user of the Premises of local, state and/ or federal laws and regulations, including all applicable environmental laws and regulations as well as any liabilities resulting from the practices of Lessee or any occupant/user of the Premises whether or not such practices were or could be deemed a violation of such laws and regulations. The indemnification provided by Lessee in the preceding sentence shall not be applicable if it can be demonstrated that the Hazardous Materials found on the Premises were present on the Premises prior to the date of this Lease, nor shall it be applicable in the event that the source of any contamination is from adjacent properties or otherwise as a result of the actions of the Lessor, its agent or employees, or any other tenants, their employees, agents or customers.

25.    **SUCCESSORS AND ASSIGNS**: The terms hereof shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns, respectively of Lessor and Lessee. The reference contained to successors and assigns is not intended to constitute a consent to assignment by Lessee, but as reference only to those instances in which Lessor may later give written consent to a particular assignment as required hereunder.

26.    **RENEWAL OPTION:**  Provided that Lessee is not in default in any of the terms of this Lease, Lessee may extend the term of this Lease and the provisions hereof for one (1), five (5) year renewal term (the "Renewal Term").  Lessee may exercise a renewal option hereunder by notifying Lessor in writing not later than two hundred seventy (270) days, but not earlier than three hundred sixty-five (365) days, prior to the expiration of the Initial Term.  The Renewal Term shall be on the same terms and conditions as herein, except that Base Rent during the Renewal Term shall be equal to the then current Fair

Exhibit A  Page 23 of 39

Market Base Rent (as defined below).  In no event shall the Base Rent for the Renewal Term be less than the then current Base Rent, and if a determination is made hereunder for a value which is less than the same, the parties agree that the Base Rent shall nevertheless be deemed to be equal to the then current amount.  Base Rent shall increase by two percent (2%) per year each year on the anniversary of the Commencement Date for the duration of the Renewal Term.

For purposes of this Lease, "Fair Market Base Rent" shall mean the market rent agreed to by both Lessor and Lessee, or determined hereafter.  If the parties are unable to agree upon the Fair Market Base Rent within thirty (30) days after Lessee's notice to Lessor exercising a Renewal Term, either Lessor or Lessee may give written notice ("Appraisal Election Notice") to the other of its election to have Fair Market Base Rent determined by appraisal under this paragraph, which notice must be accompanied by a written appraisal setting forth Fair Market Base Rent for the Premises for lessees with comparable credit for comparable space in similar buildings in the vicinity of the Premises prepared by an appraiser who is both a member of the American Institute of Appraisers and actively engaged in the appraisal of real property in the area where the Premises is located (a "Qualified Appraiser").  If one of the parties (the "Electing Party") gives a timely Appraisal Election Notice in compliance with this paragraph, then Fair Market Base Rent shall be deemed to be as set forth in the accompanying appraisal unless the other party (the "Non-electing Party") gives the Electing Party written notice of its disapproval of the Electing Party's appraisal within thirty (30) days after receipt of Electing Party's appraisal, which notice must also be accompanied by a written appraisal from a Qualified Appraiser establishing Fair Market Base Rent.  If the Non-electing Party gives timely notice of its disapproval of Electing Party's appraisal, Lessor's appraiser and Lessee's appraiser shall jointly, within fifteen (15) days after delivery of Non-electing Party's appraisal, choose a third Qualified Appraiser who shall, within twenty (20) days after appointment, choose one of the two appraised values as the Fair Market Base Rent, which determination shall be binding upon both Lessor and Lessee.  Each party shall bear the fees and expenses of its own appraiser,

24

Exhibit A  Page 24 of 39

and the fees and expenses of the third appraiser shall be borne by the party whose appraisal was not chosen by the third appraiser. The guidelines for determining Fair Market Base Rent shall be rent for premises of comparable size, quality, and location, with the same or similar uses, and same or similar improvements, in good condition and repair, taking into account, without limitation, similar paving coverage, building coverage / lot size, number of docks, and truck parking.

27.    **USE**:  Lessee shall use the Premises for the operation of a warehouse, storage, office, and distribution facility, manufacturing, production, assembly, research and development or any similar meanings or definitions of the such, including administrative functions in connection therewith, all of which shall be in accordance with any and all applicable laws, rules or regulations ("Permitted Use"); provided, however, Lessor will not unreasonably withhold its consent to a change or expansion of use that does not materially increase Lessor's exposure for risks such as, for example, environmental hazards.   In addition to, and not in limitation of, any reasonable basis for Lessor to withhold the consent contemplated by the immediately preceding sentence, it shall be reasonable for Lessor to withhold such consent in the event any proposed use would violate any law or any public or private covenants, restriction or limitations which may then affect the Premises or any portion or use thereof.

28.    **TENANT ESTOPPEL**: Upon request, Lessee will provide to Lessor, an Estoppel substantially in the form attached hereto as Exhibit "C."

29.    **SIGNAGE**:  Lessee, at its expense, may place signage upon the Premises, subject to Lessor's approval which will not be unreasonably withheld or delayed. Lessee may only place such signage in locations approved by Lessor.  Any township or other approvals shall be the responsibility of Lessee. All signs placed upon the Premises shall comply with all applicable laws, ordinances, rules and regulations. Lessee shall remove all of its signage at the expiration of the Lease Term and repair any damage occasioned by such removal.

30.    **BROKER**:  Lessor and Lessee represent and warrant that they have not dealt with any real estate agent or broker in connection with this transaction other than

Exhibit A  Page 25 of 39

Voit Real Estate Services representing Lessee, and Cushman & Wakefield representing Lessor, whose commissions shall be paid by Lessor pursuant to a separate agreement, and each agrees to indemnify and save the other harmless from and against all liability, damage, loss, cost, and expense incurred by reason of a breach of said representation, warranty and covenant.

31.    **QUIET ENJOYMENT**:  Without limiting any rights Lessee may have by statute or common law, Lessor covenants and agrees that, so long as this Lease is in full force and effect, Lessee shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without disturbance by Lessor or by any person having title paramount to Lessor's title or by any person claiming through or under Lessor, and subject to all applicable ordinances, laws, rules and regulations, shall have access to the Premises twenty-four (24) hours per day, seven (7) days per week.

32.    **LESSEE FINANCIALS**:  Upon request, Lessee shall deliver to Lessor, its affiliates or any potential lender or purchaser designated by Lessor such financial statements of Lessee as are reasonably available by Lessee, including without limitation, Lessee's financial statements for the past three (3) years.  All such financial statements shall be received by Lessor and such other designated parties in confidence and upon request by Lessee, as a condition of receipt of such financial statements, the recipients thereof shall execute and deliver to Lessee a confidentiality and non-disclosure agreement in a commercially reasonable form.  For purposes of this paragraph, "financial statements" shall mean (i) for such period that Lessee or its successor is not an entity whose equity securities are listed on NASDAQ, the New York Stock Exchange, or the American Stock Exchange, Lessee's audited profit and loss statement, balance sheet, and cash flow statement, and (ii) for such period Lessee or its successor is an entity whose equity securities are listed on such exchanges, the financial statement information that is available to the general public.

33.    **MERGER**:  All offers, acceptances, oral representations, agreements and writings between the parties heretofore made are merged herein and shall be of no force or effect unless contained in this Lease.

26

Exhibit A  Page 26 of 39

34.    **COUNTERPARTS**:    This Lease may be executed in any number of counterparts as may be convenient or necessary, and it shall not be necessary that the signature of all parties hereto be contained on any one counterpart hereof. Additionally, the parties hereto agree that for purposes of facilitating the execution of this Lease, (a) the signature pages taken from the separate individually executed counterparts of this Lease may be combined to form multiple fully executed counterparts, and (b) a facsimile or emailed transmission shall be deemed to be an original signature for all purposes. All executed counterparts of this Lease shall be deemed originals, but all such counterparts taken together or collectively, as the case may be, shall constitute one and the same agreement.

35.    **SEVERABILITY**:    If any term or provision of this Lease be invalid or unenforceable, the remainder of this Lease shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the full extent permitted by law.

36.    **LESSEE REPRESENTATION AND WARRANTY**:    Lessee hereby represents and warrants to Lessor that as of the date hereof, to Lessee's actual knowledge without inquiry, the following representations and warranties are true, correct and complete and that the same will be true, correct and complete on and as of the Commencement Date: (a) Lessee is not in violation of any Anti-Terrorism Law; (b) Neither Lessee nor its U.S. parent or any of its U.S. subsidiaries, as of the date hereof: (i) knowingly or intentionally conduct any business or engage in any transaction or dealing with any Prohibited Person, or any "forbidden entity" (as defined in Illinois Public Act 094-0079), including the governments of Cuba, Iran, North Korea, Myanmar, Sudan, Syria, Crimea Region, and Venezuela and, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person or forbidden entity; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate any of the prohibitions

27

set forth in, any Anti-Terrorism Law; and (c) Neither Lessee nor its U.S. parent or any of its U.S. subsidiaries and their officers, directors, shareholders, members, as applicable, is a Prohibited Person.

As used herein, "Anti-Terrorism Law" is defined as any law relating to terrorism, anti-terrorism, money-laundering or anti-money laundering activities, including without limitation the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, Executive Order No. 13224, Title 3 of the USA Patriot Act, Illinois Public Act 094-0079, and any regulations promulgated under any of them.  As used herein "Executive Order No. 13224" is defined as Executive Order No. 13224 on Terrorist Financing effective September 24, 2001, and relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism", as may be amended from time to time.  "Prohibited Person" is defined as (a) a person or entity that is listed in the Annex to Executive Order No. 13224, or a person or entity owned or controlled by an entity that is listed in the Annex to Executive Order No. 13224; (b) a person or entity with whom Lessor is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; or (c) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other official publication of such list. "USA Patriot Act" is defined as the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56), as may be amended from time to time.

If at any time any of these representations becomes false, then it shall be considered a material default under this Lease.

37.    **LIMITATION ON LESSOR'S LIABILITY**:  Anything in this Lease to the contrary notwithstanding, the covenants, undertakings and agreements herein made on the part of Lessor are made and intended not as personal covenants, undertakings and agreements or for the purposes of binding Lessor personally or the

Exhibit A  Page 28 of 39

assets of Lessor other than the Building and Land. No personal liability or personal responsibility is assumed by, nor shall at any time be asserted or enforceable against Lessor, its partners, shareholders, officers, directors, employees, members, investment advisors or its any of their respective successors and assigns (collectively, "Lessor Parties"), arising from this Lease or Lessor's obligations with respect to the Premises, or arising from any covenant, undertaking or agreement of Lessor contained in this Lease, and Lessee hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, under or through Lessee. If Lessor fails to perform any covenant, term or condition of this Lease upon Lessor's part to be performed, and, as a consequence of such failure, Lessee shall recover a judgment against Lessor, such judgment shall be satisfied only out of proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Lessor in the Building and Land, and Lessor shall not be liable for any deficiency. Notwithstanding any contrary provision herein, neither Lessor nor any Lessor Parties shall be liable under any circumstances for, and Lessee hereby waives and releases Lessor and Lessor Parties from, all liability for punitive, special or consequential damages arising under or in connection with this Lease, including, but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill, loss of use, or any other injury or damage to, or interference with, Lessee's business, in each case, however occurring.

38.    **GOVERNING LAW**: This Lease shall be governed by and construed in accordance with the internal laws of the State of Indiana, without reference to the conflicts of laws or choice of law provisions thereof.

39.    **WAIVER OF JURY TRIAL**: EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LEASE; PROVIDED, HOWEVER, THAT THE FOREGOING WAIVER SHALL NOT PRECLUDE THE PARTIES FROM LITIGATING ANY DISPUTES AT A TRIAL BY JUDGE. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL CONSIDERATION AND

Exhibit A  Page 29 of 39

INCUDEMNT TO THE EXECUTION OF THIS LEASE, AND CONSTIUES A KNOWING AND VOLUNTARY WAIVER.

40.    **RIGHT OF FIRST OFFER TO LEASE VACANT SPACE IN BUILDING**: The parties hereby agree that in the event Lessor becomes aware that any space within the Building will become vacant during the Term, and Lessor in its sole discretion, desires to lease such vacant space in the Building (the "Vacant Offer Space"), provided Lessee is not then in default after any applicable cure period, Lessee shall have a one-time right of first offer to lease the Vacant Offer Space. Before offering the Vacant Offer Space to any party for lease, Lessor will notify Lessee (the "Vacant Offer Notice") of the terms and conditions Lessor would be willing to accept with respect to a lease of the Vacant Offer Space, and Lessee shall have seven (7) business days within which to respond to the Vacant Offer Notice. Should Lessee decline Lessor's offer or fail to respond within such seven (7) business day time period, then Lessor shall be free to market and lease the Vacant Offer Space to any other party, and Lessor and Lessee agree that neither the validity of this Lease nor Lessee's obligations under this Lease shall be affected hereby and Lessee shall have no claim against Lessor by reason thereof. If Lessee timely accepts Lessor's offer to lease the Vacant Offer Space, then: (i) the Base Rent with respect to, and the expiration date of the term of, the Vacant Offer Space shall be as set forth in the Vacant Offer Notice; provided, however, that the term of the Vacant Offer Space and the Term for the original Premises shall run co-terminous, such that if, at the time Lessee timely accepts Lessor's offer, the Term for the original Premises has less term than the term set forth in the Vacant Offer Notice, the Term shall automatically be extended to run concurrent with the term in the Vacant Offer Notice; (ii) the term with respect to the Vacant Offer Space shall commence on the date set forth in the Vacant Offer Notice (the "Vacant Offer Space Commencement Date"), or the date the Vacant Offer Space Commencement Date would have occurred but for tenant delay and (iii) the Vacant Offer Space shall be leased in its "AS IS" condition, except to the extent otherwise specifically set forth in the Vacant Offer Notice. Commencing on the Vacant Offer Space Commencement Date: (a) the Vacant Offer Space shall be added to

and deemed a part of the Premises upon all of the terms and conditions of this Lease (including without limitation any renewal right), except as otherwise specifically set forth in the Vacant Offer Notice and this Section, but in no event shall Lessor be obligated to provide Lessee with any allowances in connection therewith (e.g., moving allowance, construction allowance, and the like), except to the extent specifically set forth in the Vacant Offer Notice; (b) the Base Rent shall be adjusted to reflect the addition of the Vacant Offer Space to the Premises at the rate set forth in the Vacant Offer Notice; and (c) Lessee's pro rata share shall be increased to reflect the addition of the Vacant Offer Space.  Lessor and Lessee agree to execute an amendment to this Lease reflecting the appropriate revisions; however, the failure to enter into such an amendment shall not affect the operation of this Section.  The parties acknowledge that Lessee's right of first offer to lease as set forth in this Section is a one-time right, limited only to the first vacancy in the Building.

      41.    **FUTURE BUILD-TO-SUIT**:  The parties hereto agree that in the event at any time during the Term, provided Lessee is not then in default after any applicable cure period, Lessee desires to expand the total premises leased from Lessor or any of its affiliates in the central Indiana market by fifty (50%) or more, then upon written notice from Lessee, the parties agree to negotiate a build-to-suit lease acceptable to Lessor in its sole discretion for the replacement of the then current premises being leased by Lessee.  It is the parties' intent that any such future build-to-suit building would likewise be located in the central Indiana market, and replace the then current premises being leased by Lessee from Lessor in said market, such that at the commencement of the new build-to-suit lease, the leases in effect for Lessee's then current premises would expire.  Neither the validity of this Lease, nor Lessee's obligations under this Lease shall be affected by nor shall Lessee have any claim against Lessor by reason of the parties having failed to reach an agreement on the new build-to-suit building as set forth in this Section.

*(Signatures on following page)*

31

IN WITNESS WHEREOF, the parties have set their hands and seals the day and year first above written.

**LESSOR:**

INDIANA BECKNELL INVESTORS
2011, a Delaware limited liability company

By: BECKNELL INDUSTRIAL
OPERATING PARTNERSHIP, L.P., a
Delaware limited partnership, its
sole member

By: BECKNELL INDUSTRIAL
OPERATING PARTNERSHIP GP,
LLC, a Delaware limited liability
company, its general partner

By: _____

Its authorized signatory

**LESSEE:**

HYPERIKON, INC., a California
corporation

By: _____

Its: _EVP_          FOUNDER + CBDO

32

Exhibit A  Page 32 of 39

EXHIBIT "A"

SITE PLAN



LOT 1
±18.104 AC.

BUILDING 1
323,000 SF

PROPOSED UNIT
152,000 SF

EX TENANT
171,000 SF

OFFICE
1,100 SF

UTILITY
ROOM

WH
RESTROOM

DEMISING
WALL

400'

850'

450'

380'

8 SEMI DOCKS & 13 K.O.
(14 TRAILER PARKING)

10 SEMI DOCKS & 11 K.O.
(15 TRAILER PARKING)

8 SEMI DOCKS & 13 K.O.
(13 TRAILER PARKING)

10 SEMI DOCKS & 11 K.O.
(15 TRAILER PARKING)

CONC. APRON

CONC. APRON

SHARED TRUCK COURT DRIVE

SHARED DRIVE

SHARED DRIVE

50 ORIGINAL TRAILER PARKING

121 CAR PARKING

FUT. 53 CAR PARKING

44 CAR PARKING

FUT. 7 CAR PARKING

SECURITY FENCE

GATE

GATE

RAMP

RAMP

RAMP

RAMP

D.I.D.

D.I.D.

D.I.D.

D.I.D.

**BECKNELL**
INDUSTRIAL

LOCATION: LOT1, EAGLE CREEK IND. CENTER, SEC 2
WHITESTOWN, BOONE CO., IN

BUILDING 1 SITE PLAN

DATE: 6/6/2017

SCALE: 1" = 120'

Exhibit A  Page 34 of 39

EXHIBIT "B"

BASE RENT SCHEDULE

| Month | PSF | Annual | Monthly |
|-------|------|--------------|-------------|
| 1-5 | $0.00 | $0.00 | $0.00 |
| 6-17 | $3.45 | $524,400.00 | $43,700.00 |
| 18-29 | $3.52 | $535,040.00 | $44,586.67 |
| 30-41 | $3.59 | $545,680.00 | $45,473.33 |
| 42-53 | $3.66 | $556,320.00 | $46,360.00 |
| 54-65 | $3.73 | $566,960.00 | $47,246.67 |

Exhibit A  Page 35 of 39

EXHIBIT "C"

TENANT ESTOPPEL CERTIFICATE

TO:              _____ and/or who else it may concern:

The undersigned, _____, a _____ ("Tenant"), is the Tenant under that certain Lease dated _____, executed by Tenant and _____("Landlord"), [as amended by that certain First Amendment to Lease dated _____,] [that certain Second Amendment to Lease dated _____,] [and that certain Third Amendment to Lease, Tenant leases [a portion of] that certain property located at _____(the "Leased Premises"), and more particularly described in the Lease.

THIS IS TO CERTIFY THAT:

1.      The Lease (i) is legal, valid and binding against Tenant, (ii) is in full force and effect and (iii) has not been modified, supplemented or amended, except as set forth in the introductory paragraph hereof. There are no other agreements or understandings, whether written or oral, with respect to the Lease or Tenant's right to use and occupy the Leased Premises, except as expressly provided in the Lease.

2.      A true, correct, and complete copy of the Lease is attached hereto as Exhibit A.

3.      The Tenant is not entitled to, and has made no agreement(s) with the Landlord or its agents or employees concerning, free rent, partial rent, rebate of rent payments, credit or offset or deduction in rent, or any other type of rental concession, including, without limitation, lease support payments or lease buy-outs (except as indicated below; if none, state "none"). _____
_____

4.      Except as provided below, Landlord has completed, and, if required under the Lease, paid for, any and all tenant work required under the Lease and Tenant has accepted the Leased Premises.  Tenant is not entitled to any further payment or credit for tenant work. _____
_____

5.      The Tenant now occupies the Leased Premises, and is and has been open for business since _____. The Lease term commenced _____.  The termination date of the present term of the Lease, excluding unexercised renewals, is ___ _____. Tenant has _____ options to renew the Lease term, each for an additional period of _____ years.

6.      Base Rent payable under the Lease is $ _____ per month.  Tenant has paid all rent, additional rents and other sums due and payable under the Lease for the Premises for the period up to and including _____.   No rent has been paid more than one (1) month in advance of its due date, except as indicated below (if none, state "none"). The Tenant's security deposit (whether in the form of cash, a letter of credit or otherwise), if any, is $ _____. _____

_____

_____

7.      To Tenant's knowledge, Landlord is not currently in default under the Lease and there are no events or conditions existing which, with or without notice or the lapse of time, or both, could constitute a default of Landlord under the Lease or entitle Tenant to offsets or defenses against the prompt payment of rent except as follows: _____. Tenant is not in default under any of the terms and conditions of the Lease nor is there now any fact or condition which, with notice or lapse of time or both, could constitute a default of Tenant under the Lease. Neither Tenant nor Landlord has commenced any action or given or received any notice for the purpose of terminating the Lease.

8.      Except as provided in the Lease, Tenant has no outstanding options or rights of first refusal to purchase the Leased Premises or any part thereof or all any part of the real property of which the Leased Premises are a part.

9.      No actions, whether voluntary or otherwise, are pending against the Tenant under the bankruptcy, reorganization, or other similar laws of the United States or any state thereof.

10.     The Tenant has not sublet the Leased Premises to any sublessee and has not assigned any of its rights under the Lease, except as indicated below (if none, state "none"). No one except the Tenant and its employees occupies the Leased Premises. _____

11.     The address for notices to be sent the Tenant is as set forth in the Lease.

12.     To the best of Tenant's knowledge, the use, maintenance or operation of the Premises complies with, and will at all times comply with, all applicable federal, state, county or local statutes, laws, rules and regulations of any governmental authorities relating to environmental, health or safety matters (being hereinafter collectively referred to as the Environmental Laws).

13.     The Leased Premises have not been used and the Tenant does not plan to use the Premises for any activities which, involve the use, generation, treatment, storage transportation or disposal of any petroleum product or any toxic or hazardous chemical, material substance, pollutant or waste, except for routine uses of small

quantities of hazardous materials as legally authorized in general warehouse and/or office operations.

14.    Tenant has not received any notices, written or oral, of violation of any Environmental Law or of any allegation which, if true, would contradict anything contained herein and there are not writs, injunctions, decrees, orders or judgments outstanding, no lawsuits, claims, proceedings or investigations pending or threatened, relating to the use, maintenance or operation of the Leased Premises, nor is Tenant aware of a basis for any such proceeding.

15.    Any right to terminate the Lease has been satisfied or waived.

16.    Tenant acknowledges that (i) this certificate will be relied upon by each of Seller, Purchaser, Purchaser's lender(s) and their respective affiliates, successors and assigns (including any designee(s) of Purchaser which take title to the Leased Premises) in connection with the purchase and sale and/or financing of the Leased Premises and (ii) such parties may rely on the certifications set forth in this certificate.

17.    The undersigned is authorized to execute this Tenant Estoppel certificate on behalf of the Tenant.

The undersigned hereby certifies that the certifications set forth above are true as of the date hereof.

IN WITNESS WHEREOF, Tenant has caused this certificate to be executed this _____ day of _____, 20___.

<div style="margin-left:40%;">

"TENANT":

_____

By:_____

Name:_____

Title:_____

</div>

[The undersigned guarantor of the Lease hereby confirms that the Guaranty dated _____, executed by the undersigned, is in full force and effect and has not been modified, supplemented, amended or terminated. The undersigned guarantor of the Lease hereby confirms that, in the event of any assignment of the Lease by Landlord to Purchaser or any other assignee, that the obligations of the undersigned guarantor will not be affected by such assignment and that the guaranty will remain in full force and effect.

GUARANTOR:

_____

By:_____

Name:_____

Title:_____]

## ASSIGNMENT AND ASSUMPTION OF LEASES

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **BECKNELL PROPERTIES**, an Illinois general partnership, **ILLINOIS BECKNELL INVESTORS 2011 LLC**, a Delaware limited liability company, **INDIANA BECKNELL INVESTORS 2007 LLC**, a Delaware limited liability company, **INDIANA BECKNELL INVESTORS LLC**, a Delaware limited liability company, **BECKNELL MUNGUSTA LLC**, a Delaware limited liability company, **INDIANA LAND BECKNELL INVESTORS LLC**, a Delaware limited liability company, **INDIANA BECKNELL INVESTORS 2011 LLC**, a Delaware limited liability company, **OHIO BECKNELL INVESTORS 2007 LLC**, a Delaware limited liability company, **and WISCONSIN BECKNELL INVESTORS LLC**, a Delaware limited liability company (each individually and/or collectively as the context shall require, the "**Assignor**"), hereby assigns, transfers and delegates to **SREIT 201 SWIFT ROAD, L.L.C.**, a Delaware limited liability company, **SREIT 221 SWIFT ROAD, L.L.C.**, a Delaware limited liability company, **SREIT HAMLIN COURT, L.L.C.**, a Delaware limited liability company, **SREIT GLEN ELLYN ROAD, L.L.C.**, a Delaware limited liability company, **SREIT TESLER ROAD, L.L.C.**, a Delaware limited liability company, **SREIT LAKESIDE DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT 1600 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 1650 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 1700 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 1851 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 1901 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 6221 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 6451 NORTHWIND, L.L.C.**, a Delaware limited liability company, **SREIT 101 MUNSTER, L.L.C.**, a Delaware limited liability company, **SREIT 215 MUNSTER, L.L.C.**, a Delaware limited liability company, **SREIT 225 MUNSTER, L.L.C.**, a Delaware limited liability company, **SREIT 235 MUNSTER, L.L.C.**, a Delaware limited liability company, **SREIT 333 MUNSTER, L.L.C.**, a Delaware limited liability company, **SREIT 480 MUNSTER, L.L.C.**, a Delaware limited liability company, **SREIT COMMERCE PARKWAY, L.L.C.**, a Delaware limited liability company, **SREIT GERDT COURT, L.L.C.**, a Delaware limited liability company, **SREIT 8401 BEARING DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT 8421 BEARING DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT 8441 BEARING DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT PERRY BOULEVARD, L.L.C.**, a Delaware limited liability company, **SREIT 4820 INDIANAPOLIS DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT 4910 INDIANAPOLIS DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT 5701 NORTH MEADOWS DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT 5900 NORTH MEADOWS DRIVE, L.L.C.**, a Delaware limited liability company, **SREIT CREEKSIDE BOULEVARD, L.L.C.**, a Delaware limited liability company, **SREIT NORTH 132ND STREET, L.L.C.**, a Delaware limited liability company, **SREIT NORTH IRONWOOD DRIVE, L.L.C.**, a Delaware limited liability company, and **SREIT 2091 RIDGEVIEW COURT, L.L.C.**, a Delaware limited liability company (each individually and/or collectively, as the context shall require, the "**Assignee**"), and Assignee hereby agrees to assume and accept the assignment and delegation of all of Assignor's right, title and interest except for Assignor's right to collect delinquent rent in

1

**Exhibit B page 1 of 35**

and to the Landlord's rights and obligations under the leases and the security deposits relating to the property located in various states and more particularly described on <u>Exhibit A</u> attached hereto. The leases and security deposits ("**Leases**") are listed on <u>Exhibit B</u> attached hereto.

All initially-capitalized terms not defined herein shall have their meaning as set forth in that certain Purchase and Sale and Escrow Agreement dated November 12, 2019, between BECKNELL PROPERTIES, an Illinois general partnership, ILLINOIS BECKNELL INVESTORS 2011 LLC, a Delaware limited liability company, INDIANA BECKNELL INVESTORS 2007 LLC, a Delaware limited liability company, INDIANA BECKNELL INVESTORS LLC, a Delaware limited liability company, BECKNELL MUNGUSTA LLC, a Delaware limited liability company, INDIANA LAND BECKNELL INVESTORS LLC, a Delaware limited liability company, INDIANA BECKNELL INVESTORS 2011 LLC, a Delaware limited liability company, OHIO BECKNELL INVESTORS 2007 LLC, a Delaware limited liability company, and WISCONSIN BECKNELL INVESTORS LLC, a Delaware limited liability company, and SCG Global Holdings, L.L.C., a Delaware limited liability company (the "**Original Purchaser**"), as assigned to Purchaser pursuant to that certain Assignment and Assumption of Purchase and Sale and Escrow Agreement, dated as of November 15, 2019 (as so assigned, the "**Purchase and Sale Agreement**").

By accepting this Assignment and by its execution hereof, Assignee assumes the payment and performance of, and agrees to pay, perform and discharge, all the debts, duties and obligations as arising and accruing from and after the date hereof to be paid, performed or discharged by the "landlord" or the "lessor" under the terms, covenants and conditions of the Leases, including, without limitation, brokerage commissions and compliance with the terms of the Leases relating to tenant improvements and security deposits.

Assignee shall indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including, without limitation, reasonable attorneys' fees, originating or relating to the period on or after the date hereof and arising out of the Assignee's assumed obligations under such leases.

Assignor shall indemnify Assignee against and hold Assignee harmless from any and all cost, liability, loss, damage or expense, including, without limitation, reasonable attorneys' fees and arising out of the Assignor's failure to perform its obligations under the Leases to the extent arising before the date hereof (except for obligations relating to the physical or environmental condition of the Property which have been assumed by Assignee). Assignee shall give written notice to Assignor of any claims for indemnification hereunder within nine (9) months following the date hereof, or Assignee's right to seek indemnification hereunder with respect to any such claims shall be of no further force and effect.

If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any

<div align="center">2</div>

provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation including, without limitation, reasonable attorneys' fees.

Recognizing that this Assignment is being executed by multiple parties as Assignor and multiple parties as Assignee, the undersigned, for the avoidance of doubt, hereby further agree that (a) each party executing this Assignment as an Assignor is making an assignment only as to the Leases identified on Exhibit B attached hereto as being applicable to such Assignor, and each Assignor's indemnity obligations hereunder relate only to the Leases identified on Exhibit B as being applicable to such Assignor, and (b) each party executing this Assignment as an Assignee is assuming only the landlord obligations under the Leases identified on Exhibit B as being applicable to such Assignee, and each Assignee's indemnity obligations hereunder relate only to the Leases identified on Exhibit B as being applicable to such Assignee.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

3

**Exhibit B page 3 of 35**

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of this 22ⁿᵈ day of ___November___, 2019.

**ASSIGNOR:**

**BECKNELL PROPERTIES, an Illinois general partnership**

By:  Becknell Industrial Operating Partnership, L.P., its authorized partner

By:  Becknell Industrial Operating Partnership GP LLC, its general partner

By: _Brent Hall_

Name: _Brent Hall_

Its: Authorized Signatory

S-1

**Exhibit B page 4 of 35**

**ILLINOIS BECKNELL INVESTORS 2011 LLC, a Delaware limited liability company**

By:  Becknell Industrial Operating Partnership, L.P., its sole member

By:  Becknell Industrial Operating Partnership GP LLC, its general partner

By: _____

Name: Brent Hall

Its: Authorized Signatory

S-2

**Exhibit B page 5 of 35**

**INDIANA BECKNELL INVESTORS 2007 LLC, a Delaware limited liability company**

By: Becknell 2007, an Illinois general partnership, its sole member

By:  Becknell Industrial Operating Partnership, L.P., its authorized partner

     By:  Becknell Industrial Operating Partnership GP LLC, its general partner

     By: _Brent Hall_

     Name: Brent Hall

     Its: Authorized Signatory

**Exhibit B page 6 of 35**

**INDIANA BECKNELL INVESTORS LLC, a Delaware limited liability company**

By: Becknell 2007, an Illinois general partnership, its sole member

By: Becknell Industrial Operating Partnership, L.P., its authorized partner

    By: Becknell Industrial Operating Partnership GP LLC, its general partner

    By: _Brent Hall_

    Name: _Brent Hall_

    Its: Authorized Signatory

S-4

**BECKNELL MUNGUSTA LLC, a Delaware limited liability company**

By: Becknell Properties, an Illinois general partnership, its sole member

By:  Becknell Industrial Operating Partnership, L.P., its authorized partner

      By:  Becknell Industrial Operating Partnership GP LLC, its general partner

          By: _____

          Name: Brent Hall

          Its: Authorized Signatory

S-5

**Exhibit B page 8 of 35**

**INDIANA LAND BECKNELL INVESTORS LLC, a
Delaware limited liability company**

By: Becknell 2004, an Illinois general partnership, its sole
member

By:  Becknell Industrial Operating Partnership, L.P., its
authorized partner

     By:  Becknell Industrial Operating Partnership GP LLC,
        its general partner

     By: _Brent Hall_

     Name:_Brent Hall_

     Its: Authorized Signatory

S-6

**Exhibit B page 9 of 35**

**INDIANA BECKNELL INVESTORS 2011 LLC, a Delaware limited liability company**

By: Becknell Industrial Operating Partnership, L.P., its sole member

    By: Becknell Industrial Operating Partnership GP LLC, its general partner

    By: _Brent Hall_

    Name: _Brent Hall_

    Its: Authorized Signatory

S-7

**Exhibit B page 10 of 35**

**OHIO BECKNELL INVESTORS 2007 LLC, a Delaware limited liability company**

By: Becknell 2007, an Illinois general partnership, its sole member

By: Becknell Industrial Operating Partnership, L.P., its authorized partner

   By: Becknell Industrial Operating Partnership GP LLC, its general partner

   By: _Brett Hall_  AV

   Name: _Brant Hall_

   Its: Authorized Signatory

S-8

**WISCONSIN BECKNELL INVESTORS LLC, a Delaware limited liability company**

By: Becknell 2004, an Illinois general partnership, its sole member

By: Becknell Industrial Operating Partnership, L.P., its authorized partner

By: Becknell Industrial Operating Partnership GP LLC, its general partner

By: _Brent Hall_

Name: _Brent Hall_

Its: Authorized Signatory

**Exhibit B page 12 of 35**

**ASSIGNEE:**

SREIT 201 SWIFT ROAD, L.L.C.,
SREIT 221 SWIFT ROAD, L.L.C.,
SREIT HAMLIN COURT, L.L.C.,
SREIT GLEN ELLYN ROAD, L.L.C.,
SREIT TESLER ROAD, L.L.C.,
SREIT LAKESIDE DRIVE, L.L.C.,
SREIT 1600 NORTHWIND, L.L.C.,
SREIT 1650 NORTHWIND, L.L.C.,
SREIT 1700 NORTHWIND, L.L.C.,
SREIT 1851 NORTHWIND, L.L.C.,
SREIT 1901 NORTHWIND, L.L.C.,
SREIT 6221 NORTHWIND, L.L.C.,
SREIT 6451 NORTHWIND, L.L.C.,
SREIT 101 MUNSTER, L.L.C.,
SREIT 215 MUNSTER, L.L.C.,
SREIT 225 MUNSTER, L.L.C.,
SREIT 235 MUNSTER, L.L.C.,
SREIT 333 MUNSTER, L.L.C.,
SREIT 480 MUNSTER, L.L.C.,
SREIT COMMERCE PARKWAY, L.L.C.,
SREIT GERDT COURT, L.L.C.,
SREIT 8401 BEARING DRIVE, L.L.C.,
SREIT 8421 BEARING DRIVE, L.L.C.,
SREIT 8441 BEARING DRIVE, L.L.C.,
SREIT PERRY BOULEVARD, L.L.C.,
SREIT 4820 INDIANAPOLIS DRIVE, L.L.C.,
SREIT 4910 INDIANAPOLIS DRIVE, L.L.C.,
SREIT 5701 NORTH MEADOWS DRIVE, L.L.C.,
SREIT 5900 NORTH MEADOWS DRIVE, L.L.C.,
SREIT CREEKSIDE BOULEVARD, L.L.C.,
SREIT NORTH 132nd DRIVE, L.L.C.,
SREIT NORTH IRONWOOD DRIVE, L.L.C.,
SREIT 2091 RIDGEVIEW DRIVE, L.L.C.,
each, a Delaware limited liability company


By: _____
Name: Garret Overlock
Its: Authorized Signatory




[Signature Page to Assignment of Leases]


**Exhibit B page 13 of 35**

**EXHIBIT A**

| PROPERTY ADDRESS |
|---|
| **CHICAGO ASSETS** |
| 201 Swift Road, Addison, IL 60101 |
| 221 Swift Road, Addison, IL 60101 |
| 12857 Hamlin Court, Alsip, IL 60803 |
| 1695 Glen Ellyn Road, Glendale Heights, IL 60139 |
| 845 Telser Road, Lake Zurich, IL 60047 |
| Lakeside Drive, Romeoville, IL 60446 |
| 101 W 45th Street, Munster, IN 46319 |
| 215 W 45th Street, Munster, IN 46319 |
| 225 W 45th Street, Munster, IN 46319 |
| 235 W 45th Street, Munster, IN 46319 |
| 333 W 45th Street, Munster, IN 46319 |
| 480 W 45th Street, Munster, IN 46319 |
| 1600-40 Northwind Parkway, Hobart, IN 46342 |
| 1650 Northwind Parkway, Hobart, IN 46342 |
| 1700-21 Northwind Parkway, Hobart, IN 46342 |
| 1851 Northwind Parkway, Hobart, IN 46342 |
| 1901-51 Northwind Parkway, Hobart, IN 46342 |
| 6221 Northwind Parkway, Hobart, IN 46342 |
| 6451-71 Northwind Parkway, Hobart, IN 46342 |
| **INDIANAPOLIS ASSETS** |
| 775 Commerce Parkway West Drive, Greenwood, IN 46143 |
| 999 Gerdt Court, Greenwood, IN 46143 |
| 8401 Bearing Drive, Indianapolis, IN 46268 |
| 8421 Bearing Drive, Indianapolis, IN 46268 |
| 8441 Bearing Drive, Indianapolis, IN 46268 |
| 3890 Perry Boulevard, Whitestown, IN |
| 4910-4938 Indianapolis Drive, Whitestown, IN 46052 |
| 4820 - 4850 Indianapolis Drive, Whitestown, IN 46052 |
| **COLUMBUS ASSETS** |
| 5701 North Meadows Drive, Grove City, OH 43123 |
| 5900 North Meadows Drive, Grove City, OH 43123 |
| 2240 Creekside Parkway, Lockbourne, OH 43137 |
| **MILWAUKEE ASSETS** |
| 4410 North 132nd Street, Butler, WI 53007 |
| 4700 North Ironwood Drive, Franklin, WI 53132 |
| W 234 N 2091 Ridgeview Court, Pewaukee, WI 53188 |

A-1

**Exhibit B page 14 of 35**

### 201 Swift Road, Addison, IL

LOT 1 OF MOLLEXA ADDITION, BEING PART OF THE NORTHEAST QUARTER,
SECTION 25, TOWNSHIP 40 NORTH, RANGE 10, EAST OF THE THIRD PRINCIPAL
MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 20, 1993
AS DOCUMENT NUMBER R93-297003, IN DUPAGE COUNTY, ILLINOIS.

TOGETHER WITH ALL RIGHT, TITLE AND INTEREST OF GRANTOR PURSUANT TO
THAT CERTAIN "GRANT OF EASEMENT AND AGREEMENT CONCERNING WATER
MAIN" BY AND BETWEEN MOLLEXA II CORPORATION, (FIRST PART) AND BOARD
OF DIRECTORS OF THE DUPAGE AREA OCCUPATIONAL EDUCATION SYSTEM,
SUCCESSOR BY OPERATION OF LAW TO THE DUPAGE COUNTY BOARD OF
SCHOOL TRUSTEES, HEREINAFTER CALLED (SECOND PARTY) DATED MARCH
18, 1994 AND RECORDED APRIL 22, 1994 AS DOCUMENT NUMBER R94-094469
AND RE-RECORDED AS DOCUMENT R95-127489 ON SEPTEMBER 19, 1995.

AND TOGETHER WITH ALL RIGHT, TITLE AND INTEREST OF GRANTOR TO A NON-
EXCLUSIVE EASEMENT FOR THE BENEFIT OF PARCEL 1 AS SET FORTH IN THE
PLAT OF SUBDIVISION RECORDED DECEMBER 20, 1993 AS DOCUMENT NUMBER
R93-207003 AND IN THE OWNER'S CERTIFICATE AND DEDICATION RECORDED
AS DOCUMENT R93-297005 AND AS CREATED BY DEED FROM BECKNELL
PROPERTIES, AN ILLINOIS GENERAL PARTNERSHIP RECORDED, AS DOCUMENT
NO.   FOR 40 FOOT EASEMENT FOR INGRESS AND EGRESS FOR A SHARED
DRIVEWAY.

### 221 Swift Road, Addison, IL

Lots 2 and 3 in Mollexa Addition, being part of the Northeast Quarter of Section 25,
Township 30 North, Range 10, East of the Third Principal Meridian, according to the plat
thereof recorded December 20, 1993 as Document No. R93-297003, in DuPage County,
Illinois.

Together with all right, title and interest of Grantor pursuant to a non-exclusive easement
for the benefit of Lot 2 in Parcel 1 for constructing permanent water mains and making
repairs and maintenance as may be necessary from time to time to the water main, as
created by the Grant of Easement and Agreement Concerning Water Main dated March
18, 1994 and recorded April 22, 1994 as Document No. R94-094469 and rerecorded
September 19, 1995 as Document No. R95-127489 by and between Mollexa II
Corporation, "First Party", and Board of Directors of the DuPage Area Occupational
Education System, "Second Party", across the property the Second Party along the strip
also shown on the attached Exhibit "A".

Together with all right, title and interest of Grantor to a non-exclusive easement for the
benefit of Lot 2 in Parcel 1 as set forth in the Plat of Subdivison recorded December 20,
1993 as Document Number R93-207003 and in the Owner's Certificate and Dedication
recorded as Document R93-297005 and as created by deed from Becknell Properties,

A-2

an Illinois general partnership recorded, as Document No. for 40 foot easement for ingress and egress for a shared driveway.

### 12857 Hamlin Court, Alsip, IL

LOT 1 IN BECKNELL INDUSTRIAL FIRST ADDITION TO ALSIP OF LOT 8 AND LOT 7 IN BLUE ISLAND GARDENS, A SUBDIVISION OF NORTHWEST 1/4 OF SECTION 35, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL AND OUTLOT 8 IN ALSIP INDUSTRIAL PARK UNIT NUMBER 2, BEING A SUBDIVISION OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF SECTION 35, TOWNSHIP 37 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

### 1695 Glen Ellyn Road, Glendale Heights, IL

LOT 1 IN BECKNELL INDUSTRIAL 1ST ADDITION TO GLENDALE HEIGHTS, A SUBDIVISION IN THE SOUTH 1/2 OF SECTION 26, TOWNSHIP 40 NORTH, RANGE 10, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED APRIL 13, 2012 AS DOCUMENT R2012-048610 IN DUPAGE COUNTY, ILLINOIS.

### 845 Tesler Road, Lake Zurich, IL

LOT 1 IN ASTOR SUBDIVISION, BEING A SUBDIVISION OF PART OF THE SOUTHEAST QUARTER OF SECTION 9, TOWNSHIP 43 NORTH, RANGE 10, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED SEPTEMBER 27, 2007 AS DOCUMENT NUMBER 6247624, AS AMENDED BY THE PLAT AMENDMENT NO. 1 ASTOR SUBDIVISION RECORDED OCTOBER 28, 2009 AS DOCUMENT NUMBER 6536524 IN LAKE COUNTY, ILLINOIS.

### 1245-1247 Lakeside Drive, Romeoville, IL

That part of Lot 1 in Marquette Center Business and Industrial Park Resubdivision No. 1, being a subdivision of part of Sections 22 and 27, Township 37 North, Range 10, East of the Third Principal Meridian, according to the plat thereof recorded September 9, 1976 as Document No. R76-29156, bounded and described as follows: beginning at the Northwest corner of said Lot 1; thence East along the North line thereof, a distance of 415.00 feet to a point; thence South, a distance of 193.00 feet to a point; thenceWest, a distance of 132.00 feet to a point; thence South, a distance of 308.00 feet to a point; thence West, a distance of 140.00 feet to a point; thence South 56 degrees 42 minutes 03 seconds West, a distance of 106.48 feet to a point; thence South a distance of 40.54 feet to a point; thence West a distance of 54.00 feet to a point; thence North a distance of 600.00 feet to the point of beginning, all in Will County, Illinois.

### 101 West 45th Street, Munster, IN

Lot 1, in DSC Subdivision, as per plat thereof, recorded in Plat Book 85 Page 83, in the Office of the Recorder of Lake County, Indiana.

### 215 West 45thStreet, Munster, IN

Lot Number 2A as shown on the recorded Replat of Lot 2 in DSC Subdivision recorded in Plat Book 88, Page 04 in the Office of the Recorder of Lake County, Indiana.

A-3

**Exhibit B page 16 of 35**

### 225 West 45th Street, Munster, IN

Lot Number 2B as shown on the recorded Replat of Lot 2 in DSC Subdivision recorded in Plat Book 88, page 04 in the Office of the Recorder of Lake County, Indiana.

### 235 West 45th Street, Munster, IN

Lot 2C of the Replat of Lot 2 in DSC Subdivision, as per plat thereof, recorded in Plat Book 88, page 4, in the Office of the Recorder of Lake County, Indiana.

### 333 West 45th Street, Munster, IN

Lot 3 in DSC Subdivision, as per plat thereof, recorded in Plat Book 85, page 83, in the Office of the Recorder of Lake County, Indiana.

### 480 West 45th Street, Munster, IN

That part of Lot 2 in Midwest Central Business Park, Unit 4, Replat in the Town of Munster as per plat thereof, recorded in Plat Book 94, Page 33, described by Beginning at the Southwest corner of said Lot 2; thence South 88 degrees 24 minutes 11 seconds East, along the South line thereof, a distance of 418.20 feet to a point; thence North 01 degrees 36 minutes 09 seconds East, a distance of 554.43 feet to a point on the North line of Lot 2; thence along a curve to the left, having a radius of 857.16 feet, 492.30 feet along said curve, through a central angle of 32 degrees 54 minutes 25 seconds, along said curve having a chord direction of North 72 degrees 19 minutes 56 seconds West, and a chord length of 485.56 feet; thence North 88 degrees 47 minutes 09 seconds West, a distance of 35.25 feet to the Northwest corner of said Lot 2; thence South 01 degrees 42 minutes 55 seconds West, a distance of 245.00 feet to a point; thence South 88 degrees 47 minutes 10 seconds East, a distance of 85.00 feet to a point; thence South 01 degrees 42 minutes 42 seconds West, a distance of 444.18 feet to the Point of Beginning, in Lake County, Indiana.

Together with all right, title and interest of Grantor to a storm water drainage easement dated December 17, 200 and recorded January 21, 2003 as Document No. 2003-006346 made by and between Center Point Venture, LLC to Becknell Development L.L.C., over and upon the following described tract: That part of Lot 1 in Midwest Central Business Park, Unit 4, in the Town of Munster as shown in Plat Book 64, page 22, described by commencing at the Southwest corner of said Lot 2; thence South 88 degrees 24 minutes 11 seconds East along the South line thereof, a distance of 62.86 feet to the Point of Beginning; thence South 88 degrees 24 minutes 11 seconds East, a distance of 51.17 feet to a point; thence South 01 degrees 35 minutes 49 seconds West, a distance of 60.45 feet to a point; thence North 88 degrees 24 minutes 11 seconds West, a distance of 51.33 feet to a point; thence North 01 degrees 44 minutes 56 seconds East, a distance of 60.45 feet to a point, to the Point of Beginning, in Lake County, Indiana.

And:

A-4

**Exhibit B page 17 of 35**

Together with all right, title and interest of Grantor pursuant to that certain Non Exclusive
Cross Access Easement dated January 2, 2003 and recorded April 9, 2003 as Document
No. 2003-035924.

### 1600-1640 Northwind Parkway, Hobart, IN

Lot 1A in Replat #4 of North Wind Crossings, as per plat thereof, recorded in Plat Book 105, page
75 as Instrument No. 2012-042273, in the Office of the Recorder of Lake County, Indiana.

### 1650 Northwind Parkway, Hobart, IN

Lot 1B in Replat #4 of North Wind Crossings, as per plat thereof, recorded in Plat Book 105, page
75 as Instrument No. 2012-042273, in the Office of the Recorder of Lake County, Indiana.

### 1700-1721 Northwind Parkway, Hobart, IN

Lot B in North Wind Crossings, as per plat thereof, recorded in Plat Book 95, page 86, in the
Office of the Recorder of Lake County, Indiana.

### 1851 Northwind Parkway, Hobart, IN

Lot 1 in Replat #6 of North Wind Crossings, a Planned Unit Development to the City of
Hobart, Lake County, Indiana, recorded May 15, 2014 in Plat Book 107 Page 21 as
Instrument No. 2014 027989, in the Office of the Recorder of Lake County, Indiana, as
amended by Certificate of Correction, recorded July 15, 2014 as Instrument No. 2014
041117, in the Office of the Recorder of Lake County, Indiana.

### 1901-1951 Northwind Parkway, Hobart, IN

PARCEL I:

Lot number 1 in the Resubdivision of Lots C & D in North Wind Crossings, as per plat thereof,
recorded in Plat Book 97, page 48, in the Office of the Recorder of Lake County, Indiana.

PARCEL II:

Lot numbered 2A in Replat #5 of North Wind Crossings, as per plat thereof, recorded in Plat Book
105, page 74, in the Office of the Recorder of Lake County, Indiana.

PARCEL III:

Lot numbered 2B in Replat #5 of North Wind Crossings, as per plat thereof, recorded in Plat Book
105, page 74, in the Office of the Recorder of Lake County, Indiana.

### 6221 Northwind Parkway, Hobart, IN

Lot 2 in North Wind Crossings - Unit Two, an addition to the City of Hobart, Lake County,
Indiana, as per plat thereof recorded January 22, 2007 in Plat Book 100 Page 89, in the
Office of the Recorder of Lake County, Indiana.

A-5

**Exhibit B page 18 of 35**

### 6451-6471 Northwind Parkway, Hobart, IN

Lot 3C in Replat #2 of North Wind Crossings - Unit Two, an addition to the City of Hobart, Lake County, Indiana, as per plat thereof recorded December 19, 2013 in Plat Book 106 Page 77, in the Office of the Recorder of Lake County, Indiana.

### 775 Commerce Parkway West, Greenwood, IN

Part of the Southeast Quarter of Section 34, township 14 North, Range 4 East and part of the Northeast Quarter of Section 3, Township 13 North, Range 4 East of the Second Principal Meridian, Johnson County, Indiana:

Lot 5B in "Lot 5A & 5B - Precedent South Business Center - Section One - Block 5", the plat of which is recorded in Plat Book "E", Pages 14 A & B as Instrument No. 2010-006764, in the Office of the Recorder of Johnson County, Indiana, containing 8.601 acres.

### 999 Gerdt Court, Greenwood, IN

Lot 1 Block 13, Precedent South Business Center, Section Four, a subdivision in the City of Greenwood, Johnson County, Indiana, as per plat thereof, recorded August 28, 2000 as Instrument No. 2000-020189, Plat Cabinet D, Slide 314 A & B, in the Office of the Recorder of Johnson County, Indiana.

Together with all right, title and interest of Grantor in and to non-exclusive easements appurtenant to the Land, pursuant to a Declaration of Covenants, Conditions, Restrictions and Easements for Precedent South Business Center, recorded April 27, 1999 as Instrument No. 1999-13137.

### 8401 Bearing Drive, Indianapolis, IN

Part of the East Half of the Northwest Quarter of Section 19, Township 17 North, Range 3 East, Marion County, Indiana, more particularly described as follows:

Commencing at the Northwest corner of said Northwest Quarter; thence North 89 degrees 00 minutes 19 seconds East (assumed basis of bearings) 1,207.87 feet along the North line of said Northwest Quarter to the Northwest corner of said East Half; thence South 00 degrees 11 minutes 08 seconds East 74.94 feet along the West line of said East Half to South line of the Grant of Right-of-Way for 86th Street as described in Instrument Number 91-29390, on file in the Office of the Recorder of Marion County, Indiana; thence continuing South 00 degrees 11 minutes 08 seconds East 367.72 feet along the West line of said East Half to the East line of the Grant of Right-of-Way for Bearing Drive (formerly North by Northwest Blvd) as described in said Instrument Number 91-29390, the following two (2) courses are along said East right-of-way line; (1) thence Southerly 170.68 feet along a curve to the right having a radius of 265.51 feet and subtended by a long chord having a bearing of South 18 degrees 36 minutes 05 seconds East and a length of 167.76 feet; (2) thence South 00 degrees 11 minutes 08 seconds East 1,015.00 feet to the POINT OF BEGINNING; thence North 89 degrees 48 minutes 56 seconds East 651.18 feet; thence South 00 degrees 11 minutes 04 seconds East 1,051.08 feet to the South line of the parcel conveyed to MEPT North by Northwest, LLC in Instrument Number 2008-135098, on file in the Office of said Recorder, the following two (2) courses are along the South and West lines thereof; (1) thence South 88 degrees 58 minutes 36 seconds West 704.23 feet; (2) thence North 00 degrees 11

A-6

**Exhibit B page 19 of 35**

minutes 08 seconds West 1,018.37 feet to the South right-of-way line of said Bearing Drive, the following two (2) courses are along the South and East right-of-way line thereof; (1) thence South 89 degrees 49 minutes 00 seconds East 53.00 feet; (2) thence North 00 degrees 11 minutes 08 seconds West 43.36 feet to the POINT OF BEGINNING. Containing 17.022 acres, more or less.

### 8421 Bearing Drive, Indianapolis, IN

Part of the East Half of the Northwest Quarter of Section 19, Township 17 North, Range 3 East, Marion County, Indiana, more particularly described as follows:

Commencing at the Northwest corner of said Northwest Quarter; thence North 89 degrees 00 minutes 19 seconds East (assumed basis of bearings) 1,207.87 feet along the North line of said Northwest Quarter to the Northwest corner of said East Half; thence South 00 degrees 11 minutes 08 seconds East 74.94 feet along the West line of said East Half to South line of the Grant of Right-of-Way for 86th Street as described in Instrument Number 91-29390, on file in the Office of the Recorder of Marion County, Indiana; thence continuing South 00 degrees 11 minutes 08 seconds East 367.72 feet along the West line of said East Half of the East line of the Grant of Right-of-Way for Bearing Drive (formerly North by Northwest Blvd) as described in said Instrument Number 91-29390, the following two (2) courses are along said East right-of-way line; (1) thence Southerly 170.68 feet along a curve to the right having a radius of 265.51 feet and subtended by a long chord having a bearing of South 18 degrees 36 minutes 05 seconds East and a length of 167.76 feet; (2) thence South 00 degrees 11 minutes 08 seconds East 448.41 feet to a 5/8-inch diameter rebar with a cap stamped "Structurepoint - 0094" (hereafter referred to as "Set Rebar") at the POINT OF BEGINNING; thence North 89 degrees 50 minutes 22 seconds East 778.85 feet to a Set Rebar; thence South 00 degrees 09 minutes 38 seconds East 87.75 feet to a Set Rebar; thence South 89 degrees 45 minutes 09 seconds West 133.60 feet to a Set Rebar; thence South 00 degrees 16 minutes 29 seconds East 343.78 feet to a Set Rebar; thence North 89 degrees 55 minutes 39 seconds West 645.75 feet to a Set Rebar on the East right-of-way line of said Bearing Drive; thence North 00 degrees 11 minutes 08 seconds West 429.10 feet along said East right-of-way line to the POINT OF BEGINNING. Containing 6.647 acres, more or less.

ALSO:

Part of the East Half of the Northwest Quarter of Section 19, Township 17 North, Range 3 East, Marion County, Indiana, more particularly described as follows:

Commencing at the Northwest corner of said Northwest Quarter; thence North 89 degrees 00 minutes 19 seconds East (assumed basis of bearings) 1,207.87 feet along the North line of said Northwest Quarter to the Northwest corner of said East Half; thence South 00 degrees 11 minutes 08 seconds East 74.94 feet along the West line of said East Half to a 5/8-inch diameter rebar with a cap stamped "Structurepoint - 0094" (hereafter referred to as "Set Rebar") on the South line of the Grant of Right-of-Way for 86th Street as described in Instrument Number 91-29390, on file in the Office of the Recorder of Marion County, Indiana, being the POINT OF BEGINNING; thence North 89 degrees 06 minutes 24 seconds East 375.04 feet along said South right-of-way line to a rebar with a cap stamped "Weihe" (hereafter referred to as 'Weihe Rebar") on the East line of the parcel conveyed to Indiana Becknell Investors 2011 LLC in Instrument Number 201300124759, on file in the Office of said Recorder, the following four (4) courses are along the West and South lines thereof; (1) thence South 00 degrees 17 minutes 22 seconds East 270.68 feet to a Weihe Rebar; (2) thence South 81 degrees 41 minutes 15 seconds East 588.58 feet to a Weihe Rebar; (3) thence South 00 degrees 15 minutes 13 seconds East 2,236.20 feet to a Weihe Rebar; (4) thence South 88 degrees 58 minutes 36 seconds West 256.14 feet to a Set

**Exhibit B page 20 of 35**

Rebar; thence North 00 degrees 11 minutes 04 seconds West 1,051.08 feet to a Set Rebar; thence South 89 degrees 48 minutes 56 seconds West 651.18 feet to a Set Rebar on the East line of the Grant of Right-of-Way for Bearing Drive (formerly North by Northwest Blvd) as described in said Instrument Number 91-29390; thence North 00 degrees 11 minutes 08 seconds West 137.48 feet along said East right-of-way line to a Set Rebar; thence South 89 degrees 55 minutes 39 seconds East 645.75 feet to a Set Rebar; thence North 00 degrees 16 minutes 29 seconds West 343.78 feet to a Set Rebar; thence North 89 degrees 45 minutes 09 seconds East 133.60 feet to a Set Rebar; thence North 00 degrees 09 minutes 38 seconds West 383.54 feet to a Set Rebar; thence North 63 degrees 35 minutes 40 seconds West 293.37 feet to a Set Rebar; thence South 89 degrees 50 minutes 22 seconds West 516.64 feet to a Set Rebar on the East right-of-way line of said Bearing Drive, the following two (2) courses are along said East right-of-way line; (1) thence North 00 degrees 11 minutes 08 seconds West 21.41 feet to a Set Rebar; (2) thence Northerly 170.68 feet along a curve to the left having a radius of 265.51 feet and subtended by a long chord having a bearing of North 18 degrees 36 minutes 05 seconds West and a length of 167.76 feet to a Set Rebar on the West line of said Indiana Becknell Investors parcel; thence North 00 degrees 11 minutes 08 seconds West 367.72 feet along said West line to the POINT OF BEGINNING.

Containing 20.698 acres, more or less.

### 8441 Bearing Drive, Indianapolis, IN

Part of the East Half of the Northwest Quarter of Section 19, Township 17 North, Range 3 East, Marion County, Indiana, more particularly described as follows:

Commencing at the Northwest corner of said Northwest Quarter; thence North 89 degrees 00 minutes 19 seconds East (assumed basis of bearings) 1,207.87 feet along the North line of said Northwest Quarter to the Northwest corner of said East Half; thence South 00 degrees 11 minutes 08 seconds East 74.94 feet along the West line of said East Half to South line of the Grant of Right-of-Way for 86th Street as described in Instrument Number 91-29390, on file in the Office of the Recorder of Marion County, Indiana; thence continuing South 00 degrees 11 minutes 08 seconds East 367.72 feet along the West line of said East Half to the East line of the Grant of Right-of-Way for Bearing Drive (formerly North by Northwest Blvd) as described in said Instrument No. 91-29390, the following two (2) courses are along said East right-of-way line; (1) thence Southerly 170.68 feet along a curve to the right having a radius of 265.51 feet and subtended by a long chord having a bearing of South 18 degrees 36 minutes 05 seconds East and a length of 167.76 feet; (2) thence South 00 degrees 11 minutes 08 seconds East 21.41 feet to a 5/8-inch diameter rebar with a cap stamped "Structurepoint - 0094" (hereafter referred to as "Set Rebar") at the POINT OF BEGINNING; thence North 89 degrees 50 minutes 22 seconds East 516.64 feet to a Set Rebar; thence South 63 degrees 35 minutes 40 seconds East 293.37 feet to a Set Rebar; thence South 00 degrees 09 minutes 38 seconds East 295.80 feet to a Set Rebar; thence South 89 degrees 50 minutes 22 seconds West 778.85 feet to a Set Rebar on the East right-of-way line of said Bearing Drive; thence North 00 degrees 11 minutes 08 seconds West 427.00 feet along said East right-of-way line to the POINT OF BEGINNING.

Containing 7.241 acres, more or less.

**Exhibit B page 21 of 35**

### 3890 Perry Blvd., Whitestown, IN

Lot numbered 13 in Perry Industrial Park II, Section 2, as per plat thereof recorded in Plat Book 17, pages 51-52 as Instrument No. 200600010367, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to Non-Exclusive Easements as established by and set forth in Declaration of Development Standards, Covenants and Restrictions for Perry Industrial Park II, recorded April 29, 1999 as Instrument No. 9905395. Amended by Amendment to Declaration of Development Standards, Covenants and Restrictions for Perry Industrial Park II, recorded November 2, 2000 as Instrument No. 0010988; Second Amendment to Declaration of Development Standards, Covenants and Restrictions for Perry Industrial Park II, recorded April 2, 2003 as Instrument No. 0305772 and recorded April 16, 2003 as Instrument No. 0306680; and Supplement and Third Amendment to Declaration of Development Standards, Covenants and Restrictions for Perry Industrial Park II, recorded June 2, 2005 as Instrument No. 0506012 in the Office of the Recorder of Boone County, Indiana.

### 4910-4938 Indianapolis Dr., Whitestown, IN

Lot Numbered One (1) in Eagle Creek Industrial Center, Section 2, as per plat thereof, recorded May 15, 2007 as Instrument No. 200700005080 in Plat Book 18 Pages 37 and 38, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to easements as set forth in Joint Drive Cut and Reciprocal Easement Agreement by and between Perry Industrial Park II, LLC and Pizzuti Land LLC, dated January 13, 2004 and recorded March 25, 2004 as Instrument No. 0403535, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to easements as set forth in Joint Drive Cut and Reciprocal Easement Agreement by and between Eagle Creek I LLC and Pizzuti Land LLC, dated October 16, 2006 and recorded October 24, 2006 as Instrument No. 200600011538, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to the easement as set forth in Fire Protection Easement Agreement by and between PCO Eagle Creek I, LP and Pizzuti Land LLC, dated October 19, 2006 and recorded October 24, 2006 as Instrument No. 200600011542, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to non-exclusive easements set forth in Temporary Drainage Easement Agreement by Eagle Creek I LLC and Pizzuti Land LLC, dated October 16, 2006, and recorded October 24, 2006, as Instrument No. 200600011539 in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to non-exclusive easements set forth in Grant of Easement for Drainage and Compensatory Storage by and between Indiana Becknell Investors 2011 LLC and Zionsville Indiana Land Becknell Investors LLC,

A-9

**Exhibit B page 22 of 35**

recorded August 9, 2019 as Instrument No. 2019007703 in the Office of the Recorder of Boone County, Indiana.

### 4820-4850 Indianapolis Dr., Whitestown, IN

Lot Numbered Two (2) in the Replat of Lot 1 of Eagle Creek Industrial Center, Section 2, Secondary Plat, as per plat thereof, recorded December 14, 2016 as Instrument No. 201600012514 in Plat Book 24 Page 83-85, in the Office of the Recorder of Boone County, Indiana.

AND

Outlot A in the Replat of Lot 1 of Eagle Creek Industrial Center, Section 2, Secondary Plat, as per plat thereof, recorded December 14, 2016 as Instrument No. 201600012514 in Plat Book 24, page 83-85, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to non-exclusive easements as set forth in Joint Drive Cut and Reciprocal Easement Agreement by and between Perry Industrial Park II, LLC and Pizzuti Land LLC, dated January 13, 2004 and recorded March 25, 2004 as Instrument No. 0403535, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to non-exclusive easements as set forth in Joint Drive Cut and Reciprocal Easement Agreement by and between Eagle Creek I LLC and Pizzuti Land LLC, dated October 16, 2006 and recorded October 24, 2006 as Instrument No. 200600011538, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to a non-exclusive easement as set forth in Fire Protection Easement Agreement by and between PCO Eagle Creek I, LP and Pizzuti Land LLC, dated October 19, 2006 and recorded October 24, 2006 as Instrument No. 200600011542, in the Office of the Recorder of Boone County, Indiana.

Together with all right, title and interest of Grantor to non-exclusive easements as set forth in Grant of Easement for Drainage and Compensatory Storage by and between Indiana Becknell Investors 2011 LLC and Zionsville Indiana Land Becknell Investors LLC, recorded August 9, 2019 as Instrument No. 2019007703 in the Office of the Recorder of Boone County, Indiana.

### 5701 Meadows Drive, Grove City, OH

Situated in the City of Grove City, County of Franklin, and State of Ohio described as follows:
Being Lot Number Six (6) in Gateway Business Park, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 86, Page 4, Recorder's Office, Franklin County, Ohio.

LESS AND EXCEPTING therefrom the following 0.488 Acre Tract as conveyed by Crossroads Ohio LLC to the City of Grove City, Ohio by Instrument Number 201304110060273, Franklin County, Ohio:

A-10

**Exhibit B page 23 of 35**

Situated in the City of Grove City, County of Franklin, and State of Ohio, located in Virginia Military Survey Number 1434, being out of Lot 6 of that subdivision entitled "Gateway Business Park", of record in Plat Book 86, Pages 4 and 5, as conveyed to Crossroads Ohio LLC by deed of record in Instrument Number 200512160265086 (all references refer to the records of the Recorder's Office, Franklin County, Ohio), and being described as follows:

Beginning at a Southeasterly corner said Lot 6, the Northeasterly corner of Lot 4 of that plat entitled "Gateway Business Park", of record in Plat Book 86, Pages 4 and 5, as conveyed to Gateway Business Park, LLC by deed of record in Instrument Number 200402250040578, being in the Westerly line of that tract conveyed to the Buckeye Ranch Foundation, Inc. by deed of record in Instrument Number 199809090228735, being referenced by a 3/4 inch iron pipe found (1.06' South, 0.96' East);

Thence North 57 deg. 02' 40" West, with the Southerly line of said Lot 6, the Northerly line of said Lot 4, (passing at 5/8 inch rebar capped "Bischoff" found at 153.76 feet) a total distance of 155.26 feet to an iron pin set;

Thence North 32 deg. 57' 20" East, across said Lot 6, a distance of 107.39 feet to an iron pin set at a point of curvature;

Thence continuing across said Lot 6, with the arc of a curve to the left having a radius of 500.00 feet, a central angle of 31 deg. 50' 28" and a chord that bears North 17 deg. 02' 06" East, a chord distance of 274.30 feet (arc distance of 277.87 feet) to an iron pin set in the Easterly line of said Lot 6, the Westerly line of said the Buckeye Ranch Foundation Inc. tract;

Thence South 01 deg. 06' 52" West, with the Easterly line of said Lot 6, the Westerly line of said the Buckeye Ranch Foundation Inc. tract, a distance of 436.93 feet to the point of beginning and containing 0.488 acres of land, more or less.

The above description was prepared using the documents of record, prior plats of survey, and observed evidence located by a field survey performed by EMH&T in June 2011.

Iron pins set, where indicated, are iron pipes, thirteen sixteenths (13/16) inch inside diameter, thirty (30) inches long with a plastic plug placed in the top bearing the initials EMHT, INC.

The bearings shown herein are based on the Ohio State Plane Coordinate System, South Zone, per NAD83 (1986 adjustment). Control for bearings was from coordinates of monuments FCGS 5548 and FCGS 5539, having a bearing of North 00 deg. 21' 40" East for a portion of the centerline of Hoover Road, established by the Franklin County Engineering Department.

A-11

**Exhibit B page 24 of 35**

ALSO LESS AND EXCEPTING therefrom the following 0.028 Acre Tract as conveyed by Crossroads Ohio LLC to the City of Grove City, Ohio by Instrument Number 201304110060273, Franklin County, Ohio:

Situated in the City of Grove City, County of Franklin, and State of Ohio, located in Virginia Military Survey Number 1434, being out of Lot 6 of that subdivision entitled "Gateway Business Park", of a record in Plat Book 86, Pages 4 and 5, conveyed to Crossroads Ohio LLC by deed of record in Instrument Number 200512160265086 (all references refer to the records of the Recorder's Office, Franklin County, Ohio), and being described as follows:

Beginning at a Northeasterly corner of said Lot 6, the Southeasterly corner of that 0.697 acre tract conveyed to Mara Enterprises Incorporated by deed of record in Deed Book 3325, Page 153, being in the Westerly line of that tract conveyed to the Buckeye Ranch Foundation, Inc. by deed of record in Instrument Number 199809090228735;

Thence South 01 deg. 06' 52" West, with the Easterly line of said Lot 6, the Westerly line of said the Buckeye Ranch Foundation Inc. tract, a distance of 81.14 feet to an iron pin set;

Thence North 88 deg. 53' 08" West, across said Lot 6, a distance of 15.00 feet to an iron pin set;

Thence North 01 deg. 06' 52" East, continuing across said Lot 6, a distance of 82.98 feet to an iron pin set in the Northerly line of said Lot 6, the Southerly line of said 0.697 acre tract;

Thence South 81 deg. 53' 57" East, with the Northerly line of said Lot 6, the Southerly line of said 0.697 acre tract, a distance of 15.11 feet to the point of beginning and containing 0.028 acre of land, more or less.

The above description was prepared using documents of record, prior plats of survey, and observed evidence located by a field survey performed by EMH&T in June 2011.
Iron pins set, where indicated, are iron pipes, thirteen sixteenths (13/16) inch inside diameter, thirty (30) inches long with a plastic plug place in the top bearing the initials EMHT, INC.

The bearings shown herein are based on the Ohio State Plane Coordinate System, South Zone, per NAD83 (1986 adjustment). Control for bearings was from coordinates of monuments FCGS 5548 and FCGS 5539, having a bearing of North 00 deg. 21' 40" East for a portion of the centerline of Hoover Road, established by the Franklin County Engineering Department.

ALSO LESS AND EXCEPTING therefrom the following 0.022 Acre Tract as conveyed by Crossroads Ohio LLC to the City of Grove City, Ohio by Instrument Number 201304110060273, Franklin County, Ohio:

**Exhibit B page 25 of 35**

Situated in the City of Grove City, County of Franklin and State of Ohio,

Being out of Lot 6 of that plat entitled "Gateway Business Park", of record in Plat Book
86, Pages 4 and 5, as conveyed to Crossroads Ohio, LLC by deed of record in Instrument
Number 200512160265086 (all references refer to the records of the Recorder's Office,
Franklin County, Ohio), and being described as follows:

Beginning at an iron pin set at a Southeasterly corner of said Lot 6, a Southwesterly corner
of Lot 4 of that plat entitled "Gateway Business Park", of record in Plat Book 86, Pages 4
and 5, as conveyed to Gateway Business Park, LLC by deed of record in Instrument
Number 200402250040578, the Westerly Right-of-way line of North Meadows Drive;

Thence with the Southerly line of said Lot 6, the Westerly right-of-way line of said North
Meadows Drive, with the arc of a curve to the left having a radius of 64.00 feet, a central
angle of 17 deg. 52' 19" and a chord that bears North 76 deg. 47' 27" West, a chord
distance of 19.88 feet (arc distance of 19.96 feet) to an iron pin set;

Thence North 42 deg. 57' 20" East, across said Lot 6, a distance of 64.02 feet to an iron
pin set at a point of curvature;

Thence continuing across said Lot 6, with the arc of curve to the left having a radius of
500.00 feet, a central angle of 10 deg. 00' 00" and a chord that bears North 37 deg. 57'
20" East, a chord distance of 87.16 feet (arc distance of 87.27 feet) to an iron pin set in
the Easterly line of said Lot 6, the Westerly line of said Lot 4;

Thence South 32 deg. 57' 20" West, with the Easterly line of said Lot 6, the Westerly line
of said Lot 4, a distance of 143.16 feet to the point of beginning and containing 0.022
acres of land, more or less.

The above description was prepared using documents of record, prior plats of survey,
and observed evidence located by a field survey performed by EMH&T in June 2011. Iron
pins set, where indicated, are iron pipes, thirteen sixteenths (13/16) inch inside diameter,
thirty (30) inches long with a plastic plug place in the top bearing the initials EMHT, INC.

The bearings shown herein are based on the Ohio State Plane Coordinate System, South
Zone, per NAD83 (1986 adjustment). Control for bearings was from coordinates of
monuments FCGS 5548 and FCGS 5539, having a bearing of North 00 deg. 21' 40" East
for a portion of the centerline of Hoover Road, established by the Franklin County
Engineering Department.

Together with all right, title and interest of Grantor to a non-exclusive easement for ingress
and egress as set forth in Declaration of Reciprocal Access Easements of record in
Official Record 34487D02, Recorder's Office, Franklin, County, Ohio.

**Exhibit B page 26 of 35**

### 5900 Meadows Drive, Grove City, OH

Situated in the City of Grove City, County of Franklin, and State of Ohio described as follows:

Being Lot Number One in Gateway Business Park, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 86, Page 4, Recorder's Office, Franklin County, Ohio.

LESS AND EXCEPTING therefrom the following 0.208 Acre Tract as conveyed by Crossroads Ohio Ohio LLC to the City of Grove City, Ohio by Instrument Number 201304110060271, Franklin County, Ohio:

Situated in the City of Grove City, County of Franklin, and State of Ohio:

Being out of Lot 1 of that plat entitled "Gateway Business Park", of record in Plat Book 86, Pages 4 and 5, as conveyed to Crossroads Ohio, LLC by deed of record in Instrument Number 200512160265086 (all references refer to the records of the Recorder's Office, Franklin County, Ohio), and being described as follows:

Beginning at an iron pin set at a Southwesterly corner of said Lot 1, a Northwesterly corner of Outlot B of that plat entitled "Gateway Business Park", of record in Plat Book 86, Pages 4 and 5, the Easterly right-of-way line of North Meadows Drive, of record in Plat Book 86, Pages 4 and 5;

Thence with Westerly line of said Lot 1, the Easterly right-of-way line of said North Meadows Drive, the following courses and distances:

North 06 deg. 36' 02" East, a distance of 110.81 feet to an iron pin set at a point of curvature;

With the arc of as curve to the left having a radius of 805.00 feet, a central angle of 16 deg. 33' 31" and a chord that bears North 01 deg. 40' 44" West, a chord distance of 231.84 feet (arc distance of 232.65 feet) to an iron pin set;

North 09 deg. 57' 29" West, a distance of 106.04 feet to an iron pin set at a point of curvature; With the arc of a curve to the right having a radius of 745.00 feet, a central angle of 18 deg. 03' 30" and a chord that bears North 00 deg. 55' 44" West, a chord distance of 233.84 feet (arc distance of 234.81 feet) to an iron pin set; and

North 08 deg. 06' 01" East, a distance of 220.94 feet to an iron pin set at the Northwesterly corner of said Lot 1, the Southwesterly corner of Lot 3 of that plat entitled "Gateway Business Park", of record in Plat Book 86, Pages 4 and 5, as conveyed to Quality Bakery Company by deed of record in Instrument Number 199804030079186 (27.885% interest) and T. Marzetti Company of record in Instrument Number 199804030079184 (72.115% interest);

Thence South 89 deg. 10' 14" East, with the Northerly line of said Lot 1, with the Southerly line of said Lot 3, a distance of 10.08 feet to an iron pin set;

Thence across said Lot 1, the following courses and distances:

South 08 deg. 06' 01" West, a distance of 222.22 feet to an iron pin set at a point of curvature;

**Exhibit B page 27 of 35**

With the arc of a curve to the left having a radius of 735.00 feet, a central angle of 18 deg. 03' 30"
and a chord that bears South 00 deg. 55' 44" East, a chord distance of 230.70 feet (arc distance
of 231.66 feet) to an iron pin set;

South 09 deg. 57' 29" East, a distance of 106.04 feet to an iron pin set at a point of curvature;

With the arc of a curve to the right having a radius of 815.00 feet, a central angle of 16 deg. 33'
31" and a chord that bears South 01 deg. 40' 44" East, a chord distance of 234.72 feet (arc
distance of 235.54 feet) to an iron pin set; and

South 06 deg. 36' 02" West, a distance of 110.78 feet to an iron pin set in the Southerly line of
said Lot 1, the Northerly line of said Outlot B;

Thence North 83 deg. 32' 43" West, with the Southerly line of said Lot 1, the Northerly line of said
Outlot B, A distance of 10.00 feet to the point of beginning and containing 0.208 acres of land,
more or less.

The above description was prepared using documents of record, prior plats of survey, and
observed evidence located by field survey performed by EMH&T in June 2011.

Iron pins set, where indicated, are iron pipes, thirteen sixteenths (13/16) inch inside diameter,
thirty (30) inches long with a plastic plug place in the top bearing the initials EMHT, INC.

The bearings shown herein are based on the Ohio State Plane Coordinate System, South Zone
per NAD83 (1986 adjustment). Control for bearings was from coordinates of monuments FCGS
5548 and FCGS 5539, having a bearing of North 00 deg. 21' 40" East for a portion of the centerline
of Hoover Road, established by the Franklin County Engineering Department.

### 2240 Creekside Parkway, Lockbourne, OH

Situated in the State of Ohio, County of Franklin, Village of Obetz, Northwest Quarter of Section
36, Township 4, Range 22 Congress Lands East of the Scioto River, being a description of 14.449
acres by survey of all of that original 14.437 acre tract as described in Tract No. 1-A in a deed to
Pizzuti/Creekside Land Holdings LLC, of record in Instrument No. 200407300176834, all
references to records are on file in the Recorder's Office, Franklin County, Ohio, said 14.449 acres
being more particularly described as follows:

Beginning at a mag-nail found in the centerline of Rohr Road, in the northerly line of said Section
36, at the northwesterly corner of the dedicated road right of way for Rohr Road as delineated on
the plat "Dedication of Creekside Parkway and Easements" of record in Plat Book 109, Page 45
and being located South 86° 15' 59" East, a distance of 286.92 feet from Franklin County
Monument No. 5406, and North 86° 15' 59" West, a distance of 1311.96 feet from Franklin County
Monument No. 5456;

Thence South 03° 44' 01" West, along the westerly terminus of said dedicated Rohr Road, along
an easterly line of said original 14.437 acre tract, a distance of 30.00 feet to an iron pin set in the
southerly right-of-way line of Rohr Road at a point of curvature;

Thence along the arc of a non-tangent curve to the right, along a southerly line of said Rohr Road,
a northerly line of said original 14.437 acre tract, having a radius of 60.00 feet, a central angle of
90° 59' 45", an arc distance of 95.29 feet to an iron pin set at a

A-15

point of compound curvature, said arc being subtended by a chord bearing South 40° 46' 07"
East, a chord distance of 85.59 feet;

Thence along the arc of a curve to the right, along a westerly right of way line of Creekside
Parkway, an easterly line of said original 14.437 acre tract, having a radius of 360.00 feet, a
central angle of 38° 36'18", an arc distance of 242.56 feet to an iron pin found with a cap stamped
"HLG Eng & Surv" at a point tangency, said arc being subtended by a chord bearing South 24°
01' 55" West, a chord distance of 238.00 feet;

Thence South 43° 20' 04" West, continuing along the westerly right of way line of Creekside
Parkway, an easterly line of said original 14.437 acre tract, a distance of 288.67 feet to an iron
pin found with a cap stamped "HLG Eng & Surv" at a point of curvature;

Thence along the arc of a curve to the right, continuing along the westerly right of way line of
Creekside Parkway, an easterly line of said original 14.437 acre tract, having a radius of 65.00
feet, a central angle of 46° 18' 27", an arc distance of 52.53 feet to a 5/8" rebar found with no cap
at a point of reverse curvature, said arc being subtended by a chord bearing South 66° 29' 17"
West, a chord distance of 51.12 feet;

Thence along the arc of a curve to the left, continuing along the westerly right of way line of
Creekside Parkway, an easterly line of said original 14.437 acre tract, having a radius of 87.00
feet, a central angle of 66° 46' 33", an arc distance of 101.39 feet to an iron pin found with a cap
stamped "HLG Eng & Surv" at a southeasterly corner of said original 14.437 acre tract, at a
northeasterly corner of that 41.402 acre tract as described in a deed to Industrial CT Owner LLC,
of record in Instrument Number 200701250014803, said arc being subtended by a chord bearing
South 56° 15' 14" West, a chord distance of 95.75 feet;

Thence North 85° 41' 58" West, along the southerly line of said original 14.437 acre tract, the
northerly line of said 41.402 acre tract, a distance of 801.39 feet to an iron pin found with a cap
stamped "HLG Eng & Surv" in the easterly right-of-way line of the Norfolk & Western Railroad
Company, as conveyed to said Norfolk and Western Railroad in Deed Book 217, Page 344, as
original partitioned to the Scioto Valley Railway Company in Deed Book 200, Page 558, at the
southwesterly corner of said original 14.437 acre tract, at the northwesterly corner of said 41.402
acre tract;

Thence North 04° 12' 05" East, along the easterly right-of-way line of Norfolk & Western Railway
Company, the westerly line of said original 14.437 acre tract, passing an iron pin found with a cap
stamped "HLG Eng & Surv" at a distance of 528.52 feet, a total distance of 530.44 feet to an iron
pin set in the southerly right-of-way line of Rohr Road and the southerly line of that 1.28 acre tract
as described in Parcel 2 on page four in a deed to the Board of County Commissioners of Franklin
County, Ohio, of record in Deed Book 967, Page 1;

Thence North 87° 05' 14" East, along the southerly right-of-way of Rohr Road, the southerly line
of said 1.28 acre tract, the northerly line of said original 14.437 acre tract, a distance of 533.40
feet to an iron pin set at the southeasterly corner of said 1.28 acre tract;

Thence North 04° 12' 05" East, along a westerly line of said original 14.437 acre tract, the easterly
line of said 1.28 acre tract, a distance of 18.26 feet to a mag-nail set in the centerline of Rohr
Road, in the northerly line of said Section 36, at the northwesterly corner of said original 14.437
acre tract, witness a railroad spike found North 04° 12' 14" East, at a distance of 0.33 feet;

**Exhibit B page 29 of 35**

Thence South 86° 15' 59" East, along the centerline of said Rohr Road, the northerly line of said Section 36, the northerly line of said original 14.437 acre tract, passing said Franklin County Monument No. 5406 at a distance of 308.15 feet, a total distance of 595.07 feet to the True Place of Beginning and containing 14.449 acres of land, more or less, by survey of which 0.423 acre is in present road occupied.

Bearings are based on North 86° 15' 59" West along the centerline of said Rohr Road and is based on the Ohio State Plane Coordinate System, South Zone and the North American Datum of 1983(1986) as established from a GPS survey originating from Franklin County Survey Control Monuments "FCGS 9927" and "FCGS 9930".

The foregoing description has been prepared from an actual field survey of the premises in June 2011 by BRH Group, Inc., under the direct supervision of John L. Price, Registered Professional Surveyor Number 7159. Iron pins referenced as being set are 5/8" rebar, 30" long with a yellow plastic cap stamped "BRH Group".

### 4410 N 132nd Street, Butler, WI

PARCEL A:

Parcel 2 of Certified Survey Map No. 8732, recorded on March 10, 1999, in Volume 77 of Certified Survey Maps, on Page 247, as Document No. 2428940, a redivision of Lots 4 and 5 of Obmark, a recorded Plat and Lot 1 of Certified Survey Map No. 5440, recorded in Volume 44 on Pages 42-44, as Document No. 1469209, all lying in the Southwest 1/4 and Southeast 1/4 of the Northeast 1/4 of Section 1, Town 7 North, Range 20 East, in the Village of Butler, County of Waukesha, State of Wisconsin.

PARCEL B: All right, title and interest of Grantor to easement for the benefit of Parcel A created by Easement Agreement dated March 3, 1999 and recorded on March 10, 1999, as Document No. 2428939 for sign, landscape, utility and ingress and egress as provided for therein.

### 4700 Ironwood Drive, Franklin, WI

Parcel 1 of Certified Survey Map No. 6423, recorded on October 21, 1997 on Reel 4164, Images 840-842, as Document No. 7437569, being a redivision of part of Outlot 1 in Block 6 in Franklin Business Park Addition No. 1, being a redivision of Outlot 1, Certified Survey Map No. 6225, being part of the Northeast 1/4, Southeast 1/4, Southwest 1/4 and Northwest 1/4 of the Northeast 1/4, Outlot 1, Certified Survey Map No. 6201, being part of the Northeast 1/4, Southeast 1/4, Southwest 1/4 and Northwest 1/4 of the Southeast 1/4, of Section 26, and Parcels 1 and 2 of Certified Survey Map No. 1805, being a part of the Northwest 1/4 of the Northwest 1/4 of Section 25, and lands lying in the Northwest 1/4 of the Northwest 1/4 of Section 25, and lands lying in the Northeast 1/4 and Southeast 1/4 of the Southeast 1/4 of Section 26, and lands lying in the Southeast 1/4 of the Southwest 1/4 of Section 26, all in Town 5 North, Range 21 East, City of Franklin, County of Milwaukee, State of Wisconsin.

### W 234 N 2019 Ridgeview Court, Pewaukee, WI

Parcel 2 of Certified Survey Map No. 9036 recorded in the office of the Register of Deeds for Waukesha County, Wisconsin, on August 25, 2000 in Volume 81 of Certified Survey Maps, at

A-17

**Exhibit B page 30 of 35**

Pages 159-162, as Document No. 2586341, being a redivision of Outlot 1 of Certified Survey Map No. 7871 and lands in the Northeast 1/4, Northwest 1/4, Southwest 1/4 and Southeast 1/4 of the Northeast 1/4 of Section 23, Town 7 North, Range 19 East, in the City of Pewaukee, County of Waukesha, State of Wisconsin.

**Exhibit B page 31 of 35**

EXHIBIT B
Leases and Security Deposits

| Property | Lease/Tenant | Security Deposit | Assignor | Assignee |
|---|---|---|---|---|
| 201 Swift Road | The Men's Wearhouse, Inc. | $225,000.00 | Becknell Properties | SREIT 201 Swift Road, L.L.C. |
| 221 Swift Road | Mondelez Global LLC | N/A | Becknell Properties | SREIT 221 Swift Road, L.L.C. |
| 12857 Hamlin Court | Bimbo Bakeries USA, Inc. | N/A | Illinois Becknell Investors 2011 LLC | SREIT Hamlin Court, L.L.C. |
| 1695 Glen Ellyn Road | Bimbo Bakeries USA, Inc. | N/A | Illinois Becknell Investors 2011 LLC | SREIT Glen Ellyn Road, L.L.C. |
| 845 Telser Road | Bimbo Bakeries USA, Inc. | N/A | Illinois Becknell Investors 2011 LLC | SREIT Tesler Road, L.L.C. |
| 1245-1247 Lakeside Drive | Crown Corr, Inc. | $27,738.90 | Becknell Properties | SREIT Lakeside Drive, L.L.C. |
| 101 W 45th Street | List Industries, Inc. | N/A | Indiana Becknell Investors 2007 LLC | SREIT 101 Munster, L.L.C. |
| 101 W 45th Street | FedEx Ground Package System, Inc. | N/A | Indiana Becknell Investors 2007 LLC | SREIT 101 Munster, L.L.C. |
| 101 W 45th Street | MRC Global (US) Inc. | N/A | Indiana Becknell Investors 2007 LLC | SREIT 101 Munster, L.L.C. |
| 215 W 45th Street | Carl Buddig and Company | $23,291.67 | Becknell Properties | SREIT 215 Munster, L.L.C. |
| 225 W 45th Street | Rockwell Automation, Inc. | N/A | Becknell Properties | SREIT 225 Munster, L.L.C. |
| 333 W 45th Street | Staley General Transportation, Inc. | N/A | Becknell Mungusta LLC | SREIT 333 Munster, L.L.C. |
| 235 W 45th Street | HSD Holding Co. | N/A | Indiana Becknell Investors LLC | SREIT 235 Munster, L.L.C. |
| 480 W 45th Street | Three Floyds Brewing LLC | N/A | Indiana Becknell Investors LLC | SREIT 480 Munster, L.L.C. |
| 1600-40 Northwind Parkway | Steiner Electric Company | N/A | Indiana Land Becknell Investors LLC | SREIT 1600 Northwind, L.L.C. |

B-1

**Exhibit B page 32 of 35**

| Address | Company | Amount | Landlord | SREIT Entity |
|---|---|---|---|---|
| 1600-40 Northwind Parkway | Base Solutions, LLC | N/A | Indiana Land Becknell Investors LLC | SREIT 1600 Northwind, L.L.C. |
| 1600-40 Northwind Parkway | Rogers Supply Company, Inc. | $6,470.98 | Indiana Land Becknell Investors LLC | SREIT 1600 Northwind, L.L.C. |
| 1650 Northwind Parkway | John Tillman Company | N/A | Indiana Land Becknell Investors LLC | SREIT 1650 Northwind, L.L.C. |
| 1701-1721 Northwind Parkway | Vision Integrated Graphics Group LLC | N/A | Indiana Becknell Investors LLC | SREIT 1700 Northwind, L.L.C. |
| 1701-1721 Northwind Parkway | Stevens Engineers & Constructors, Inc. | $35,984.25 | Indiana Becknell Investors LLC | SREIT 1700 Northwind, L.L.C. |
| 1851 Northwind Parkway | Sunbelt Rentals, Inc. | N/A | Indiana Land Becknell Investors LLC | SREIT 1851 Northwind, L.L.C. |
| 1901-51 Northwind Parkway | Americall Group Inc. | N/A | Indiana Land Becknell Investors LLC | SREIT 1901 Northwind, L.L.C. |
| 1901-51 Northwind Parkway | Furmanite America, Inc. | N/A | Indiana Land Becknell Investors LLC | SREIT 1901 Northwind, L.L.C. |
| 1901-51 Northwind Parkway | Munch's Supply LLC | N/A | Indiana Land Becknell Investors LLC | SREIT 1901 Northwind, L.L.C. |
| 6221-6241 Northwind Parkway | American News Company, LLC | $21,351.75 | Indiana Land Becknell Investors LLC | SREIT 6221 Northwind, L.L.C. |
| 6221-6241 Northwind Parkway | Foremost Groups, Inc. | $32,916.66 | Indiana Land Becknell Investors LLC | SREIT 6221 Northwind, L.L.C. |
| 6451-71 Northwind Parkway | Calpipe Industries, Inc. | $20,000.00 | Indiana Land Becknell Investors LLC | SREIT 6451 Northwind, L.L.C. |
| 6451-71 Northwind Parkway | Foremost Groups, Inc. | N/A | Indiana Land Becknell Investors LLC | SREIT 6451 Northwind, L.L.C. |
| 775 Commerce Parkway West Dr | Poynter Sheet Metal, Inc. | N/A | Indiana Becknell Investors 2011 LLC | SREIT Commerce Parkway, L.L.C. |

B-2

**Exhibit B page 33 of 35**

| | | | | |
|---|---|---|---|---|
| 999 Gerdt Court | NSK Corporation | N/A | Indiana Becknell Investors 2011 LLC | SREIT Gerdt Court, L.L.C. |
| 999 Gerdt Court | Poly-Tainer, Inc. | $15,492.96 | Indiana Becknell Investors 2011 LLC | SREIT Gerdt Court, L.L.C. |
| 8401 Bearing Drive | The Harvard Drug Group, LLC | $108,000.00 | Indiana Becknell Investors 2011 LLC | SREIT 8401 Bearing Drive, L.L.C. |
| 8401 Bearing Drive | M S International, Inc. | N/A | Indiana Becknell Investors 2011 LLC | SREIT 8401 Bearing Drive, L.L.C. |
| 8421 Bearing Drive | Sankyo America, Inc. | N/A | Indiana Becknell Investors 2011 LLC | SREIT 8421 Bearing Drive, L.L.C. |
| 8421 Bearing Drive | Business Furniture LLC | N/A | Indiana Becknell Investors 2011 LLC | SREIT 8421 Bearing Drive, L.L.C. |
| 8441 Bearing Drive | Oldcastle Buildingenvelope®, Inc. | N/A | Indiana Becknell Investors 2011 LLC | SREIT 8441 Bearing Drive, L.L.C. |
| 3890 Perry Boulevard | MWI Veterinary Supply Co. | $15,000.00 | Indiana Becknell Investors 2011 LLC | SREIT Perry Boulevard, L.L.C. |
| 4820-4850 Indianapolis Drive | Cummins Inc. | N/A | Indiana Becknell Investors 2011 LLC | SREIT 4820 Indianapolis Drive, L.L.C. |
| 4820-4850 Indianapolis Drive | Hyperikon, Inc. | $47,073.59 | Indiana Becknell Investors 2011 LLC | SREIT 4820 Indianapolis Drive, L.L.C. |
| 4938-4990 Indianapolis Drive | Alliance Healthcare Services, Inc. | $8,883.33 | Indiana Becknell Investors 2011 LLC | SREIT 4910 Indianapolis Drive, L.L.C. |
| 4938-4990 Indianapolis Drive | Stephen Gould Corporation | N/A | Indiana Becknell Investors 2011 LLC | SREIT 4910 Indianapolis Drive, L.L.C. |
| 5701 North Meadows Drive | ODW Logistics, Inc. | N/A | Ohio Becknell Investors 2007 LLC | SREIT 5701 North Meadows Drive, L.L.C. |
| 5701 North Meadows Drive | Expresspoint Technology Services, Inc. | N/A | Ohio Becknell Investors 2007 LLC | SREIT 5701 North Meadows Drive, L.L.C. |

B-3

Exhibit B page 34 of 35

| Address | Tenant | Amount | Landlord | SREIT Entity |
|---|---|---|---|---|
| 5900 North Meadows Drive | Communications Test Design, Inc. | N/A | Ohio Becknell Investors 2007 LLC | SREIT 5900 North Meadows Drive, L.L.C. |
| 2240 Creekside Parkway | McLane Foodservice Distribution, Inc. | N/A | Ohio Becknell Investors 2007 LLC | SREIT Creekside Boulevard, L.L.C. |
| 4410 North 132nd Street | Milwaukee Electric Tool Corporation | N/A | Wisconsin Becknell Investors LLC | SREIT North 132nd Street, L.L.C. |
| 4410 North 132nd Street | Keystone Automotive Industries, Inc. | N/A | Wisconsin Becknell Investors LLC | SREIT North 132nd Street, L.L.C. |
| 4410 North 132nd Street | S-L Distribution Company, LLC | N/A | Wisconsin Becknell Investors LLC | SREIT North 132nd Street, L.L.C. |
| 4700 North Ironwood Drive | API Heat Transfer Thermasys Corporation | N/A | Wisconsin Becknell Investors LLC | SREIT North Ironwood Drive, L.L.C. |
| W 234 N 2091Ridgeview Court | Southern Graphic Systems, LLC | $63,002.79 | Wisconsin Becknell Investors LLC | SREIT 2091 Ridgeview Court, L.L.C. |

B-4

**Exhibit B page 35 of 35**

## SUBLEASE

This **SUBLEASE** is dated as of _November 2nd_, 2020 by and between **HYPERIKON, INC.**, a California corporation, as Sublessor, and **HOMEGOODS, INC.**, a Delaware corporation, as Subtenant.

1.     **Parent Lease**

    **A.**    Reference is made to a Lease dated August 1, 2017 between Indiana Becknell Investors 2011 LLC, a Delaware limited liability company, as Landlord (hereinafter together with its successors and assigns referred to as "Parent Landlord"), and Sublessor as tenant (the "Parent Lease"), and the leasing thereunder of certain premises containing 152,000 square feet of space (the "Demised Premises") located in a building (the "Building") containing approximately three hundred twenty two thousand (322,000) square feet Eagle Creek Industrial Park, 4850 South Indianapolis Road, Whitestown, Indiana (hereinafter referred to as the "Property"). Sublessor represents and warrants to Subtenant that the Parent Lease has not been amended and is in full force and effect. Sublessor represents and warrants that the Building is zoned I-1 for light industrial use.

    **B.**    This Sublease is, and shall be, subject and subordinate to the Parent Lease. With respect to all obligations, services, conditions and agreements to be furnished, observed or performed by Parent Landlord under the Parent Lease, to or for the Demised Premises, Subtenant shall look only to the Parent Landlord for the performance, observance or furnishing thereof, and no failure on the part of Parent Landlord to furnish such services or perform such agreements or obligations or observe such conditions shall constitute a breach of the obligations of Sublessor. Sublessor shall, upon receipt of notice from Subtenant, promptly make demand upon Parent Landlord, and use all reasonable efforts to obtain Parent Landlord's performance of any obligation or observance of any condition imposed upon Parent Landlord under the Parent Lease and the furnishing of any service by Parent Landlord required of Parent Landlord under the Parent Lease. Parent Landlord has indicated its consent to this Sublease by having signed the Non-Disturbance Agreement attached hereto as Schedule C.

    **C.**    Except as otherwise provided herein and except for obligations specifically addressed herein which are different than those specified in the Parent Lease, during the term of this Sublease, Subtenant shall perform and observe all of the obligations, terms and conditions set forth in the provisions of the Parent Lease which are to be performed or observed by Sublessor as Tenant thereunder with respect to the Demised Premises and Subtenant shall have the benefit of the obligations, terms and conditions set forth in the provisions of the Parent Lease referred to in this Sublease which are to be performed by Parent Landlord as Landlord thereunder with respect to the Demised Premises, and Sublessor shall, upon reasonable request of Subtenant, cooperate with Subtenant in enforcing such provisions, at Subtenant's expense. All of the provisions of the Parent Lease which are referred to in this Sublease are hereby incorporated herein by reference and made a part hereof. Any expression that is used both herein and in any of the provisions of the Parent Lease and is not defined herein shall have the same definition herein as defined in the Parent Lease.

2.     **Demised Premises**

    In consideration of the rents, agreements and conditions herein contained on the part of Subtenant to be paid, performed and observed, Sublessor does hereby demise and sublease to Subtenant, and Subtenant hereby rents from Sublessor, for the term hereinafter set forth, upon and subject to the agreements and conditions of this Sublease, the Demised Premises, labelled "DP" upon Schedule A attached hereto, containing approximately one hundred fifty two thousand (152,000) square feet of floor area. Sublessor warrants the following: There are thirty (30) exclusive trailer parking spaces against the Building (fifteen (15) on each side) plus sixteen (16) dock doors (eight (8) on each side of the Building) that are exclusive to the Demised Premises with the items listed in Section 4 B. below. There is a small office area with bathrooms and a break room and use of the non-exclusive parking which contains approximately two hundred fifty (250) shared car parks for employees. The Demised Premises are hereby demised to Subtenant subject to, and with the benefit of, the Parent Lease and all easements, restrictions, and encumbrances therein set forth, including without limitation, the non-exclusive right to use, in common with others, the parking areas, accesses, driveways and walkways and any other so-called common areas which Sublessor has the right to use thereunder (the "Common Areas").

3.     **Term**

    **A.**    <u>Original Term</u>. The original term of this Sublease shall be the period of twenty five months, commencing on the later of the twenty first (21st) day after the date of this

**Exhibit C Page 1 of 21**

Sublease and the delivery of the Demised Premises to Tenant in vacant condition, structurally sound and watertight (the "Commencement Date"), and terminating on December 31, 2022.

**B.** If the Commencement Date has not occurred by the date that is twenty one days after the date of this Sublease, then, notwithstanding Section 5(a) to the contrary, the Subtenant shall be relieved from rent payments based on a pro-rated amount for each day that the Demised Premises is not delivered after such twenty first (21st) day, up to ten (10) days. If the Commencement Date does not occur by the thirty first day after the date of this Sublease, then, at any time thereafter, Subtenant shall have the right, as Subtenant's sole and exclusive remedy, to terminate this Sublease, by giving Landlord notice thereof.

**4.     Improvements**

**A.** Sublessor shall provide to Subtenant with an updated HVAC inspection report with quarterly reports of service provided to all office and warehouse units. It appears that there may be an issue with one of the heating units in the middle of the warehouse that should be checked into and report back to Subtenant on its condition. All HVAC units shall be delivered in good working order.

B.     Sublessor will deliver the Demised Premises to Subtenant with the benefit of use throughout the term of the existing equipment and furniture, which shall be in good working order and taken "As Is" by Subtenant and itemized on Schedule B. The items listed on Schedule B will be returned to Sublessor at the end of the term of this Sublease, **in the same condition they were delivered to Subtenant, reasonable wear and tear excepted**.

C.     Sublessor shall relocate and install new LED Warehouse lights. Sublessor, prior to November 1, 2020, shall install its new warehouse high-bay LED lighting with motion sensors set to 30 minutes with appropriate emergency lighting and exit lighting throughout the warehouse required by code for the entire warehouse space and in all the racked aisles with 5000K temperature lighting of 30 fc at 36 inches above finished floor.

All improvements to the Demised Premises necessary for Subtenant's use or occupancy thereof shall be completed by Subtenant, at Subtenant's expense, and shall hereinafter be referred to as "Subtenant Improvements". The Subtenant Improvements shall be completed by Subtenant in conformity with plans and specifications covering the Subtenant Improvements in such detail as Sublessor may require, and Subtenant agrees not to commence work on any of the Subtenant Improvements until Sublessor and Parent Landlord have approved such plans and specifications in writing. Notwithstanding the foregoing, Subtenant may make interior non-structural alterations and exterior improvements without Sublessor's consent including the installation of additional battery charging stations, swing arm dock lights, security cameras and infrastructure, dock restraints with flashing stop and go lights, additional dock doors and related equipment. **Sublessor shall cooperate with Subtenant in obtaining Parent Landlord's consent for Subtenant's installation of a satellite dish, exterior fencing and installing of an electrically operated guard shack in a mutually acceptable location.**

**5.     Minimum Rent**

**A.** Except as provided in Section 3(B) above, from the Commencement Date until the expiration of the term of this Sublease, Subtenant shall pay to Sublessor minimum rent at the annual rate of Seven Hundred Seventy Five Thousand Two Hundred Dollars ($775,200.00) (based on $5.10 per square feet of the Demised Premises). For purposes of clarification, this is a gross lease and Subtenant shall not be required to make any other payments under this Sublease to Sublessor, except for charges for gas and electric utilities, which are discussed below.

B.     All minimum rent shall be payable, without notice or demand, in equal monthly installments of one-twelfth the annual rate thereof then applicable, in advance, upon the first day of each calendar month included within the term of this Sublease (except as set forth in Section 5(A)) without abatement, counterclaim, setoff or deduction, except as otherwise set forth in this Sublease. Rent for the fraction of a month or year at the commencement of the term, and the fraction of a month or year at the termination of the term, if any, of this Sublease shall be pro-rated. All payments of rent to be made by Subtenant to Sublessor shall be made payable to Sublessor and sent to Sublessor at the place to which notices to Sublessor are required to be sent unless Sublessor shall direct otherwise by notice to Subtenant.

**6.     Intentionally omitted.**

**7.     Utilities**

**A.** Sublessor has confirmed that all utilities to the Demised Premises are separately metered. Subtenant shall pay, when due, the cost of utilities used or consumed in the Demised Premises including without limitation the electricity and gas. The other utilities (water and trash

**Exhibit C Page 2 of 21**

removal) are included in the gross rental payment. Subtenant shall provide copies of the gas and electric utility bills owed during the Subtenant's term of occupancy for reimbursement to Sublessor.

B.    Sublessor and Subtenant hereby acknowledge that all or a part of the utilities referred to this Sublease may be located in or upon the Demised Premises.

### 8.    Subtenant's Obligations

A.    Demised Premises Condition. Subtenant shall return the Demised Premises to Sublessor **in the condition they were delivered to the Subtenant, reasonable wear and tear and casualty excepted.** Further, Subtenant shall sweep the Demised Premises one day prior to returning the Demised Premises to the Sublessor.

B.    Subtenant's Improvements. Subtenant shall not be responsible for any repairs needed to the Demised Premises for damages existing prior to Commencement Date.

C.    Pre-existing Damages. **Any damages or defects in the Demised Premises must be accounted for and notated by Subtenant in writing to Sublessor sent within thirty (30) days after Sublessor has delivered the Demised Premises to Subtenant** in order to clarify the existing damages or defects.

### 9.    Intentionally omitted.

### 10.   Late Charge

The term "rent" as used in this Sublease shall mean and include all minimum rent and charges for utilities payable hereunder. Any rent which is not paid within ten (10) days after the same is due shall bear interest at an annual rate equal to ten percent (10%) (or the highest rate permitted by applicable law, whichever is lower) (the "Default Rate") from the first (1st) day due until paid. Any such interest shall be payable as additional rent hereunder, and shall be payable immediately on demand.

### 11.   Intentionally omitted.

### 12.   Alterations

Subtenant shall not make any repairs, alterations, replacements, other improvements or installations to the exterior of the Demised Premises or the foundation, roof, exterior walls, gutters, downspouts, or any structural parts of the Demised Premises, or any repairs, alterations, installations or improvements that would affect any centralized or common utilities without Sublessor's and Landlord's written consent which consent shall not be unreasonably withheld. Subtenant shall submit to Sublessor and Landlord all plans and specifications for any such repairs, alterations, installations or improvements that are required under the terms of the Parent Lease. Any such repairs, alterations, installations or improvements by Subtenant permitted hereunder shall conform to the requirements of, and be subject to the Parent Lease, including, without limitation, obtaining any consents required thereunder.

Subtenant agrees that any repairs, alterations, replacements, other improvements or installations made by Subtenant to or upon the Demised Premises shall be done in a good and workmanlike manner and in conformity with all laws, ordinances and regulations of all public authorities having jurisdiction, that materials of good quality shall be employed therein, that the structure of the Demised Premises shall not be endangered or impaired thereby, and that the Demised Premises shall not be diminished in value thereby.

Subtenant shall procure at its sole expense all necessary permits before making any repairs, alterations, improvements or installations. Upon request of Subtenant, Sublessor shall request the cooperation therewith of Parent Landlord. Subtenant shall save Sublessor and Parent Landlord harmless from, and defend and indemnify Sublessor and Parent Landlord against, any and all injury, loss claim or damage to any person or property occasioned by or arising out of the doing of any such work.

Subtenant shall permit no mechanic's, materialmen's or other lien against the Demised Premises in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Subtenant, or anyone claiming under Subtenant, and if any such lien shall be filed against the Demised Premises due to work performed by or on behalf of Subtenant, Subtenant shall cause the same to be discharged, provided, however, that Subtenant may contest such lien as long as the enforcement thereof is stayed.

### 13.   Signs

Subject to applicable governmental laws, codes and regulations and the provisions of the Parent Lease, including, without limitation, obtaining any required consent from Parent Landlord, Subtenant may erect and maintain its usual sign upon the exterior of the Demised Premises. Subtenant shall obtain all permits and approvals necessary for such sign and shall maintain such sign in good condition and repair and in proper operating order at all times. Subtenant shall be responsible for such sign as if the same were inside the Demised Premises. Except as specifically permitted herein, no other signs shall be permitted without the approval of Sublessor.

14. **Repairs**

**A.** Subtenant shall promptly make all repairs and alterations to the Demised Premises which may be required as a result of repairs, alterations, other improvements or installations made by Subtenant, anyone claiming under Subtenant or the agents of any of them.

**B.** If Subtenant shall give Sublessor notice of the need for any repair or alteration to the Demised Premises which is required to be made by Parent Landlord, pursuant to the Parent Lease, Sublessor shall promptly give Parent Landlord notice of the need for such repair or alteration and shall cooperate with Subtenant to enforce said repair or alteration obligation of Parent Landlord.

**C.** Subtenant shall make all repairs and alterations, and perform all maintenance required with respect to the Demised Premises which Sublessor is required to make thereto as Tenant pursuant to the provisions of the Parent Lease.

15. **Assignment and Subletting**

Subtenant shall not assign, mortgage, pledge or otherwise encumber or transfer its interest in this Sublease or in the Demised Premises, or sublet the whole or any part of the Demised Premises without on each occasion obtaining the prior consent of the Sublessor, which consent Sublessor shall not unreasonably withhold, condition or delay. Notwithstanding the foregoing, Subtenant shall have the right to sublease the Demised Premises or assign this Sublease to an affiliate, commonly controlled, parent or wholly owned direct or indirect subsidiary company or surviving company in the event of a merger without Sublessor's consent or Parent Landlord's consent, provided Sublessor and Parent Landlord are given written notice within fifteen (15) days following said sublease or assignment. Notwithstanding any such assignment, transfer or sublease, Subtenant shall remain fully, primarily and unconditionally liable under this Sublease, and without any so-called suretyship defenses with respect thereto and shall not thereby be released from the performance and observance of all of the agreements and conditions on the part of Subtenant to be performed or observed hereunder.

16. **Use**

The Demised Premises shall be used and occupied only for the purpose of a warehouse, processing of product and distribution center and ancillary offices and any other lawful use permitted under the Parent Lease. Subtenant shall procure, at its sole expense, any licenses and permits which may be required for the transaction of business in or use of the Demised Premises and shall otherwise comply with all applicable laws, ordinances and governmental regulations and any order or regulation of any insurance company providing coverage on any part of the Building. Subtenant shall keep the Demised Premises free from waste at all times and shall keep the Demised Premises neat, clean and free of refuse at all times. All trash and refuse shall be stored only within designated trash storage areas in closed containers and shall be removed from the Demised Premises by Subtenant at least weekly. Subtenant shall not do, or suffer to be done, or keep, or suffer to be kept, or omit to do, anything in, upon or about the Demised Premises which may prevent the obtaining of or invalidate any insurance on the Demised Premises or the Building, including without limitation, fire, extended coverage and public liability insurance or which may increase the rate of, any such insurance.

Subtenant shall comply with the requirements of all Federal, State and local environmental laws, regulations and orders (collectively, "Environmental Laws") and shall immediately give notice to Sublessor of any presence, release or threat of release of any oil, asbestos or hazardous material, substances or waste regulated under Environmental Laws (collectively, "Hazardous Substances") at, to or from the Demised Premises, and of any notices from any governmental authority with respect thereto. Subtenant shall not cause or permit any Hazardous Substances to be used, stored generated or disposed of on or in the Demised Premises by Subtenant or any person claiming under Subtenant, except for those Hazardous Substances which may lawfully be used, stored, generated or disposed of in the ordinary course of business in the operation of a distribution center (Subtenant hereby disclosing hazardous materials in beauty products with flammable aerosols, diesel batteries and batteries for forklifts) and then only to the extent Subtenant does not, in so doing, violate any Environmental Laws in effect at the time of so doing. If Subtenant shall default under the immediately preceding sentence, Subtenant shall defend and indemnify and save harmless Parent Landlord and Sublessor from

4

and against any and all claims, damages, costs and losses, including without limitation, reasonable attorneys' fees, arising during or after the term as a result thereof.  If Subtenant shall receive a complaint from a public agency or official of a default by Subtenant under this Article, then Subtenant shall comply with such complaint (unless such release was not caused by Subtenant), but Subtenant shall not be in default under this sentence if Subtenant is contesting such complaint in accordance with law and the enforcement thereof is then withheld pending such contest.  Except in the event of an emergency when immediate action is required and obtaining Sublessor's prior approval is not feasible, Subtenant shall first obtain Sublessor's approval for any remedial action required of Subtenant hereunder, which approval shall not be unreasonably withheld.

### 17.    Indemnity and Insurance

   **A.**    Subtenant agrees to indemnify and save harmless Sublessor from and against all claims of whatever nature arising from any wrongful act, omission or negligence of Subtenant or Subtenant's agents, servants or employees for personal injury or damage to the property of any person in or about the Demised Premises, Building or the Property, unless such claims arise from any act, omission or negligence of Sublessor or Sublessor's agents, servants or employees or any other tenants and/or their employees, agents or customers.  This indemnity and hold harmless agreement shall include indemnity against all reasonable costs, expenses and liabilities incurred or in connection with any such claim or proceeding brought thereon, the reasonable expenses of investigating the same and the defense thereof.  It is a condition of this save harmless and indemnification of Sublessor that Subtenant shall receive notice of any claim against Sublessor promptly after Sublessor first has knowledge thereof.

   **B.**    Sublessor agrees to indemnify and save harmless Subtenant from and against all claims of whatever nature arising from any wrongful act, omission or negligence of Sublessor or Sublessor's agents, servants or employees for personal injury or damage to the property of any person in or about the Demised Premises, Building or the Property, unless such claims arise from any act, omission or negligence of Subtenant or Subtenant's agents, servants or employees or any other tenants and/or their employees, agents or customers.  This indemnity and hold harmless agreement shall include indemnity against all reasonable costs, expenses and liabilities incurred or in connection with any such claim or proceeding brought thereon, the reasonable expenses of investigating the same and the defense thereof.  It is a condition of this save harmless and indemnification of Subtenant that Sublessor shall receive notice of any claim against Subtenant promptly after Subtenant first has knowledge thereof.

   **C.**  Subtenant shall maintain general comprehensive public liability insurance, with respect to the Demised Premises and their appurtenances, issued by insurance companies authorized to do business in the state in which the Demised Premises are located, naming Parent Landlord and its designees and Sublessor and Subtenant as insureds as their interests may appear, in a combined single limit of not less than Five Million Dollars ($5,000,000) with respect to bodily injury and property damage or in such higher amounts as shall be required by Parent Lease.  Subtenant shall comply with any additional insurance requirements contained in the Parent Lease which are applicable to Sublessor as Tenant.

   Subtenant also agrees to carry workmen's compensation insurance as required by law.

   **D.**  Subtenant hereby releases Sublessor and Parent Landlord to the extent of Subtenant's actual insurance coverage or any other insurance Subtenant is required to maintain whether or not such insurance is actually maintained, from any and all liability for any loss or damage caused by fire or any of the extended coverage casualties or any other casualty insured against, even if such fire or other casualty shall be brought about by the fault or negligence of Sublessor or its agents or Parent Landlord or its agents, provided, however, this release shall be in force and effect only with respect to loss or damage occurring during such time as Subtenant's policies covering such loss or damage shall contain a clause to the effect that this release shall not affect said policies or the right of Subtenant to recover thereunder.  Subtenant agrees that its fire and other casualty insurance policies shall include such a clause confirming the foregoing.

   **E.**  Sublessor hereby releases Subtenant, to the extent of Sublessor's insurance coverage, from any and all liability for any loss or damage caused by fire or any of the extended coverage casualties or any other casualty insured against, even if such fire or other casualty shall be brought about by the fault or negligence of Subtenant or its agents, provided, however, this release shall be in force and effect only with respect to loss or damage occurring during such time as Sublessor's policies covering such loss or damage shall contain a clause to the effect that this release shall not affect said policies or the right of Sublessor to recover thereunder.  Sublessor agrees that its fire and other casualty insurance policies shall include such a clause confirming the foregoing.

**Exhibit C, Page 5 of 21**

### 18.    Fire and Other Casualty

If the Demised Premises, or any part thereof, or the Property, or any part thereof, shall be damaged or destroyed by fire, the elements or other casualty during the term of this Sublease, then Subtenant shall give notice thereof to Parent Landlord and Sublessor, and Subtenant may terminate the this Sublease only if Sublessor has a right to terminate the Parent Lease, provided that Subtenant gives notice to Sublessor of its desire to terminate this Sublease at least five (5) business days prior to the last day on which Sublessor may send notice to Parent Landlord terminating the Parent Lease. In addition, Sublessor may, without notice from Subtenant, to the extent permitted under the Parent Lease, terminate the Parent Lease, and his Sublease shall terminate simultaneously therewith. If this Sublease is not so terminated, then, Subtenant shall comply with the provisions of the Parent Lease relating to restoration of the Demised Premises, including Subtenant's fixtures and merchandise, by fulfilling the obligations of Sublessor, as Tenant thereunder. Any termination of this Sublease hereunder shall have the effect as if the termination date were the expiration date of this Sublease.

### 19.    Eminent Domain

**A.** If after the execution of this Sublease and prior to the expiration of the term of this Sublease the whole or any part of the Demised Premises or the Property shall be appropriated by right of eminent domain, then Subtenant or Sublessor shall have the right to terminate this Sublease to the extent that Sublessor has the right to terminate the Parent Lease, provided, however, that Subtenant shall give Sublessor notice of its desire to terminate this Sublease at least five (5) business days prior to the last date by which Sublessor may send notice to Parent Landlord terminating the Parent Lease. In the event that Sublessor or Parent Landlord terminates the Parent Lease, or Subtenant or Sublessor terminates this Sublease, the term of this Sublease shall cease as of the time of such termination, and rent shall be apportioned and adjusted as of the time of termination.

### 20.    Defaults

**A.** If Subtenant shall (i) fail to pay any installment of rent or other sum of money required hereunder within seven (7) days after notice that the same remains unpaid; or (ii) default in the performance or observance of any covenant or agreement of this Sublease (other than a default involving the payment of money) which default is not cured within fifteen (15) days after the giving of notice thereof by Sublessor, unless such default is of such a nature that it cannot be cured within such 15 day period, then no default shall occur so long as Subtenant shall commence the curing of the default within said 15 day period and shall thereafter diligently prosecute the curing of the same); or (iii)  default under the Parent Lease resulting directly or directly from the action of Subtenant (Sublessor agrees to promptly provide Subtenant with a copy of any notice thereof given to Sublessor by the Parent Landlord); or (iv) be declared bankrupt or insolvent according to law or if a petition under any insolvency or bankruptcy law is filed by or against Subtenant or if any assignment shall be made of Subtenant's property for the benefit or creditors; then, in any of such cases, Sublessor lawfully, may immediately, or at any time thereafter, and without any further notice or demand, enter into and upon the Demised Premises or any part thereof in the name of the whole, by force or otherwise, and hold the Demised Premises as if this Sublease had not been made, and expel Subtenant and those claiming under Subtenant and remove its or their property (forcibly, if necessary) without being taken or deemed to be guilty of any manner of trespass (or Sublessor may send notice to Subtenant of the termination of the term of this lease), and upon entry as aforesaid (or in the event that Sublessor shall send to Subtenant notice of termination as above provided, on the fifth (5th) day next following the date of the sending of such notice), the term of this Sublease shall terminate. Subtenant hereby waives any right to any statutory notice to quit and/or statutory right to cure and Subtenant agrees that this Sublease shall terminate and Sublessor shall be entitled to re-entry and possession in accordance with the terms hereof.

**B.** Sublessor may terminate this Sublease upon the happening of any one or more of the foregoing events. Upon the termination of this Sublease as aforesaid, Sublessor may re-enter upon the Demised Premises with process of law and remove all persons or chattel therefrom and Sublessor shall not be liable for damages or otherwise by reason of such re-entry or termination of the term of this Sublease. Notwithstanding the termination, the liability for the rent and any other sums due and owing hereunder by Subtenant shall not be extinguished for the balance of the term remaining. Sublessor shall be entitled to receive monthly as it becomes due the difference between the rent set forth in this Sublease and the rent obtained by re-letting the Demised Premises. The parties agree that Sublessor shall use commercially reasonable efforts in accordance with applicable law to mitigate its damage and relet the Demised Premises.

### 21.    Surrender

C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$688b21e9999f$605AE8E3073340A8...

**Exhibit C   Page 6 of 21**

All alterations, additions, improvements, and fixtures (other than Subtenant's unattached, readily movable furniture and equipment) which may be made or installed by either party upon the Demised Premises shall remain upon and be surrendered with the Demised Premises and become the property of Sublessor at the termination of this Sublease without credit or compensation. Upon termination of this Sublease, Subtenant shall, at Subtenant's expense, remove all of Subtenant's unattached, movable trade fixtures from the Demised Premises and repair any damage occasioned by such removal. Any such trade fixtures or other property of Subtenant not so removed shall be deemed abandoned by Subtenant, and Sublessor at Sublessor's option, shall have the right to retain all or any part of such property, in which event title thereto shall thereupon vest in Sublessor, or remove from the Demised Premises and dispose of in any manner all or any part of such property at Sublessor's cost. At the termination of this Sublease, Subtenant shall remove Subtenant's signs from the exterior and interior of the Demised Premises and repair any damage resulting therefrom.

### 22. Access

Parent Landlord and Sublessor each shall have the right to enter upon the Demised Premises during regular business hours, after twenty-four hours' notice and in the presence of a representative of Subtenant, for the purpose of inspecting the same, or of making any repairs, alterations or improvements to the Demised Premises, or of exercising any of the rights and obligations of Sublessor hereunder or of Parent Landlord under the Parent Lease, as the case may be or during the last two months of the term of this Sublease, of showing the Demised Premises to prospective purchasers, lessees or lenders, without being liable to Subtenant for any claim for damages or indemnification from Parent Landlord or Sublessor or abatement of rental or other charges hereunder.

### 23. Real Estate Broker

Subtenant and Sublessor represent to each other that Subtenant and Sublessor have dealt with (and only with) Tom Cooler of CBRE and Michael Weishaar and Todd Vannatta of Cushman and Wakefield as brokers in connection with this Sublease, and no other broker or finder is entitled to any commission in connection with this Sublease. Sublessor agrees to indemnify, defend and hold Subtenant, its employees and agents harmless from and against any claims made by any broker or finder other than the broker named above for a commission or fee in connection with this Sublease. The brokers named herein shall be paid by Sublessor pursuant to a separate agreement.

### 24. Successors and Assigns

The words "Sublessor" and "Subtenant" and the pronouns referring thereto, as used in this Sublease, shall mean, where the context requires or admits, the persons named herein as Sublessor and Subtenant, respectively, and their respective heirs, legal representatives, successors and assigns, irrespective of whether singular or plural, masculine, feminine or neuter. Except as hereinafter provided otherwise, the agreements and conditions in this Sublease contained on the part of Sublessor to be performed and observed shall be binding upon Sublessor and its heirs, legal representatives, successors and assigns and shall enure to the benefit of Subtenant and its heirs, legal representatives, successors, and assigns; and the agreements and conditions on the part of Subtenant to be performed and observed shall be binding upon Subtenant and its heirs, legal representatives, successors and assigns and shall enure to the benefit of Sublessor and its heirs, legal representatives, successors and assigns. The word "Sublessor", as used herein, means only the owner for the time being of Sublessor's interest in this Sublease, that is, in the event of any transfer of Sublessor's interest in this Sublease the transferor shall cease to be liable, and shall be released for all liability, for the performance of observance of any agreements or conditions on the part of Sublessor to be performed or observed subsequent to the time of said transfer, it being understood and agreed that from and after said transfer the transferee shall be liable for the performance and observance of said agreements and conditions. If Subtenant shall consist of more than one person or if there shall be a guarantor of Subtenant's obligations hereunder, then the liability of all such persons, including the guarantor, if any, shall be joint and several and shall be deemed to mean any one of such persons. No trustee, shareholder or beneficiary of any trust and no participant in any joint venture or partnership and no individual who or which holds Sublessor's interest in this Sublease shall be personally liable for any of the agreements expressed or implied, hereunder, except that such agreements shall, as the case may be, be binding (i) upon the trustees of said trust as trustees, but not individually, and upon the trust estate, or (ii) upon an individual, group of individuals jointly or severally, corporation, joint venture or partnership only to the extent of his, its or their ownership interest in the Parent Lease.

### 25. Quiet Enjoyment

Sublessor agrees that so long as Subtenant shall perform and observe all of the terms and conditions on the part of Subtenant to be performed or observed hereunder, Subtenant shall and may peaceably and quietly have, hold and enjoy the Demised Premises during the term of this Sublease without any manner of hindrance or molestation by Sublessor or anyone claiming

7

through or under Sublessor subject, however, to the terms and conditions of the Parent Lease, this Sublease and any mortgages or other instruments to which this Sublease is subordinate.

### 26. Notices

All notices and other communications authorized or required hereunder shall be in writing and shall be given by mailing the same by certified or registered mail, return receipt requested, postage prepaid, or by recognized overnight courier service which delivers only upon signed receipt of the addressee such as Fedex. If given to Subtenant the same shall be mailed to Sublessor at 707 Broadway, Suite 800, San Diego CA 92101 Attention, Chief Operating Officer, or to such other person or as such other address as Subtenant may hereafter designate by notice to Subtenant; and if given to Subtenant the same shall be mailed to Sublessor at 770 Cochituate Road, P.O. Box 9357, Framingham, Massachusetts 01701, Attention: Vice President - Real Estate with a copy to the same address but sent to the attention of Vice President, Legal – Real Estate, or to such other person or at such other address as Sublessor may hereafter designate by notice to Subtenant.

### 27. Subordination

Subtenant agrees that whenever Sublessor shall subordinate the Parent Lease to the lien of any present or future mortgage, or deed of trust, this Sublease shall automatically also be subordinated to the mortgage involved. Subtenant agrees that the foregoing provisions of this Article shall be self-operative.

### 28. Estoppel Certificate

Subtenant shall, within twenty (20) days after receipt of such request, but no more than an aggregate of two (2) times during any one calendar year, deliver to Sublessor, a letter addressed thereto stating, if such be the case: (a) that this sublease is unmodified and is in full force and effect, or referring to any modifications thereof, (b) the Commencement Date, (c) the latest date to which minimum rent has been paid, (d) that Tenant is then in possession of the Demised Premises, (e) the amount of the security deposit has been paid to Sublessor by Subtenant, and (f) that Tenant has neither given to, nor received from, Sublessor any notice of default under this sublease that, to the knowledge of subtenant, then remains uncured, or, if any, specifying any such defaults. If such request shall be received prior to the Commencement Date then, notwithstanding the foregoing, such letter may omit the statements referred to in clauses (b), (c) and (d) of the immediately preceding sentence. Sublessor shall, within thirty (30) days after receipt of subtenant's request, but no more than two (2) times during any one calendar year, deliver an estoppel letter setting forth the status of the sublease including the statements in (a), (b), (c) and (e) and whether or not there are any known defaults under this sublease and if so specifying the particulars of such default.

### 29. Attorney's Fees

In the event either party is required to commence legal proceedings in order to enforce its rights or protect its interests hereunder, the prevailing party in such legal proceedings shall be paid its reasonable attorneys' fees from the other party.

### 30. Intentionally omitted.

### 31. Holding Over

If Subtenant or any person claiming under Subtenant shall remain in possession of the Demised Premises or any part thereof after the expiration of the term of this Sublease without any agreement in writing between Sublessor and Subtenant with respect thereto, the person remaining in possession shall be deemed a tenant-at-sufferance.

### 32. Waivers

Failure of Sublessor to complain of any act or omission on the part of Subtenant, no matter how long the same may continue, shall not be deemed to be a waiver by Sublessor of any of its rights hereunder. No waiver by Sublessor at any time, express or implied, of any breach of any provision of this Sublease shall be deemed a waiver of a breach of any other provision of this Sublease or a consent to any subsequent breach of the same or any other provision. If any action by Subtenant shall require the consent or approval of the Sublessor, such consent to or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion. In any situation in which the consent or approval (both referred to herein as "consent") of Parent Landlord shall be required pursuant to the Parent Lease, the failure, refusal or omission of Parent Landlord to grant such consent in accordance with the Parent Lease, after Sublessor has requested the same in accordance with any request made of Sublessor herein by Subtenant, shall be conclusively deemed reasonable grounds for withholding consent by

8

**Exhibit C Page 8 of 21**

Sublessor. No payment by Subtenant or acceptance by Sublessor of a lesser amount than the amount actually due shall be deemed to be anything but payment on account. Any and all rights and remedies which either party may have under this lease or by operation of law either at law or in equity, upon any breach, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other; and any two or more or all of such rights and remedies may be exercised at the same time.

### 33. Security Deposit

Subtenant shall pay to Sublessor the sum of One Hundred Twenty Nine Thousand Two Hundred Dollars ($129,200.00) as security for the payment of all rents and the performance and observance of all agreements and conditions in this Sublease contained on the part of Subtenant to be performed or observed. In the event of any default or defaults in any such payment, performance or observance, Sublessor may apply said sum or any part thereof towards the curing of any such default or defaults and/or towards compensating Sublessor for any loss or damage arising from any such default or defaults. Upon the yielding up of the Demised Premises at the expiration or other termination of the term of this Sublease, if Subtenant shall not then be in default or otherwise liable to Sublessor, said sum or the unapplied balance thereof shall be returned to Subtenant. Sublessor shall always have the right to apply said sum, or any part thereof, as aforesaid, in the event of any default or defaults, without prejudice to any other remedy or remedies which Sublessor may have, or Sublessor may pursue any other such remedy or remedies in lieu of applying said sum or any part thereof. No interest shall be payable on said sum or any part thereof. If Sublessor shall apply said sum or any part thereof, as aforesaid, Subtenant shall upon demand pay to Sublessor the amount so applied by Sublessor, to restore the security to the amount required under the first sentence of this Section. Whenever the holder of Sublessor's interest in this Sublease, whether it be the Sublessor named in this Sublease or any transferee of said Sublessor, immediate or remote, shall transfer its interest in this Sublease, said holder shall pay over to its transferee said sum or the unapplied balance thereof, and thereafter said holder shall be released from any and all liability to Subtenant with respect to said sum or its application or return, it being understood that Subtenant shall thereafter look only to such transferee with respect to said sum, its application and return.

### 34. Force Majeure Delays

Except for obligations pursuant to the Parent Lease which do not contain a provision substantially the same as the following, in any case where either party hereto is required to do any act (other than make a payment of money), delays caused by or resulting from Act of God, war, civil commotion, fire, the elements or other casualty, labor difficulties, general shortages of labor, materials or equipment, or other causes beyond such party's reasonable control, shall not be counted in determining the time when the performance of such act must be completed, whether such time be designated by a fixed time, a fixed period of time, or "a reasonable time".

### 35. Anti-Corruption

Without limitation of any other term or provision of this Sublease:

(a) Landlord warrants, represents, covenants and agrees that: (1) it shall comply with all applicable anti-bribery and anti-corruption laws, including the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, the Canadian Corruption of Foreign Public Officials Act, and all other similar applicable laws ("Anti-Corruption Laws") in connection with the performance of Landlord's Construction Work or any other service or work for the benefit of Tenant (the "Services"); (2) no payments of money, gifts or anything of value have been or shall be offered, promised or paid, directly or indirectly, to any person or entity to influence the acts of any Government Official (as hereinafter defined) or member of their family or to obtain or receive an improper advantage in connection with the performance of the Services otherwise for the benefit of Tenant; (3) no payments of money, gifts or anything of value have been or shall be requested, received or accepted, directly or indirectly through any agent or intermediary, from any person or entity corruptly to influence the acts of such person or entity, or to influence the acts of any Government Official or member of their family, to obtain or receive an improper advantage in connection with the Services or otherwise for the benefit of Tenant; (4) it has no direct or indirect legal, financial or other relationship(s) with any Government Official (or member of their family) involved with or affecting the Services; (5) it has not been charged with or convicted of bribery, corruption or fraud; and (6) if Landlord acts on behalf of Tenant during the performance of the Services, it has complied and shall comply with Tenant's Global Anti-Bribery Policy. Landlord shall promptly notify Tenant in writing of any change regarding any of the representations made above.

(b) Landlord covenants and agrees to maintain for a period of at least five (5) years from the last performance of the Services, accurate books and records with respect to all expenditures, payments, fees incurred, paid or received in connection with performance of the Services,

9

**Exhibit C Page 9 of 21**

including invoices, receipts, statements of account and other supporting documentation. Tenant shall have the right to conduct a review of all relevant records of Landlord for the purpose of evaluating compliance with all applicable Anti-Corruption Laws and this Section. Landlord shall make relevant books and records available to Tenant promptly upon request and shall reasonably cooperate with any request or inquiry relative to any possible violation of this Section.

(c)  Violation of the foregoing shall be deemed a material breach of this Sublease, and notwithstanding anything to the contrary contained in this Sublease, shall entitle Tenant to immediately terminate this Sublease upon written notice to Landlord.

(d)  As used herein, the term "Government Official" means any person exercising a public function and/or acting in an official capacity on behalf of a government agency, department, or instrumentality, political party, or candidate for political office, and includes officials or employees of federal, state, provincial, county or municipal governments or any department or agency thereof; any officers or employees of a company or business owned in whole or in part by a government; any officers or employees or a public international organization; any political party or official thereof; or any candidate for political office. Government Officials include officials at every level of government, regardless of rank or position.

36.  **Miscellaneous**

**A.**  If any provisions of this Sublease shall be determined to be void by any court of competent jurisdiction then such determination shall not affect any other provisions of this Sublease, all of which other provisions shall remain in full force and effect. It is the intention of the parties hereto that if any provision of this Sublease is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. It is agreed that the provisions of this Sublease shall be interpreted pursuant to the laws of the jurisdiction in which the Demised Premises are located.

**B.**  This instrument contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have force and effect. This Sublease shall not be modified in any way except by a writing subscribed by both parties. Each signatory hereto hereby represents and affirms that such signatory is authorized to execute this Agreement on behalf of the party for whom such signatory purports to be executing this Sublease.

**C.**  Wherever in this Sublease provision is made for the doing of any act by any person it is understood and agreed that said act shall be done by such person at its own cost and expense unless a contrary intent is expressed.

**D.**  The parties hereto shall, and they hereby do, waive trial by jury in any action arising out of or in any way connection with this Sublease, the relationship of Sublessor and Subtenant, Subtenant's use or occupancy of the Demised Premises and/or any claim of injury, loss or damage.

**E.**  The captions used as headings for the various articles of this Sublease are used only as a matter of convenience for reference and are not to be considered a part of this Sublease or to be used in determining the intent of the parties to this Sublease.

**F.**  Subtenant warrants and represents and agrees that neither it nor any of its affiliates is currently the subject of any proceeding under federal or state bankruptcy, receivership, insolvency or similar laws and that no consents of third parties are necessary for the execution and performance of this Sublease by Subtenant. Subtenant shall defend, indemnify and save harmless Sublessor from and against all losses, claims, demands, costs, and reasonable attorney's fees resulting from a breach of or inaccuracy in any of the representations, warranties and agreements set forth in this paragraph. Sublessor warrants and represents and agrees that neither it nor any of its affiliates is currently the subject of any proceeding under federal or state bankruptcy, receivership, insolvency or similar laws and that no consents of third parties are necessary for the execution and performance of this Sublease by Sublessor. Sublessor shall defend, indemnify and save harmless Subtenant from and against all losses, claims, demands, costs, and reasonable attorney's fees resulting from a breach of or inaccuracy in any of the representations, warranties and agreements set forth in this paragraph.

**G.**  The submission of this Sublease for examination does not constitute an offer to enter into a lease and this Lease shall become effective only upon execution and delivery hereof by Landlord and Tenant.

**H.**  This Sublease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one contract. Further, signatures transmitted in a "PDF" format by e-mail, or accomplished through

an electronic signature platform, such as DocuSign, shall have the same force and effect as an original signature

Exhibit C Page 11 of 21

**IN WITNESS WHEREOF**, each of the parties hereto have caused this instrument to be executed and delivered and its corporate seal to be affixed hereto, by its officers thereunto duly authorized, all as of the day and year first written above.

**WITNESSES**

**SUBLESSOR**:

**HYPERIKON, INC.**
**a California corporation**

By: _____
Nicole Kamergorodsky

Name: Alex Kamergorodsky
Title: COO

By: _____
Name:
Title:

SEE ATTACHED
FOR NOTARY CERTIFICATE

**SUBTENANT**:

**HOMEGOODS, INC.**
a Delaware corporation

DocuSigned by:
Susan Beaumont
Susan Beaumont

By: Alicia Kelly
Alicia C. Kelly
Secretary

DocuSigned by:
Alison Dolan
Alison Dolan

By: David L Averill
David L. Averill
Vice President

C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$688b21e9999f$605AE8E3073340AFB3EA51C4D89C31DF

**Exhibit C Page 12 of 21**

.FORNIA ALL-PURPOSE ACKNOWLEDGMENT                                    CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ San Diego _____ }

On _NOV 2 2020_ before me, _D. Peacock_ ,Notary Public
         Date                                  Here Insert Name and Title of the Officer
personally appeared _Alexander Kamergorodsky_
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

D. PEACOCK
COMM. # 2196990
NOTARY PUBLIC • CALIFORNIA
SAN DIEGO COUNTY
My Commission Expires
MAY 26, 2021

I certify under PENALTY OF PERJURY under the
laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _D. Peacock_
                   Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

Exhibit C Page 13 of 21





SCHEDULE B

LIST OF EQUIPMENT

| Equipment | Quantity | Working Condition |
|---|---|---|
| 1 stand up forklift and charger | 1 | Good |
| 1 reach truck and charger | 1 | Good |
| Tool Cage | 1 | Good |
| Sofa (office) | 1 | Good |
| Office Desks | 6 | Good |
| Ping Pong table | 1 | Good |
| Foosball table | 1 | Good |
| conference room table | 1 | Good |
| office chairs | 10 | Good |
| stretch wrap machine | 1 | Needs servicing |
| Racking | ALL | Good |

SCHEDULE B      B-11
C:\ProgramData\activePDF\Temp\DocConverter\API\Input\$688b21e9999f$605AE8E3073340A89B8EA7
1C40D91531.doc

Exhibit C Page 15 of 21

## CONSENT TO SUBLEASE

This Consent to Sublease (this "Consent") is executed this _2nd_ day of _November_____, 2020, by SREIT 4820 Indianapolis Drive, L.L.C., a Delaware limited liability company ("Landlord") of 2750 E. 146th Street, Suite 200, Carmel, IN 46033.

### *RECITALS*

A.       Landlord owns that certain improved real property located in Eagle Creek Industrial Park at 4850 South Indianapolis Road, Whitestown, Indiana (the "Premises").

B.       Hyperikon, Inc., a California corporation ("Tenant"), is a tenant leasing the Premises pursuant to that certain lease agreement by and between Indiana Becknell Investors 2011 LLC (predecessor-in-interest to Landlord) and Tenant dated August 1, 2017 (the "Lease").

C.       The Lease is in full force and effect, there are no defaults under the Lease, by either party, and nothing has occurred which, with the passage of time would constitute such a default, and Tenant desires to sublease the Premises to HomeGoods, Inc., a Delaware corporation (the "Subtenant").

D.       Subtenant desires to accept a sublease in the form attached as **Exhibit A** (the "Sublease"). Landlord is willing to consent to the Sublease on the terms and conditions set forth in this Consent.

### *AGREEMENT*

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree as follows:

1.       The above recitals are incorporated herein by this reference.

2.       Effective upon receipt by Landlord of (i) the executed Sublease, and (ii) a certificate of insurance confirming that Subtenant carries all of the insurance coverages required to be carried by Subtenant under the Lease and Sublease, Landlord hereby consents to the Sublease and the transaction contemplated therein.

3.       By acceptance hereof, Tenant acknowledges that Tenant shall be and remain liable for all claims that Landlord may have under the Lease. Landlord will be entitled to pursue all remedies available in the event of the Tenant's breach of the Lease, without regard to the performance or nonperformance of the terms of the Sublease by Subtenant.

4.       The parties hereby acknowledge and agree that Landlord is a third-party beneficiary to the indemnities set forth in the Sublease.

5.       Landlord does hereby recognize the Sublease and all of Tenant's rights thereunder. Landlord hereby agrees that if the term of the Lease shall be canceled, terminated or expire prior to the expiration of the term of the Sublease, or Landlord shall come into possession of all or any part of the Premises demised under the Sublease prior to the expiration of the term of the Sublease, the Sublease shall continue in full force and effect in accordance with its terms and Subtenant's rights in the Premises demised under the Sublease and Subtenant's rights under the Sublease shall not be disturbed, except for such cause as would entitle Tenant to terminate the Sublease in accordance with the terms and conditions contained in the Sublease; and Landlord shall recognize Subtenant as tenant of the Premises for the

**Exhibit C Page 16 of 21**

DocuSign Envelope ID: 8297562D-932C-4C28-9088-A873B4B5635F

balance of the term of the Sublease under the terms and provisions of the Sublease, provided, however, that in the event of any inconsistencies between the terms and provisions of the Sublease and the terms and provisions Lease with respect to Landlord's obligations thereunder, the terms and provisions of the Lease shall control. Notwithstanding the foregoing and for purposes of clarification, if the term of the Lease shall be canceled, terminated or expire prior to the expiration of the term of the Sublease, or Landlord shall come into possession of all or any part of the Premises demised under the Sublease prior to the expiration of the term of the Sublease, Subtenant would be obligated to pay rent and additional rent to Landlord pursuant to the terms of the Sublease, not the Lease. Notwithstanding the foregoing, if Tenant is in default under the terms of the Lease, beyond any applicable notice and cure period thereunder, Subtenant, upon written notice from Landlord, shall be obligated to pay rent and additional rent to Landlord pursuant to the terms of the Sublease. Landlord agrees that any rental payments Subtenant makes to Landlord pursuant to Landlord's notice and demands shall be applied towards Subtenant's obligations under the Sublease regardless of whether or not Landlord is or was entitled to demand (and/or receive) such rental payments. Furthermore, in connection with the aforesaid and notwithstanding anything to the contrary contained elsewhere herein, Tenant and its successors and assigns hereby agree to indemnify and hold harmless Subtenant against any expenses, claims, losses or damages incurred by Subtenant resulting from or arising out of claims by Tenant, its successors and assigns that such rental payments should not have been, or cannot be made to the Landlord, or the like. Landlord, Tenant and Subtenant agree that the foregoing statements shall in no way be deemed a release of Tenant's obligation to pay rent and additional rent to Landlord pursuant to the terms of the Lease.

6.      This Consent relates solely to the Sublease and not to any other or future Sublease of the Lease or any other matter requiring Landlord's consent under the Lease.

7.      This consent shall be binding upon, and inure to the benefit of, each of the parties hereto and their respective successors and assigns.

8.  Except as otherwise expressly stated, nothing contained herein shall:

(a)      operate as a representation or warranty by Landlord of any nature whatsoever;

(b)      be construed to modify, waive or affect any of the provisions, covenants or conditions of the Lease or to waive any breach thereof or any rights of Landlord thereunder or to increase Landlord's obligations under the Lease; or

(c)      release or discharge the Tenant from any liability under the Lease. Tenant shall remain liable and responsible for the full performance and observance of all of the provisions, covenants and conditions set forth in the Lease on the part of the tenant to be performed and observed.

9.      This Consent may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall comprise but a single instrument. To facilitate execution of this Consent, the parties may execute and deliver counterparts hereof (or counterparts of the signature page or pages hereof) by email transmission (such as DocuSign) and such email transmitted counterparts will be binding and enforceable to the same extent as originals thereof.

10.      This Consent shall be governed by and construed in accordance with the Laws of the State of Indiana.

11.      If Subtenant records this Consent, Subtenant shall bear the costs of such recording, and, upon expiration or earlier termination of the Sublease, Subtenant shall promptly take all necessary steps, at its sole cost and expense, to remove such recording from record.

Exhibit C Page 17 of 21

THIS PAGE ENDS HERE

Exhibit C Page 18 of 21

IN WITNESS WHEREOF, Landlord has executed this Consent as of the date first written above.

**Landlord**

SREIT 4820 INDIANAPOLIS DRIVE,
L.L.C, a Delaware limited liability company

By: _____

Name: _Andres Pauza_

Its: _Authorized Signatory_

**ACCEPTED AND AGREED:**

HYPERIKON, INC., a California
corporation

By: _____

Name: _Alex Kamergorodsky_

Its: _COO_

**SUBTENANT**

HOMEGOODS, INC.
a Delaware corporation

By: _Alicia Kelly_
    8A8B018DE73A407...
    Alicia Kelly, Secretary

By: _David L. Averill_
    0E7B24DA110D42E...
    David L. Averill, Vice President

4

Exhibit C Page 19 of 21

DocuSign Envelope ID: B2375620-932C-4C28-9088-A873B4B5635F

## LANDLORD'S ACKNOWLEDGMENT

STATE OF _____  )
    ) SS.
COUNTY OF _____  )

On this _____ day of _____, in the year 2020, before me, the undersigned notary public, personally appeared _____, as _____ for SREIT 4820 INDIANAPOLIS DRIVE, L.L.C., a Delaware limited liability company, personally known to me/or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged that he/she/they executed same in his/her/their authorized capacity(ies).


_____
Notary Public
My Commission Expires:

## TENANT'S ACKNOWLEDGMENT

STATE OF _____  )
    ) SS.
COUNTY OF _____  )

*SEE ATTACHED FOR NOTARY CERTIFICATE*

On this _____ day of _____, in the year 2020, before me, the undersigned notary public, personally appeared _____, as _____ for Hyperikon, Inc., a California corporation, personally known to me/or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged that he/she/they executed same in his/her/their authorized capacity(ies).


_____
Notary Public
My Commission Expires:

## SUBTENANT'S ACKNOWLEDGMENT

COMMONWEALTH OF MASSACHUSETTS  )
    ) SS.
COUNTY OF MIDDLESEX     )

On this _____ day of _____, 2020, before me, the undersigned notary public, personally appeared Alicia C. Kelly as Secretary and David L. Averill as Vice President, respectively, of HomeGoods, Inc., on behalf of the corporation, proved to me through satisfactory evidence of identification, which is personal knowledge of the identity of both, to be the people whose names are signed on the preceding document and who acknowledged that they signed it voluntarily and executed same in their authorized capacities for its stated purpose.


_____
Notary Public
My Commission Expires:

Exhibit C Page 20 of 21

CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ San Diego _____

On _NOV 2, 2020_ before me, _D. Peacock_ ,Notary Public

⟋Date          *Here Insert Name and Title of the Officer*

personally appeared _Alexander Kamergorodsky_

*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> D. PEACOCK
> COMM. # 2196990
> NOTARY PUBLIC • CALIFORNIA
> SAN DIEGO COUNTY
> My Commission Expires
> MAY 26, 2021

*Place Notary Seal and/or Stamp Above*

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Signature of Notary Public*

Exhibit C Page 21 of 21

AIR

## AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET

1.  **Basic Provisions ("Basic Provisions")**

1.1   **Parties:** This Lease ("Lease"), dated for reference purposes only August 12, 2016
is made by and between MGM Partnership

_____ ("Lessor")

and Hyperikon, Inc., a California corporation

_____
("Lessee"), (collectively the "Parties", or individually a "Party").

1.2(a)   **Premises:** That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor
under the terms of this Lease, commonly known by the street address of 8515 Miramar Place
located in the City of San Diego , County of San Diego , State of
California , with zip code 92121 , as outlined on Exhibit A attached hereto ("Premises")
and generally described as (describe briefly the nature of the Premises) approximately 54,560 SF of an approximately
101,760 SF warehouse/distribution building on a 7.5 acre lot known as 8515 Miramar Place.

In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to any utility raceways of
the building containing the Premises ("Building") and to the common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the
roof or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they
are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)

1.2(b)   **Parking:** See Exhibit B _____ unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3   **Term:** Five (5) years and Three (3) months ("Original Term")
commencing November 1, 2016 ("Commencement Date") and ending January 31, 2022
("Expiration Date"). (See also Paragraph 3)

1.4   **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
Upon full lease execution, delivery of 1st month's rent and security deposit, receipt of
completed Certificate of Insurance, and subject to availability of Premises. ("Early Possession
Date").
(See also Paragraphs 3.2 and 3.3)

1.5   **Base Rent:** $ 47,467.20 per month ("Base Rent"), payable on the 1st
day of each month commencing November 1, 2016 . (See also Paragraph 4)
☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph 50

1.6   **Lessee's Share of Common Area Operating Expenses:** fifty three pt. six two percent (53.62 %)
("Lessee's Share"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate
Lessee's Share to reflect such modification.

1.7   **Base Rent and Other Monies Paid Upon Execution:**

(a)   Base Rent: $47,467.20 for the period 11/01/2016 - 11/30/2016
(b)   Common Area Operating Expenses: $4,364.80 for the period 11/01/2016 - 11/30/2016
(c)   Security Deposit: $59,392.29 ("Security Deposit"). (See also Paragraph 5)
(d)   Other: $--- for ---

(e)   Total Due Upon Execution of this Lease: $111,224.29

1.8   **Agreed Use:** General office, manufacturing and distribution for a light bulb
supplier as permitted within the zoning.
_____ (See also Paragraph 6)

1.9   **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)

1.10   **Real Estate Brokers:** (See also Paragraph 15 and 25)

(a)   **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction
(check applicable boxes):

☑ Cushman & Wakefield _____ represents Lessor exclusively ("Lessor's Broker");
☑ Hughes Marino, Inc. _____ represents Lessee exclusively ("Lessee's Broker"); or
☐ _____ represents both Lessor and Lessee ("Dual Agency").

(b)   **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the
brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the
total Base Rent) for the brokerage services rendered by the Brokers.

1.11   Guarantor. The obligations of the Lessee under this Lease are to be guaranteed by.

_____ ("Guarantor"). (See also Paragraph 37)

1.12   **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an Addendum consisting of Paragraphs 50 through 60 .

☑ a site plan depicting the Premises: Exhibit A

☐ a site plan depicting the Project;

☐ a current set of the Rules and Regulations for the Project;

# Exhibit D Page 1 of 21

INITIALS

INITIALS

□ a current set of the Rules and Regulations adopted by the owners' association.

21-01776-LT7    Filed 06/29/21    Entered 06/29/21 15:21:49    Doc 68    Pg. 138

☑ other (specify) Exhibit B (Site Plan-Loading/Parking)

**2    Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2    **Condition.** Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems. roof, foundations, and/or bearing walls - see Paragraph 7). Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements and especially the zoning are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4    **Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    **Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately

# Exhibit D Page 2 of 21

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-22-09/15E

prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective

2.6   **Vehicle Parking.** Lessee shall be entitled to use the number of parking spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking. Lessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "**Permitted Size Vehicles.**" Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor. In addition:

(a)   Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b)   Lessee shall not service or store any vehicles in the Common Areas.

(c)   If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice. In addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7   **Common Areas - Definition.** The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8   **Common Areas - Lessee's Rights.** Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9   **Common Areas - Rules and Regulations.** Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10   **Common Areas - Changes.** Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)   To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)   To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)   To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)   To add additional buildings and improvements to the Common Areas;

(e)   To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)   To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3.   **Term.**

3.1   **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   **Early Possession.** Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3   **Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4   **Lessee Compliance.** Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.   **Rent.**

4.1   **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are

# Exhibit D Page 3 of 21

INITIALS

INITIALS

deemed to be rent ("Rent").

Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

    (a)    "Common Area Operating Expenses" are defined, for purposes of this Lease, as all costs relating to the ownership and operation of the Project, including, but not limited to, the following:

        (i)    The operation, repair and maintenance, in neat, clean, good order and condition , and if necessary the replacement, of the following:

            (aa)    The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

            (bb)    Exterior signs and any tenant directories.

            (cc)    Any fire sprinkler systems.

            (dd)    All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

        (ii)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

        (iii)    The cost of trash disposal, pest control services, property management, security services, owners' association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

        (iv)    Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

        (v)    Real Property Taxes (as defined in Paragraph 10).

        (vi)    The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

        (vii)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

        (viii)    Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

        (ix)    The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.

        (x)    The cost of any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

    (b)    Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

    (c)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same. Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

    (d)    Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

    (e)    Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

    4.3    **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

5.    **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not



**Exhibit D Page 4 of 21**

INITIALS

PAGE 7 OF 15

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-22-09/15E

6.   Use.

6.1   **Use.** Lessee shall use and occupy the Premises for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessee shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Building or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Project. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2   **Hazardous Substances.**

(a)   **Reportable Uses Require Consent.** The term **"Hazardous Substance"** as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. **"Reportable Use"** shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)   **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)   **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)   **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)   **Lessor Indemnification.** Except as otherwise provided in paragraph 6.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)   **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)   **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance



INITIALS

# Exhibit D Page 5 of 21

INITIALS

PAGE □ OF 1

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-22-09/15E

thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.** Lessor and Lessor's "Lender" [as defined in Paragraph 30] and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of written request therefor.

7.    **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

7.1    **Lessee's Obligations.**

(a)    **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation). Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)    **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler and pressure vessels, and (iii) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)    **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)    **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation). Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    **Utility Installations; Trade Fixtures; Alterations.**

(a)    **Definitions.** The term **"Utility Installations"** refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term **"Trade Fixtures"** shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term **"Alterations"** shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. **"Lessee Owned Alterations and/or Utility Installations"** are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)    **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental



INITIALS

# Exhibit D Page 6 of 21

PAGE ? OF 1?

INITIALS

permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance ____ be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialman's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4 **Ownership; Removal; Surrender; and Restoration**

(a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8. **Insurance; Indemnity.**

8.1 **Payment of Premiums.** The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2 **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3 **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b) **Rental Value.** Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c) **Adjacent Premises.** Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d) **Lessee's Improvements.** Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned

# Exhibit D Page 7 of 21

INITIALS

INITIALS

Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4    **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

(a)    **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b)    **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c)    **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(d)    **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8    **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.    **Damage or Destruction.**

9.1    **Definitions.**

(a)    **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)    **"Premises Total Destruction"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)    **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)    **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)    **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

# Exhibit D Page 8 of 21

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION    FORM MTN-22-09/15E

PAGE 7 OF 1

9.2 **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3 **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4 **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5 **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6 **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7 **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10. **Real Property Taxes.**

10.1 **Definition.** As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2 **Payment of Taxes.** Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3 **Additional Improvements.** Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area

# Exhibit D Page 9 of 21

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations made to the Premises by or for Lessee. Notwithstanding Paragraph 10.2(a), an increase in Real Property Taxes due to any improvements made by Lessor subsequent to the execution of this Lease shall not be included in the Additional Expenses payable by other parties.

    10.4    **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

    10.5    **Personal Property Taxes.** Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs. There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting**

    12.1    **Lessor's Consent Required**

        (a)    Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

        (b)    Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

        (c)    The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

        (d)    An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

        (e)    Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

        (f)    Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

        (g)    Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

    12.2    **Terms and Conditions Applicable to Assignment and Subletting**

        (a)    Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

        (b)    Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

        (c)    Lessor's consent to any assignment or subletting shall not constitute consent to any subsequent assignment or subletting.

        (d)    In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

        (e)    Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

        (f)    Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

        (g)    Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

    12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

# Exhibit D Page 10 of 21

PAGE 9 OF 15

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-22-09/11E

(a)     Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor starting that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)     In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)     Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)     No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)     Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.     **Default; Breach; Remedies.**

13.1     **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)     The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)     The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)     The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee. In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)     The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material data safety sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)     A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)     The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)     The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)     If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2     **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)     Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessee in connection with this Lease applicable to the

# Exhibit D Page 11 of 21

INITIALS                                                                                                    INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                            FORM MTN-22-09/15E

unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

**13.3 Inducement Recapture.** Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

**13.4 Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then, notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

**13.5 Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

**13.6 Breach by Lessor.**

(a) **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14. Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of the parking spaces is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15. Brokerage Fees.**

~~15.1 Additional Commission. In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.~~

**15.2 Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers

# Exhibit D Page 12 of 21

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

INITIALS

FORM MTN-22-09/15E

any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay its Broker any amounts due as and for brokerage fees pertaining to this Lease when due, or fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3    **Representations and Indemnities of Broker Relationships**  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    **Estoppel Certificates**

(a)    Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)    If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)    If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    **Definition of Lessor**.  The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.    **Severability**.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    **Days**.  Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    **Time of Essence**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    **No Prior or Other Agreements; Broker Disclaimer**.  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.    **Notices**.

23.1 **Notice Requirements**.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2 **Date of Notice**.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers**.

(a)    No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such

# Exhibit D Page 13 of 21

PAGE 13 OF 18

INITIALS

INITIALS

accepted by Lessor on account of moneys or damages due Lessor notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)     THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)     *Lessor's Agent.*  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  To the Lessor:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)     *Lessee's Agent.*  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  To the Lessee:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  To the Lessee and the Lessor:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)     *Agent Representing Both Lessor and Lessee.*  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)     Brokers have no responsibility with respect to any Default or Breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)     Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.     **No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Holdover Base Rent shall be calculated on monthly basis.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     **Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     **Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.     **Binding Effect; Choice of Law.**  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.     **Subordination; Attornment; Non-Disturbance.**

30.1     **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, **"Security Device"**), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as **"Lender"**) shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2     **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3     **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a **"Non-Disturbance Agreement"**)

# Exhibit D Page 14 of 21

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTN-22.09/15E

from the Lander which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term of be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4   **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.   **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.   **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.   **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.   **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.   **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.   **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.   ~~Guarantor.~~

~~37.1   Execution. The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association.~~

37.2   **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.   **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.   **Options.** If Lessee is granted any option, as defined below, then the following provisions shall apply.

39.1   **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2   **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3   **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4   **Effect of Default on Options.**

(a)   Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the

# Exhibit D Page 15 of 21

INITIALS

INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| By LESSOR: | By LESSEE: |
|---|---|
| MGM Partnership | Hyperikon Inc., a California corporation |

By: _____    By: _____
Name Printed: Sam Grinceri    Name Printed: DAN BRITTNONO
Title: Partner    Title: CEO

By: _____    By: _____
Name Printed: _____    Name Printed: _____
Title: _____    Title: _____
Address: 13359 Old Winery Road    Address: 8515 Miramar Place
Poway, CA 92064    San Diego, CA 92121

Telephone (858) 674-4795    Telephone (858) 846-4973
Facsimile:( )    Facsimile ( )
Email:    Email
Email:    Email
Federal ID No.    Federal ID No.

| BROKER: | BROKER: |
|---|---|
| Cushman & Wakefield | Hughes Marino, Inc. |

Attn: _____    Attn: _____
Title: _____    Title: _____
Address: 4747 Executive Drive, 9th Floor    Address: 1450 Front St,
San Diego, CA 92121    San Diego, CA 92101
Telephone:(858) 546-5400    Telephone (619) 534-3000
Facsimile ( )    Facsimile ( )
Email:    Email:
Federal ID No.    Federal ID No.
Broker/Agent BRE License #:    Broker/Agent BRE License #:

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 500 N Brand Blvd, Suite 900, Glendale, CA 91203. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

©Copyright 1999 By AIR Commercial Real Estate Association.
All rights reserved. No part of these works may be reproduced in any form without permission in writing.



**Exhibit D Page 16 of 21**

INITIALS    INITIALS

©1999 - AIR COMMERCIAL REAL ESTATE ASSOCIATION
FORM MTN-22-09/15E

**EXHIBIT A**

138



2ND FLOOR

This site plan is intended only to show the general layout of the property or a part thereof. Lessor reserves the right to alter, vary, add to, or omit in whole or in part any structures and/or common a___ and/or la__ a___ sh__n on this site p____

# Exhibit D Page 17 of 21

LESSORS'S INITIALS:

LESSEE'S INITIALS:



This site plan is intended only to show the general layout of the property or a portion thereof. Lessor reserves the
right to alter, ... in any ... commercial ... and or ... area shown
on this site plan. All ... and ... are approximately ... plan is not to be scaled.

# Exhibit D Page 18 of 21

LESSORS'S INITIALS:

LESSEE'S INITIALS:



# ADDENDUM

**Date:** August 12, 2016

**By and Between (Lessor)** MGM Partnership
(Lessee) Hyperikon Inc., a California corporation

**Address of Premises:** 8515 Miramar Place
San Diego, CA 92121

Paragraph 50 - 60

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

50.    ANNUAL RENT ADJUSTMENT: The Base rent shall be adjusted as follows:

|  | Base rent |
|---|---|
| 11/01/2016 - 10/31/2017 | $47,467.20 per month" |
| 11/01/2017 - 10/31/2018 | $48,891.22 per month" |
| 11/01/2018 - 10/31/2019 | $50,357.95 per month" |
| 11/01/2019 - 10/31/2020 | $51,868.69 per month* |
| 11/01/2020 - 10/31/2021 | $53,424.75 per month" |
| 11/01/2021 - 01/31/20212 | $55,027.49 per month* |



$+ \$4364.80$

$\$754$

"In addition to the base rent, Lessee shall be responsible for paying their prorated share of the operating expenses on a monthly bases.

51.    PREMISES CONDITION: Lessor shall deliver the Premises, its structural components, foundations, roof, existing HVAC, windows and sills, electrical and plumbing systems and equipment in good condition as of the date of Lease Commencement. If it is discovered within the first twelve (12) months of Lessor's occupancy that any of the above-mentioned systems do not have a remaining useful life of at least the Lease Term, then Lessor will either warranty, repair or replace such system at Lessor's sole cost.

52.    RENT CONCESSION: As long as Lessee is not in Default under the Lease and makes all of its payments in a timely manner, during months two (2) through seven (7), (the "Concession Period"), the Base Rent set forth above will be reduced by $23,733.60 each month for a total Rent Concession of $142,401.60; provided, however, that such concession shall not relieve Lessee from paying, and Lessee shall pay, any other costs and expenses Lessee is obligated to pay under the Lease at all times. In the Event of a Default by Lessee at any time prior to, during or after the Concession Period, Lessee shall immediately pay the total amount of any concession taken to Lessor as Additional Rent under the Lease. The failure to pay such sum shall be an Event of Default.

53.    RIGHT TO SUBLEASE: Lessee shall have the right to sublease or assign any portion of the Premises to any related entity, subsidiary or successor ("Affiliate") without Lessor's consent, but by providing notice to Lessor. Such sublease or assignment to an Affiliate shall not relieve Lessee from liability under the Lease. An assignment or subletting to any entity other than an Affiliate shall require Lessor's consent, which shall not be unreasonably withheld, conditioned or delayed. Any profits from a third party sublease or assignment shall be split equally between Lessor and Lessee after Lessee's costs of subleasing have been first deducted (including commissions, legal fees, tenant improvements and any other concessions reasonably required to induce a subtenant).

# Exhibit D Page 19 of 21

INITIALS

INITIALS

54. OPTION TO RENEW: As long as Lessee still occupies the entire original Premises under this Lease, Lessee shall, further provided that the Lessee is not in default under any of the terms and conditions of the Lease beyond applicable notice and cure periods at the time of exercise, have two (2) options to renew the Term of the Lease (the "Option") for five (5) years (the "Option Term"), on the same terms and conditions set forth in the Lease, except as modified by the terms, covenants and conditions as set forth below:

    a.   If Lessee elects to exercise the Option, then Lessee shall provide Lessor with written notice no earlier than the date which is nine (9) months prior to the expiration of the Lease Term but no later than the date which is six (6) months prior to the expiration of the current Term of the Lease, and the annual Basic Rent and monthly installment in effect at the expiration of the Lease Term shall be modified, commencing on the first day of the Option term, to reflect mutually agreed upon terms as described in subsection (b) below. If Lessee fails to provide such notice, Lessee shall have no further or additional right to extend or renew the Term of the Lease. The notice shall be given in the manner provided in the Lease for the giving of notices to Lessor.

    b.   The new monthly Base Rent for the Option term shall be at a rate equal to that of the fair market rent for the Premises as of the commencement of the Option Term. "Fair market rent" for the Premises shall be determined with reference to the then-prevailing rental rates for new Leases in comparable buildings, of similar size and age, in the Miramar submarket.

Any extension of the Lease Term by Lessor shall be deemed an exercise of the Option. The Option is not transferable and is personal to Lessee and in no event will any other assignee or subLessee have any rights to exercise the Option.

55. FIRST RIGHT OF REFUSAL: During the Term, Lessee shall have the First Right of Refusal on any adjacent space at the same terms and conditions that Lessor is willing to accept from a bona fide third party, by accepting or rejecting within seven (7) days of receiving written notice from Lessor that a bona fide offer has been received by Lessor. Such written notice shall be accompanied with a copy of such offer for verification purposes.

56. SIGNAGE: Lessor shall permit Lessee, at Lessee's sole cost and expense, to erect building and monument signage as permitted by local building code regulations, CC&Rs and project sign specifications. All signage design and location shall require Lessor's prior written approval. The costs associated with the purchase, installation, maintenance and eventual removal of such signage shall be borne by Lessee.

57. TENANT IMPROVEMENTS: Lessor shall provide a Tenant Improvement Allowance of Two dollars ($2.00) per rentable square foot for the cost of Tenant Improvement construction and all related fees and expenses. Lessee shall provide to Lessor prior to construction the Tenant Improvement scope for review and approval, which shall not be unreasonably withheld Lessee shall not be obligated to restore the office Premises upon expiration of the Lease. Outside of the Tenant Improvement Allowance, Lessor will construct a demising wall in the warehouse.

Lessee will convert the building to LED lighting at their own cost as a benefit to Lessor, the estimated cost of which is $30,000.

58. OPERATING EXPENSES: Lessee shall pay its proportionate share of the actual Operating Expenses associated with the Premises and the Project. Operating Expenses include real estate taxes, common area maintenance expenses and insurance costs. Lessee shall have industry standard audit rights of Lessor's Operating Expense accounting. Janitorial service and Lessee's utilities to the Premises shall be paid additionally and directly by Lessee to such service providers.

Lessor shall maintain and replace all structural walls, foundations, concrete subflooring, structural elements of the roof and underground utilities ("Structural Elements") of the Building and site structures at Lessor's sole cost, which cost shall not be included in the Operating Expenses. An



**Exhibit D Page 20 of 21**

INITIALS
INITIALS

capital expenses incurred by Lessor before the Commencement Date or during the Lease Term for capital related to improving the Building's architecture, parking lot, common areas or structure may not be passed through to Lessee.

59. PARKING: Lessee shall have exclusive rights and unreserved rights to parking and loading at the subject Premises in accordance with the Exhibit B attached herein. Lessee's parking and loading shall not impede access through or to the parking lot/driveways or loading of the adjacent Lessee's Premises.

60. ADDITIONAL COMMISSION: In the event that Lessee expands within the first twelve (12) months from the commencement date of the lease term, the Brokers (Cushman & Wakefield as Lessors representative and Hughes Marino as Lessee's representative) shall be paid by Lessor a commission at the same schedule as the initial Premises.

INITIALS

**Exhibit D Page 21 of 21**



## AIRCRE

## STANDARD SUBLEASE

### (Short-form to be used with post-1995 AIR leases)

**(NOTE: DO NOT USE IF LESS THAN ENTIRE PREMISES ARE BEING SUBLET.  FOR SITUATIONS WHERE THE PREMISES ARE TO BE OCCUPIED BY MORE THAN ONE TENANT OR SUBTENANT USE THE "STANDARD SUBLEASE-MULTI-TENANT" FORM)**

**1.    Basic Provisions ("Basic Provisions").**

    **1.1    Parties:** This Sublease ("**Sublease**"), dated for reference purposes only <u>August        ,  2018  </u>, is made by and between <u>Hyperikon, Inc., a California corporation</u> ("**Sublessor**") and <u>Crest Beverage, L.L.C., a Delaware limited liability company</u> ("**Sublessee**"), (collectively the "**Parties**," or individually a "**Party**").

    **1.2    Premises:** That certain real property, including all improvements therein, and commonly known as (street address, city, state, zip) <u>8515 Miramar Place, San Diego, CA 92121</u> located in the County of <u>San Diego</u>, State of <u>California</u> and generally described as (describe briefly the nature of the property) <u>approximately 54,560 rentable square feet in an approximately 101,760 square-foot warehouse/distribution building, as outlined in Exhibit A attached herto, and rights to the yard area as outlined in the Master Lease.</u> ("**Premises**").

    **1.3    Term:** _____ years and <u>approximately Thirty-Nine (39) months</u> months commencing <u>Forty-Five (45) days from full execution of the Sublease</u> ("**Commencement Date**") and ending <u>January 31, 2022</u> ("**Expiration Date**").

    **1.4    Early Possession.** If the Premises are available Sublessee may have non-exclusive possession of the Premises commencing <u>See Paragraph 3.1</u> ("**Early Possession Date**").

    **1.5    Base Rent:** <u>$58,924.80</u> per month ("**Base Rent**"), payable on the <u>First (1st)</u> day of each month commencing <u>on the Commencement Date</u>.

    ☑ If this box is checked, there are provisions in this Sublease for the Base Rent to be adjusted. (See Paragraph 14)

    **1.6    Base Rent and Other Monies Paid Upon Execution:**
      (a)  **Base Rent:** <u>$58,924.80</u> for the period <u>the First (1st) full month of Term</u>.
      (b)  **Security Deposit:** <u>$64,388.72</u> ("**Security Deposit**").
      (c)  **Association Fees:** <u>$0</u> for the period _____.
      (d)  **Other:** <u>$0</u> for _____.
      (e)  **Total Due Upon Execution of this Lease:** <u>$123,313.52</u>.

    **1.7    Agreed Use:** The Premises shall be used and occupied only for <u>general office and warehouse</u> and for no other purposes.

    **1.8    Real Estate Brokers:**
      (a)  **Representation:** The following real estate brokers ( the "**Brokers**") and brokerage relationships exist in this transaction (check applicable boxes):
      ☑  <u>Jones Lang LaSalle Brokerage, Inc.</u> represents Sublessor exclusively ("**Sublessor's Broker**");
      ☑  <u>Kidder Matthews</u> represents Sublessee exclusively ("**Sublessee's Broker**"); or
      ☐  _____ represents both Sublessor and Sublessee ("**Dual Agency**").
      (b)  **Payment to Brokers:** Upon execution and delivery of this Sublease by both Parties, Sublessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement ~~(or if there is no such agreement, the sum of _____ or _____% of the total Base Rent)~~ for the brokerage services rendered by the Brokers.

    ~~**1.9    Guarantor.** The obligations of the Sublessee under this Sublease shall be guaranteed by _____ ("**Guarantor**").~~

    **1.10    Attachments.** Attached hereto are the following, all of which constitute a part of this Sublease;
    ☑  an Addendum consisting of Paragraphs <u>14</u> through <u>16</u>;
    ☑  a plot plan depicting the Premises; (Exhibits A & B)
    ☐  a Work Letter;
    ☑  a copy of the master lease and any and all amendments to such lease (collectively the "**Master Lease**");
    ☑  other (specify): <u>Commencement Date Memorandum</u>.

**2.    Premises.**

    **2.1    Letting.** Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Sublease.  While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not

_NAB_

INITIALS

_X_

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

SBS-9.02, Revised 11-27-2017

## Exhibit E Page 1 of 11

subject to adjustment should the actual size be determined to be different. **Note: Sublessee is advised to verify the actual size prior to executing this Sublease.**

2.2 **Condition.** Sublessor shall deliver the Premises to Sublessee broom clean and free of debris with all warehouse racking removed on the Commencement Date or the Early Possession Date, whichever first occurs ("**Start Date**"), and warrants that the existing mechanical, electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("**HVAC**") and electric fence gate in adjacent yard area, and the structural, roof and slab components of the Premises, and any items which the Sublessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those constructed by Sublessee, shall be in good operating condition on said date. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Sublessor shall, as Sublessor's sole obligation with respect to such matter, except as otherwise provided in this Sublease, promptly after receipt of written notice from Sublessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Sublessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements. If Sublessee does not give Sublessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Sublessee at Sublessee's sole cost and expense. Sublessor shall remove Sublessor's building top signage prior to the Commencement Date at Sublessor's sole cost and expense.

2.3 **Compliance.** Sublessor warrants that any improvements, alterations or utility installations made or installed by or on behalf of Sublessor to or on the Premises comply with all applicable covenants or restrictions of record and applicable building codes, regulations and ordinances ("**Applicable Requirements**") in effect on the date that they were made or installed. Sublessor makes no warranty as to the use to which Sublessee will put the Premises or to modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Sublessee's use. **NOTE: Sublessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Sublessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Sublessor shall, except as otherwise provided, promptly after receipt of written notice from Sublessee setting forth with specificity the nature and extent of such non-compliance, rectify the same.

2.4 **Acknowledgements.** Sublessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Sublessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Sublessee's intended use, (c) Sublessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Sublessor, (e) the square footage of the Premises was not material to Sublessee's decision to sublease the Premises and pay the Rent stated herein, and (f) neither Sublessor, Sublessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Sublease. In addition, Sublessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Sublessee's ability to honor the Sublease or suitability to occupy the Premises, and (ii) it is Sublessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5 **Americans with Disabilities Act.** In the event that as a result of Sublessee's use, or intended use, of the Premises the Americans with Disabilities Act or any similar law requires modifications or the construction or installation of improvements in or to the Premises, Building, Project and/or Common Areas, the Parties agree that such modifications, construction or improvements shall be made at: ☐ Sublessor's expense ✔ Sublessee's expense.

**3. Possession.**

3.1 **Early Possession.** Any provision herein granting Sublessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Sublessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Sublease (including but not limited to the obligations to pay Sublessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such period. Any such Early Possession shall not affect the Expiration Date. Upon full execution of the Sublease, Master Lessor consent to the Sublease and Sublessee providing proof of liability insurance, Sublessee shall be granted early occupancy and access to the warehouse area of the Premises (free from Monthly Rent) for the purpose of completing tenant improvements, fixturization, move-in, etc., up Sublessor vacating said area.

3.2 **Delay in Commencement.** Sublessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises by the Commencement Date. If, despite said efforts, Sublessor is unable to deliver possession as agreed, the rights and obligations of Sublessor and Sublessee shall be as set forth in Paragraph 3.3 of the Master Lease (as modified by Paragraph 6.3 of this Sublease).

3.3 **Sublessee Compliance.** Sublessor shall not be required to tender possession of the Premises to Sublessee until Sublessee complies with its obligation to provide evidence of insurance. Pending delivery of such evidence, Sublessee shall be required to perform all of its obligations under this Sublease from and after the Start Date, including the payment of Rent, notwithstanding Sublessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Sublessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Sublessor may elect to withhold possession until such conditions are satisfied.

**4. Rent and Other Charges.**

4.1 **Rent Defined.** All monetary obligations of Sublessee to Sublessor under the terms of this Sublease (except for the Security Deposit) are deemed to be rent ("**Rent**"). Rent shall be payable in lawful money of the United States to Sublessor at the address stated herein or to such other persons or at such other places as Sublessor may designate in writing.

4.2 **Utilities.** Sublessee shall pay for all water, gas, heat, light, power, telephone/data, security system, janitorial services, trash disposal

*NAB*

INITIALS

Page 2 of 6
Last Edited: 8/17/2018 3:13 PM

*K*

INITIALS

© 2017 AIR CRE. All Rights Reserved.    SBS-9.02, Revised 11-27-2017

**Exhibit E Page 2 of 11**

and other utilities and services supplied to the Premises, together with any taxes thereon.

**5.    Security Deposit.**    The rights and obligations of Sublessor and Sublessee as to said Security Deposit shall be as set forth in Paragraph 5 of the Master Lease (as modified by Paragraph 6.3 of this Sublease).

**6.    Master Lease.**

6.1  Sublessor is the lessee of the Premises by virtue of the "**Master Lease**", wherein _MGM Partnership_ is the lessor, hereinafter the "**Master Lessor**".

6.2  This Sublease is and shall be at all times subject and subordinate to the Master Lease.

6.3  The terms, conditions and respective obligations of Sublessor and Sublessee to each other under this Sublease shall be the terms and conditions of the Master Lease except for those provisions of the Master Lease which are directly contradicted by this Sublease in which event the terms of this Sublease document shall control over the Master Lease.  Therefore, for the purposes of this Sublease, wherever in the Master Lease the word "Lessor" is used it shall be deemed to mean the Sublessor herein and wherever in the Master Lease the word "Lessee" is used it shall be deemed to mean the Sublessee herein.

6.4  During the term of this Sublease and for all periods subsequent for obligations which have arisen prior to the termination of this Sublease, Sublessee does hereby expressly assume and agree to perform and comply with, for the benefit of Sublessor and Master Lessor, each and every obligation of Sublessor under the Master Lease except for the following paragraphs which are excluded therefrom:  _N/A_ .

6.5  The obligations that Sublessee has assumed under paragraph 6.4 hereof are hereinafter referred to as the "**Sublessee's Assumed Obligations**".  The obligations that sublessee has not assumed under paragraph 6.4 hereof are hereinafter referred to as the "**Sublessor's Remaining Obligations**".

6.6  Sublessee shall hold Sublessor free and harmless from all liability, judgments, costs, damages, claims or demands, including reasonable attorneys fees, arising out of Sublessee's failure to comply with or perform Sublessee's Assumed Obligations.

6.7  Sublessor agrees to maintain the Master Lease during the entire term of this Sublease, subject, however, to any earlier termination of the Master Lease without the fault of the Sublessor, and to comply with or perform Sublessor's Remaining Obligations and to hold Sublessee free and harmless from all liability, judgments, costs, damages, claims or demands arising out of Sublessor's failure to comply with or perform Sublessor's Remaining Obligations.

6.8  Sublessor represents to Sublessee that the Master Lease is in full force and effect and that no default exists on the part of any Party to the Master Lease.

**7.    Assignment of Sublease and Default.**

7.1  Sublessor hereby assigns and transfers to Master Lessor Sublessor's interest in this Sublease, subject however to the provisions of Paragraph 8.2 hereof.

7.2  Master Lessor, by executing this document, agrees that until a Default shall occur in the performance of Sublessor's Obligations under the Master Lease, that Sublessor may receive, collect and enjoy the Rent accruing under this Sublease.  However, if Sublessor shall Default in the performance of its obligations to Master Lessor then Master Lessor may, at its option, receive and collect, directly from Sublessee, all Rent owing and to be owed under this Sublease.  In the event, however, that the amount collected by Master Lessor exceeds Sublessor's obligations any such excess shall be refunded to Sublessor.  Master Lessor shall not, by reason of this assignment of the Sublease nor by reason of the collection of the Rent from the Sublessee, be deemed liable to Sublessee for any failure of the Sublessor to perform and comply with Sublessor's Remaining Obligations.

7.3  Sublessor hereby irrevocably authorizes and directs Sublessee upon receipt of any written notice from the Master Lessor stating that a Default exists in the performance of Sublessor's obligations under the Master Lease, to pay to Master Lessor the Rent due and to become due under the Sublease.  Sublessor agrees that Sublessee shall have the right to rely upon any such statement and request from Master Lessor, and that Sublessee shall pay such Rent to Master Lessor without any obligation or right to inquire as to whether such Default exists and notwithstanding any notice from or claim from Sublessor to the contrary and Sublessor shall have no right or claim against Sublessee for any such Rent so paid by Sublessee.

7.4  No changes or modifications shall be made to this Sublease without the consent of Master Lessor.

**8.    Consent of Master Lessor.**

8.1  In the event that the Master Lease requires that Sublessor obtain the consent of Master Lessor to any subletting by Sublessor then, this Sublease shall not be effective unless, within 10 days of the date hereof, Master Lessor signs this Sublease thereby giving its consent to this Subletting.

8.2  In the event that the obligations of the Sublessor under the Master Lease have been guaranteed by third parties, then neither this Sublease, nor the Master Lessor's consent, shall be effective unless, within 10 days of the date hereof, said guarantors sign this Sublease thereby giving their consent to this Sublease.

8.3  In the event that Master Lessor does give such consent then:

(a)  Such consent shall not release Sublessor of its obligations or alter the primary liability of Sublessor to pay the Rent and perform and comply with all of the obligations of Sublessor to be performed under the Master Lease.

(b)  The acceptance of Rent by Master Lessor from Sublessee or any one else liable under the Master Lease shall not be deemed a waiver by Master Lessor of any provisions of the Master Lease.

(c)  The consent to this Sublease shall not constitute a consent to any subsequent subletting or assignment.

(d)  In the event of any Default of Sublessor under the Master Lease, Master Lessor may proceed directly against Sublessor, any guarantors or any one else liable under the Master Lease or this Sublease without first exhausting Master Lessor's remedies against any other person or entity liable thereon to Master Lessor.

_NAB_

_____
INITIALS

Page 3 of 6
Last Edited: 8/17/2018 3:13 PM

_____
INITIALS

© 2017 AIR CRE.  All Rights Reserved.                    SBS-9.02, Revised 11-27-2017

**Exhibit E Page 3 of 11**

(e)   Master Lessor may consent to subsequent sublettings and assignments of the Master Lease or this Sublease or any amendments or modifications thereto without notifying Sublessor or any one else liable under the Master Lease and without obtaining their consent and such action shall not relieve such persons from liability.

(f)   In the event that Sublessor shall Default in its obligations under the Master Lease, then Master Lessor, at its option and without being obligated to do so, may require Sublessee to attorn to Master Lessor in which event Master Lessor shall undertake the obligations of Sublessor under this Sublease from the time of the exercise of said option to termination of this Sublease but Master Lessor shall not be liable for any prepaid Rent nor any Security Deposit paid by Sublessee, nor shall Master Lessor be liable for any other Defaults of the Sublessor under the Sublease.

(g)   Unless directly contradicted by other provisions of this Sublease, the consent of Master Lessor to this Sublease shall not constitute an agreement to allow Sublessee to exercise any options which may have been granted to Sublessor in the Master Lease (see Paragraph 39.2 of the Master Lease).

8.4   The signatures of the Master Lessor and any Guarantors of Sublessor at the end of this document shall constitute their consent to the terms of this Sublease.

8.5   Master Lessor acknowledges that, to the best of Master Lessor's knowledge, no Default presently exists under the Master Lease of obligations to be performed by Sublessor and that the Master Lease is in full force and effect.

8.6   In the event that Sublessor Defaults under its obligations to be performed under the Master Lease by Sublessor, Master Lessor agrees to deliver to Sublessee a copy of any such notice of default. Sublessee shall have the right to cure any Default of Sublessor described in any notice of default if Sublessee does so within the same number of days set forth in the notice of default given to Sublessor. If such Default is cured by Sublessee then Sublessee shall have the right of reimbursement and offset from and against Sublessor.

**9.   Additional Brokers Commissions.**

9.1   Sublessor agrees that if Sublessee exercises any option or right of first refusal as granted by Sublessor herein, or any option or right substantially similar thereto, either to extend the term of this Sublease, to renew this Sublease, to purchase the Premises, or to lease or purchase adjacent property which Sublessor may own or in which Sublessor has an interest, then Sublessor shall pay to Broker a fee in accordance with the schedule of Broker in effect at the time of the execution of this Sublease. Notwithstanding the foregoing, Sublessor's obligation under this Paragraph is limited to a transaction in which Sublessor is acting as a Sublessor, lessor or seller.

9.2   If a separate brokerage fee agreement is attached then Master Lessor agrees that if Sublessee shall exercise any option or right of first refusal granted to Sublessee by Master Lessor in connection with this Sublease, or any option or right substantially similar thereto, either to extend or renew the Master Lease, to purchase the Premises or any part thereof, or to lease or purchase adjacent property which Master Lessor may own or in which Master Lessor has an interest, or if Broker is the procuring cause of any other lease or sale entered into between Sublessee and Master Lessor pertaining to the Premises, any part thereof, or any adjacent property which Master Lessor owns or in which it has an interest, then as to any of said transactions, Master Lessor shall pay to Broker a fee, in cash, in accordance with the schedule attached to such brokerage fee agreement.

9.3   Any fee due from Sublessor or Master Lessor hereunder shall be due and payable upon the exercise of any option to extend or renew, upon the execution of any new lease, or, in the event of a purchase, at the close of escrow.

9.4   Any transferee of Sublessor's interest in this Sublease, or of Master Lessor's interest in the Master Lease, by accepting an assignment thereof, shall be deemed to have assumed the respective obligations of Sublessor or Master Lessor under this Paragraph 9. Broker shall be deemed to be a third-party beneficiary of this paragraph 9.

**10.   Representations and Indemnities of Broker Relationships.**   The Parties each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Sublease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Sublessee and Sublessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**11.   Attorney's fees.**   If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Sublessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**12.   No Prior or Other Agreements; Broker Disclaimer.**   This Sublease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Sublessor and Sublessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Sublease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Sublessor or Sublessee under this Sublease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Sublease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

_NAB_

INITIALS                                                                                                              INITIALS

© 2017 AIR CRE. All Rights Reserved.                                          SBS-9.02, Revised 11-27-2017

# Exhibit E Page 4 of 11

**13. Accessibility; Americans with Disabilities Act.**

    (a)  The Premises:

☑ have not undergone an inspection by a Certified Access Specialist (CASp). Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

    (b)  Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

<u>ATTENTION</u>: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY REAL ESTATE BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS SUBLEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:
1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS SUBLEASE.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO:  THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR SUBLESSEE'S INTENDED USE.

<u>WARNING</u>: IF THE SUBJECT PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE SUBLEASE MAY NEED TO BE REVISED TO COMPLY WITH LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED

| | |
|---|---|
| Executed At: _____ | Executed At: _____ |
| On: _____ | On: _____ |
| **By Sublessor:** | **By Sublessee:** |
| Hyperikon, Inc., a California corporation | Crest Beverage, L.L.C., a Delaware limited liability company |
| By: _Nik_ | By: _(signature)_ |
| Name Printed: NICKLAS BRANDRUP | Name Printed: Timothy S McGuire |
| Title: CO-OWNER | Title: VP of Finance |
| Phone: 888·846·4973 | Phone: 714·933·2400 |
| Fax: | Fax: |
| Email: NAB@hyperikon.com | Email: tmcguire@reyesholdings.com |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: _____ |
| Email: _____ | Email: _____ |
| Address: _____ | Address: Attn: Kevin O'Conney, 8870 Liquid Court, San Diego, CA 92121 |
| Federal ID No.: _____ | Federal ID No.: _____ |

**BROKER**

BROKER
_NAB_
___
INITIALS

_(initials)_
___
INITIALS

SBS-9.02, Revised 11-27-2017

© 2017 AIR CRE.  All Rights Reserved.

**Exhibit E Page 5 of 11**

Jones Lang LaSalle Brokeage, Inc.

Attn: Andy Irwin
Title: Vice President
Address: 8910 University Center Lane, Suite 100, San Diego, CA 92122
Phone: 858-410-6376
Fax:
Email: andy.irwin@am.jll.com
Federal ID No.:
Broker/Agent BRE License #: 01302674

Kidder Matthews

Attn: James Duncan
Title: Senior Vice President
Address: 12230 El Camino Real, 4th Floor, San Diego, CA 92130
Phone: 858-369-3015
Fax:
Email: jduncan@kiddermatthews.com
Federal ID No.:
Broker/Agent BRE License #: 01253770

Consent to the above Sublease is hereby given.

Executed At: _____
Executed On: _____

**By Master Lessor:**
MGM Partnership
By: _____
Name Printed: Sam Grinceri
Title: Partner
Phone: 858-674-4795
Fax: _____
Email: _____

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____

Address: 13359 Old Winery Road, Poway, CA 92064
Federal ID No.: _____

Executed At: _____
Executed On: _____

**By Guarantor:**
By: _____
Name Printed: NICHLAS BRANDRUP
Title: _____
Address: _____

By: _____
Name Printed: _____
Title: _____
Address: _____

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

NAB
INITIALS
© 2017 AIR CRE. All Rights Reserved.

Page 6 of 6
Last Edited: 8/17/2018 3:13 PM


INITIALS
SBS-9.02, Revised 11-27-2017

**Exhibit E Page 6 of 11**



## ADDENDUM
TO STANDARD SUBLEASE

**Date:** ___August_____ , _2018_
**By and Between**
   **SubLessor:** _Hyperikon, Inc., a California corporation_
   **SubLessee:** _Crest Beverage, L.L.C., a Delaware limited liability company_
**Property Address:**   _8515 Miramar Place, San Diego, CA 92121_
                         (street address, city, state, zip)

Paragraph: _14-16_

In the event of any conflict between the provisions of this Addendum and the printed provisions of the SubLease, this Addendum shall control.

**14. Annual Rent Adjustment.** The Base Rent shall be adjusted as follows:

| Term Period | Monthly Base Rent |
|---|---|
| Months 1 – 12 | $58,924.80 |
| Months 13 – 24 | $60,692.54 |
| Months 25 – 36 | $62,513.32 |
| Months 37 – 40 | $64,388.72 |

**15. Operating Expenses.** Sublessee's prorata share of Operating Expenses for the Premises shall be included in the monthly Base Rent. Operating Expenses include, but are not limited to, real estate taxes, common area maintenance expenses and insurance costs. These expenses are presently estimated to be Ten Cents ($0.10) per rentable square foot. The Base Year for the Operating Expenses shall be 2018. In subsequent years, Sublessee shall pay in addition to Base Rent any increases in the Operating Expenses up to a Five Percent (5%) cap.

**16. Yard Area.** Sublessor shall convey to Sublessee the rights to the yard area pursuant to the Master Lease.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

_NAB_
INITIALS
© 2017 AIR CRE. All Rights Reserved.

INITIALS
ADD-1.01, Revised 07-28-2017

**Exhibit E Page 7 of 11**

EXHIBIT A



EXHIBIT A

**Exhibit E Page 8 of 11**

NAB

EXHIBIT B



**YARD AREA**
**(Parking & Loading)**

EXHIBIT B

*NAB*

# Exhibit E Page 9 of 11



## COMMENCEMENT DATE MEMORANDUM

**Date:** _____, 2018

**By and Between**

    **Sub**Lessor: Hyperikon, Inc., a California corporation

    **Sub**Lessee: Crest Beverage, L.L.C., a Delaware limited liability company

**Property Address:** 8515 Miramar Place, San Diego, CA 92121
    (street address, city, state, zip)

THIS MEMORANDUM, made as of _____, 2018 by and between Hyperikon, Inc., a California corporation ("SubLessor") and Crest Beverage, L.L.C., a Delaware limited liability company ("SubLessee").

**Recitals:**

SubLessor and SubLessee are parties to that certain SubLease, dated for reference purposes August _____, 2018 (the "SubLease") for certain premises (the "Premises") commonly known as (street address, city, state, zip) 8515 Miramar Place, San Diego, CA 92121 .

SubLessee is now in possession of the Premises and the Term of the SubLease has commenced.

SubLessor and SubLessee desire to enter into this Memorandum confirming the Commencement Date, the Expiration Date and other matters under the SubLease.

NOW, THEREFORE, SubLessor and SubLessee agree as follows:

1. The actual Commencement Date is _____, 2018 .

2. The actual Expiration Date is January 31, 2022 . Note: Master Lease expires on January 31, 2022.

3. ~~The Base Rent shall be adjusted on the dates indicated as follows: _____ (strike if not applicable)~~

4. ~~Other: _____ (strike if not applicable)~~

5. Capitalized terms not defined herein shall have the same meaning as set forth in the SubLease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date and year first above written.

**By SubLessor**
Hyperikon, Inc., a California corporation

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____
Address: _____
_____
Federal ID No.: _____

**By SubLessee**
Crest Beverage, L.L.C., a Delaware limited liability company

By: _____
Name Printed: Timothy S McGuire
Title: VP of FINANCE
Phone: 714.933.2700
Fax: _____
Email: tmcguire@reyesholdings.com

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____
Address: Attn: Kevin O'Conney, 8870 Liquid Court, San Diego, CA 92121
Federal ID No.: _____

*NAB*
INITIALS

Page 1 of 2
Last Edited: 8/17/2018 3:13 PM

INITIALS

© 2017 AIR CRE. All Rights Reserved.
CDM-2.00, Revised 01-03-2017

# Exhibit E Page 10 of 11

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.



INITIALS



INITIALS

© 2017 AIR CRE.  All Rights Reserved.

CDM-2.00, Revised 01-03-2017

# Exhibit E Page 11 of 11

**MGM PARTNERSHIP**

# INVOICE

**MGM Partnership**

c/o Mary Lee Nuñez
858.254.2573
maryleenunez@
gmail.com

Attention:     Yan He, Alex Kamergorodsky - Hyperikon

Property:      8515 Miramar Place
                San Diego CA 92121

Date:          13 May 2021
Invoice #:      13052021
Terms:         10 Days

Pay to:        MGM Partnership

                via electronic transfer

| Description | | |
|---|---|---|
| Rent - March 2021 | | $  53,424.75 |
| Common Area Maintenance Charges | | $   1,858.14 |
| Late Charges | Per Item 13.4 of Standard Commercial Multi-Unit Lease dated 8/12/2016 | $   5,342.48 |
| | | |
| Rent - May 2021 | | $  53,424.75 |
| Common Area Maintenance Charges | | $   1,858.14 |
| Late Charges | | $   5,342.48 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total Due** | | **$121,250.74** |

# Exhibit F Page 1 of 1